**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**PEGGY BANKS**, individually and on behalf of a class of all persons and entities similarly situated,

                    *Plaintiff,*

          v.

**SUNRUN, INC**,

                    *Defendant.*

Case No. 4:24-cv-07877-JST

Presiding: **Jon S. Tigar**

**EXPERT DECLARATION OF AARON WOOLFSON**

I, Aaron Woolfson, state and declare as follows:

1.      I have been retained by Plaintiff's counsel to provide structure to, and then analyze, the electronic Call Detail Records ("CDR" or "CDRs"), customer lists, and other associated information that has been, or will be, provided in this lawsuit reflecting the calling done by Sunrun, Inc. ("Sunrun, Inc." or "Sunrun" or "Defendant").

2.      More specifically, I have been asked to opine whether there is a reliable method to identify which calls in CDR reports maintained by Defendant's dialing platform vendor were outbound telephone calls that had (a) been dispositioned with "*Answering Machine*" or "*No Answer/VM/Cont to Call - NON FINAL*" that were made to telephone numbers that had been that were on the national Do-Not-Call ("DNC") list for more than thirty (30) days, and two (2) or more calls had been placed to that number within 365 days; or, (b) were made thirty (30) days or more after the numbers had been placed on an internal do-not-call ("IDNC") list.

3.      As described in this declaration, it is my conclusion that using call records produced in this matter there is a reliable method to identify outbound telephone calls that (a) had been dispositioned with "*Answering Machine*" or "*No Answer/VM/Cont to Call - NON FINAL*" that were made to telephone numbers that had been that were on the national DNC list for more

1

Declaration of Aaron Woolfson                                    Case No. 4:24-cv-07877-JST

than thirty (30) days, and two (2) or more calls had been placed to that number within 365 days; or, (b) calls that were made thirty (30) days or more after the numbers had been placed on an IDNC list.

4.    I was not retained in this matter to determine the legal standards of any court decisions or their applicability to this case, and I was not involved in the sampling or selection of data provided by the Defendants. This report reflects the results of my study of the underlying facts, independent analysis of the data and documents provided by Motive to counsel for Plaintiff, and third parties.  My rate is $440.00 per hour for expert engagements, and $675.00 per hour for depositions, trial, and arbitration appearances.

5.    I am personally familiar with the matters that are contained within this declaration, and if called to testify, I can accurately and competently testify as to them.

**Qualifications and Expert Engagements.**

6.    I have over 25 years of experience in developing and analyzing databases and telephone systems and establishing the interfaces between telephone systems and the networks that convey calls.  I have implemented call recording and call data collection and retention systems for commercial, government, aerospace, telecommunications, and payroll industries.   My professional experience includes serving as an expert witness in cases where I evaluated the technical aspects of telephone systems, including whether they had a random or sequential number generator.

7.    My qualifications and curriculum vitae are attached to this expert report as Exhibit 1.  A list of the other cases in which I have testified as an expert at trial or by deposition during the previous four years is attached as Exhibit 2.  I have been qualified by both Federal and State courts.[1]  My testimony has been relied upon by courts in both individual and class actions,[2]

---

[1]  *ABM Industries Overtime Cases* (Case No. JCCP 4502, San Francisco Superior Court) (2017) 19 Cal. App. 5th 277, footnote 5, at page 8, ("[T]here was evidence in the record that Woolfson had previously qualified as an expert in both state and federal court ...") (*ABM Industries Overtime Cases*, A132387, A133077, A133695, 19 Cal. App. 5th 277 (Dec. 11, 2017; pub. ord. Jan. 10, 2018)). (Exhibit 3).

[2]  "The Court notes that Mr. Woolfson's expert report appears to include information related to the (footnote continued)

2

Declaration of Aaron Woolfson                                    Case No. 4:24-cv-07877-JST

by plaintiffs and defendants. My opinions have also been relied upon in arbitrations, including those involving TCPA claims.

8.    I was the developer of the automated Verification of Deposit ("VOD") and Verification of Mortgage ("VOM") system that was used by Chase, Wells Fargo, Bank of America, as well as some regional banks and mortgage lenders, to facilitate the review of mortgage applications by call center staff. These systems required a great deal of integration between the telephone systems and the financial institution's computer systems, and relied heavily on my deep understanding of database and timekeeping integration technologies. It also required me to build interfaces to the ACH[3] exchanges, and with Global Payments and other large automated electronic inter-exchanges of financial information. Other processes necessitated integrating fax and OCR[4] capabilities as well as enhanced call routing – inbound and outbound – including predictive elements of enhanced call processing, and the precise timings of these events.

9.    I am the inventor of "Canvas", a programming language that I developed for interfacing between telephone systems and telephone networks, capable of processing hundreds of thousands of calls a day. To date, hundreds of millions of calls have been handled by Canvas on behalf of call centers, financial institutions, conference calling companies, and organizations offering Interactive Voice Response ("IVR") services.[5]

10.    I have developed highly available, upwardly scalable databases for use in the telecommunications industry. The databases and telephone systems that I have personally

merits of the case in addition to class certification issues." *Gaines v. Law Office of Patenaude & Felix, A.P.C.*, Case No. 3:13-cv-01556-JLS-DHB (S.D. Cal.), Sep. 21, 2015, ECF 132, at 3.

[3] Automated Clearing House ("ACH").

[4] The OCR ("Optical Character Recognition") process as integrated into the automatic monitoring of telephone calls in real time to determine whether the call was a voice or fax call, and if a fax call, decoding the contents of each fax-page into machine readable text *while* a fax was being transmitted to the bank's computers for integration with a database.

[5] IVR is a technology that allows a computer to interact with humans through the use of voice and/or DTMF tones inputted via a telephone keypad. DTMF ("Dual Tone Multi Frequency") is the signal you generate when you press a telephone's touch keys.

3

Declaration of Aaron Woolfson                                    Case No. 4:24-cv-07877-JST

developed and/or coded are used by telephone companies and call centers throughout the United States and Canada to catalogue and index various customer-calling activities. Some of the companies that have used my databases and/or telephone equipment (which I personally created and manufactured) have included Japan Telecom, Experian, Bank of America, Wells Fargo Bank, JP Morgan, Bank of the West, Cogent Communications, Zone Telecom (ANPI), Aion Networks, Smartcall Conferencing, and First National Collection Bureau, Inc., and the United States government, including the Department of Justice.

11. Through my hands-on work experience in developing databases and telephone systems, I have become very familiar with the technology related to telephone systems and their interfaces with the networks through which calls are processed, received, and transmitted. I am also familiar with how dialing systems work, and how telephone systems handle inbound and outbound calls.

12. I have been responsible for the design and development of specialized hardware and software systems that are highly dependent upon the capabilities of the computers upon which they run, and are in use at mission-critical applications, including Patriot Missile (SAIC, Patriot RTOS), Air Traffic Control Systems (Kongsberg Geospatial Corporation), and Point Lepreau Nuclear Generating Station, New Brunswick, Canada (Energié NB).

13. I held a Certificate of Public Convenience and Necessity[6] ("CPCN") – a special license and compliance certification granted to companies that provide essential public services, such as telephone corporations. The California Public Utilities Commission granted my most recent CPCN on July 18, 2017. This was a re-issue of my initial CPCN granted to TelSwitch, Inc. on June 10, 1994, which I held for approximately eighteen (18) years before taking a hiatus from providing public telephone services. The license originally granted to me in 1994 allowed me to interconnect the equipment that I designed, built and programmed, with the phone network for the purpose of providing wholesale and retail telecommunications services.

---

[6] Certificate of Convenience and Necessity U-5410-C granted to TelSwitch, Inc. on 06-10-1994 (Decision 94-06-022). Reissued as U-7327-C on 07-18-2017 (Decision 17-07-009).

4

Declaration of Aaron Woolfson                                    Case No. 4:24-cv-07877-JST

14. I have also been qualified as an expert in matters involving the TCPA and have previously been engaged on behalf of defendants and plaintiffs to analyze records of calls and, among other things, compare call records for their inclusion on the national DNC list.

15. For example, in *Wright v. eXp Realty, LLC*, No. 6:18-cv-01851-PGB-EJK (M.D. Fla.), I was engaged on behalf of <u>defendant</u> eXp to analyze call records and, among other things, compare them against records of leads from various sources, and to identify which numbers were authoritatively associated with telephone companies on the dates that the calls were made.

**Expertise Specifically Related to Database Work.**

16. I was relied upon as an expert witness in the case of *Hines v. KFC*, filed in the United States District Court, Southern District of California (Case No. 09cv2422 JM (POR)). In *Hines*, the court granted plaintiff's motion for class certification and certified plaintiff's meal period and rest break claims based on my analysis after finding that I am an "expert in the compilation and analysis of databases …."

17. I was expert for the plaintiffs in *Albert H. Cicairos, Frank A. Daniel, Richard Wheeler and George Thompson v Summit Logistics, Inc.* and *Kenneth Bluford v Safeway Stores, Inc.* (Case No. CV014837 [Consolidated with Case No. CV028541] Superior Court of California, County of San Joaquin).

18. In addition, I served as an expert in the *ABM Industries Overtime Cases* (Case No. JCCP 4502, San Francisco Superior Court). Relying upon my expert finding, the Appellate Court reversed the trial court's ruling and certified the plaintiffs' proposed wage and hour classes. The court noted that there was sufficient evidence contained within my expert report to support certification of the classes and subclasses, and that my experience was sufficient to allow my expert report to be admitted as evidence for that purpose. (Exhibit 3).

19. I was also expert in *Beatriz Aldapa And Elmer Avalos v. Fowler Packing Company, Inc., Ag Force, LLC, Fowler Marketing International LLC,* (Case No. 1:15-CV-00420-DAD-SAB ED, Ca.), where the employer used Datatech to maintain an accounting of piece-work and non-piece-work hours worked by agricultural workers. The court order in *Fowler Packing* is attached as Exhibit 4.

5

Declaration of Aaron Woolfson                    Case No. 4:24-cv-07877-JST

20.    I have applied similar methods to structure large amounts of unstructured data on behalf of defendants Verizon Wireless and Collecto in *Lofton v. Verizon* (Case No. 3:13-cv-05665) and *Lofton v. Collecto* (Case No. 4:13-cv-03293-YGR). In *Lofton v. Collecto*, I was ordered by the District Court of the Northern District of California to reconstruct a database from information that was in Verizon's possession that the plaintiff stated was "un-structurable" and useless for purposes of analysis and determination of the results of calls that took place. I was able to complete the re-structuring of Verizon's data so that the parties could reach a successful settlement. The portion of the Court's Order from *Lofton v. Verizon* instructing me to create a database from Verizon's unstructured data is attached as Exhibit 5.

21.    I engaged on behalf of plaintiff Michael Anthony in *Michael Anthony v. The Federal Savings Bank, National Bancorp Holdings, Inc. and FDE Marketing Group LLC* (Case No. 1:21-cv-02509, ND, Il, Eastern Div.) in which I undertook a comprehensive analysis of the Defendants records in support of class certification. The order granting class certification is attached as Exhibit 6.

22.    I was also engaged on behalf of plaintiff Robert Mason in *Robert Mason et al v. Spring EQ* (Case No. 5:24-cv-01833-MWC-AGR, CD, Ca). In the court's order denying defendant's motion to decertify the class, the course stated that the plaintiff has sufficiently identified a method by which an expert can separate residential from business numbers and that "The fact that most of the numbers identified by Defendant did not appear in the post-Waterfall dataset, as Mr. Woolfson attests, further suggests the method is reliable. Defendant's new evidence does not compel a different result" (ECF 166, page 12 of 14). The court's order is attached as Exhibit 7.

**Expertise Specifically Related to Outbound Dialing Systems in Call Centers.**

23.    I have over twenty-five years of hands-on experience in telecommunications, in the design and programming of the equipment that handles calls. In specific, I was responsible for the development of specialized hardware and software systems, called Rapid Announce and Rapid Record that have been used in both telephone company central offices and in call centers,

6

Declaration of Aaron Woolfson                                    Case No. 4:24-cv-07877-JST

for the pacing, dialing, and measurement of phone calls, and has cumulatively handled hundreds of millions of calls.  At its peak use, Rapid Announce processed 240,000 inbound and 280,000 outbound calls per day for companies such as First National Collection Bureau.

24.    Rapid Announce was primarily used to match the pacing of outbound calls with the availability of agents to accept the calls once they were answered.  Rapid Announce also evaluated the connected calls to determine whether the phone was answered by an answering machine or a live person.  Based upon the availability of the agents and the type of call that was being placed, the system would then transfer the call to the correct type of agent, or skill-set group, to handle the particular circumstances for which the call was received, or dialed.

25.    Rapid Record was responsible for handling the recording and media storage of inbound calls, as well as the implementation of a technology that I developed called AggravationSense.  AggravationSense was designed to measure the cadence and speed at which an individual spoke.  By measuring the cadence and speed of the speech against a baseline of background noise, AggravationSense would proactively patch in a customer service supervisor in advance of any party asking to speak with one.

**Materials and Documents Reviewed and Relied Upon.**

26.    In conducting my analysis and preparing my conclusions and opinions, I relied upon the following materials and information:

`

I.    **Materials that I relied upon in connection with my Declaration:**

(a)    Complaint (ECF 1); and,

(b)    Call Detail Files containing 5,398,230 records of calls:
*SUNRUN-PB-000163.xlsx*
*SUNRUN-PB-000164.xlsx*
*SUNRUN-PB-000165.xlsx*
*SUNRUN-PB-000166.xlsx*
*SUNRUN-PB-000167.xlsx*
*SUNRUN-PB-000168.xlsx*

(c)    Contact [type] information for the Named Plaintiff:
*SUNRUN-PB-000067.xlsx*

7

Declaration of Aaron Woolfson                               Case No. 4:24-cv-07877-JST

**II.      Electronic database resources that are available:**

(a)      The North American Numbering Plan Administrator's Numbering Plan Area Report Sorted by Location; and,

(b)      The National Exchange Carrier Association ("NECA") North American Numbering Plan 1000-block assignments database; and,

(c)      External, publicly available databases, including iConectiv's WDNC[7,8] for use in identifying the type of line and the Federal TCPA-eligible area code (and DNC) list that is published daily by the FTC[9]

(d)      Reassigned Number Database ("RND") made available to me by Somos.

**Methods and Tools Used to Analyze Records.**

27.    I create and analyze databases using Structured Query Language (SQL). A database is a computerized compilation of data organized into tables, each table having columns (attributes), with column headings, and rows of information. Tables that share at least one attribute in common are "related." Tables without a common attribute may still be related via other tables with which they do share a common attribute. The pathways relating those separate tables are called "joins." Once tables have been related by a join, a user may view the combined information in the joined tables to derive new and/or useful information. To access such

[7] FCC order FCC-15-35A1 (03/27/2015) explicitly mandated *continued* availability of iConectiv's data for purposes stemming from the TCPA. (¶.142). The historical information *does not* contain subscriber information, only carrier of record and line type. Before number portability, this would have been a simple task of looking at the Local Exchange Routing Guide ("LERG"), or absent access to the LERG, finding the area codes and prefixes from an online collection of national phone books. TelSwitch, Inc. is a reseller and authorized user of iConectiv data.

[8] In *Perrong v Call Identified as Connor* (Case No. 1:22-cv-04479-CPO-EAP, DC, New Jersey, Camden Vicinage), "plaintiff has queried the database of iConectiv, the company charged by the Federal Communications Commission to administer the Number Portability Administration Center, which is the master database which lists which telephone provider services a particular number, among other information required to route telephone calls to the proper provider" (ECF 3). I was not the expert in *Perrong v Caller Identified as Connor*, nor did I provide the data.

[9] TelSwitch, Inc's FTC Organization ID is 10159990-70991, Subscription Account Number (SAN) 10418065-518065-25.

8

Declaration of Aaron Woolfson                                    Case No. 4:24-cv-07877-JST

information, a user sends queries to the database, which executes the queries and retrieves the requested information from the tables in the database. A database, however, only recognizes queries written in complex "query languages."  The most common query language is SQL.  A proper query in this language consists of one or more "clauses."  Common types of clauses are SELECT, WHERE, FROM, HAVING, ORDER BY, and GROUP BY clauses.  Thus, to compose a proper inquiry, a user must understand the structure and content of the relational database as well as the complex syntax of the specific query language.

28.    When analyzing call records, I start by creating a database to serve as a repository for the call records. I then create a set of tables to accumulate the results of the identifiers related to the telephone calls, such as isPorted, isWireless, mostRecentPortDate, state, and operating (telephone) company number.[10]

29.    I use standardized SQL queries to tag each call (text) record according to (a) any data field contained in the text records, including the telephone number called, the date of a text message, the duration and disposition of any text; and (b) any data field contained in any associated leads records.  I am also able to add (c) whether the telephone number to which the text had been sent was on the national DNC list, and if so, whether the number had been indicated on the DNC list for more than thirty (30) days as of the transmission. This is precisely the task that I have undertaken in this matter upon the data.

30.    I am guided by my many years of experience with these precise tasks, and I personally constructed all SQL statements myself and am the sole author of all work product associated with the methodologies I have (and will) undertake.

---

[10] As stated on iConectiv's website, "We may disclose information that individually identifies our customers in certain circumstances, such as to comply with valid legal process including subpoenas, court orders or search warrants, and as otherwise authorized by law." (https://numberportability.com/privacy-policy – last visited 01/11/2026).  This includes the line types (e.g. wireless or wireline), the telephone operating company numbers, and whether the number had been ported.

Declaration of Aaron Woolfson                    Case No. 4:24-cv-07877-JST

**Steps I take when Organizing and Analyzing Call Records.**

31.    I start by opening each of the files that contain call records data (collectively referred to as "Call Detail Records" or "CDRs").  I do this to (a) determine the format that the call records were stored in, and then (b) to determine what pre-processing I would need to conduct in order to achieve an import of the calls.[11]

32.    I then import the CDRs file into SQL database tables using Microsoft SQL™ Service Management Studio to apply a set of filters to include only calls to valid telephone numbers that were made that:

    a.   Were made to a number that contained precisely ten digits; and,

    b.   Were made to a number that started with a 2 through 9; and,

    c.   Were contained within structurable data[12]; and,

    d.   Had an associated date; and,

    e.   Whether a call indicated a duration greater than zero, and whether the records contained a disposition indicating "*Answering Machine*" or "*No Answer/VM/Cont to Call - NON FINAL*"; and,

    f.   Were placed to area codes that were subject to the TCPA, according to the FTC (Appendix A).

I also tagged calls to indicate whether:

    g.   Whether the number was on the national DNC list for more than thirty (30) days; and, whether a number had been called two (2) or more calls within 365 days; and,

    h.   Whether the number to which calls had been placed had been on the internal DNC list for thirty (30) or more days before the call; and,

    i.   Whether the number to which those calls had been placed that *had been*

---

[11] I typically do not need to apply any pre-process to the CDRs, as most CDRs originate from electronic call data capture systems that are already Electronic Data Interface ("EDI") capable.

[12] I conducted this to confirm that the calls were structurable and conformed to a normalized database layout specification in which data is aligned to the designated columns.  (e.g. all data was contained in the columns allocated for that proper data type).

Declaration of Aaron Woolfson                            Case No. 4:24-cv-07877-JST

placed thirty (30) or more days *after* IDNC, had connected.

33.    I also prepared the framework for a set of data files that can be used to exchange with the telephone companies that can be used to identify the subscriber to the telephone number, based upon a well-defined format called an Electronic Data Interchange ("EDI") format, to query the telephone company databases in order to obtain the subscribership information.

**Telephone Companies databases maintain subscriber information and residential / business line classifications in electronic format as part of their standard record keeping.**

34.    Wireless and wireline carriers maintain historical records that can be used to identify the residential or business classification for any particular phone number, as well as contact information (Exhibit 8, properly redacted) As part of record-keeping requirements imposed upon them by the FCC, telephone companies must maintain those items for the reporting of residential and business line classifications, as well as being able to respond to subpoenas. They also use this information to route customer service calls to the correct residential or business service center,

35.    The line type and customer information attributes are also maintained to support local-number-portability ("LNP") requests.  In other words, when someone wishes to move their number from one carrier to another, they are required to provide certain requisite information, such a name and contact information, which must match then match the other carrier's records from where the number was being ported.  These exchanges of port-in/port-out requests are handled electronically, and exchanged between and amongst the phone carriers[13] using a process

---

[13] LNP includes both non-mobile and mobile carriers.  Companies, regardless of the carrier type are required to support Local Number Portability ("LNP").  The National Portability Administration Center ("NPAC") is responsible for maintaining the database of the national numbering inventory, and as part of the FCC's order granting authority to iConectiv to maintain this, they agreed to continue to make data available for purposes stemming from the TCPA. (FCC 15-35, ¶ 142).

11

Declaration of Aaron Woolfson                               Case No. 4:24-cv-07877-JST

called Electronic Data Interchange ("EDI") protocol. The EDI process encompasses a well-defined, regimented set of informational exchanges, and provides an efficient manner to handle, and route, port-in and port-out requests using a common set of data attributes.

36.    I have become familiar with the manner in which telephone companies maintain these records to handle their own customer service and reporting requirements, as well as to provide support for the EDI protocol. Both in my role in providing billing and customer service software to phone companies, and in my role as a consulting expert for phone companies who are involved in litigation, I am familiar with the type of information that phone companies maintain on behalf of their customers.

37.    As an example, I was the expert for Verizon Wireless in *Lofton v. Verizon Wireless (VAW) LLC*, No. 13-cv-05665-YGR (N.D. Cal.). In the course of my work on that case, I came to understand that Verizon Wireless maintained records of which numbers were residential or business subscribers. In addition, I learned which types of information, which included line subscribership details that were maintained on a historical basis. Similarly, I am aware that other companies, such as AT&T Wireless and T-Mobile, maintain similar information for both compliance and customer support purposes. This information is also maintained so that calls for invoicing purposes can be rated and billed properly, and so that subpoenas can be properly responded to.

38.    I also formerly ran a consumer telephone company, called Tel-One Network Services, which was similarly expected to maintain both business and residential information on subscribers' numbers, as well as contact information. Part of my responsibility at Tel-One Network Services was to interface with other telephone companies such as Pacific Bell (now AT&T) during the process of onboarding new subscribers, because we had to work with the proper business or residential department, depending upon the type of the product being offered.

12

Declaration of Aaron Woolfson                                    Case No. 4:24-cv-07877-JST

**Waterfall Analysis 1. Steps that I applied to the Defendant's data determine the number of calls and the quantity of unique numbers that received calls where the called number had received two or more calls within 365 days while the number had been on the national DNC list for more than thirty days.**

39.     I started with the set of data that was provided, which included 5,398,230 calls within the source file listed in paragraph 26(I)(b). I started by removing 2,192 records that appeared that they were duplicative of another call in the production.  I then removed 12,861 calls that were made to numbers that was not contained within the FTC's index of TCPA-eligible area codes.  This resulted in 5,383,177 remaining calls.

40.     From the remaining 5,383,177 calls, I removed 2,230,257 calls that indicated a zero duration, or disposition did not indicate "*Answering Machine*" or "*No Answer/VM/Cont to Call - NON FINAL*".  This resulted in 3,152,920 remaining calls.

41.     From the resulted in 3,152,920 remaining calls, I removed 1,592,930 calls to any telephone number to which the call was placed was not indicated as having been contained on the national DNC list for more than thirty (30) days.  Finally, I removed 8,066 calls to those telephone numbers that *had* been on the national DNC list for more than thirty (30) days, but had not received two (2) or more calls within 365 days.

42.     This left a total of 1,551,924 telephone calls that had been placed to 53,113 unique telephone numbers, including thirty-one (31) calls to the Named Plaintiff's number ending in -5370.

| | |
|---|---|
| All items within "Defendant Call Records" files [callLogs]: Production: | 5,398,230 |
| Removal of any duplicate call records (e.g. Removal of any records from the remaining call detail records ("CDR") where the call was recorded duplicatively. | (2,192) |
| Removal of any number that was not part of the FTC's list of valid TCPA-eligible north american numbering plan destination area codes, or records indicating a telephone number that was not ten digits, or the record did not have a properly formatted date/time. | (12,861) |
| Calls with zero duration | (63,259) |

13

Declaration of Aaron Woolfson                                 Case No. 4:24-cv-07877-JST

| Removal of any record that indicated a disposition that was not tagged as ("Answering Machine" or "No Answer/VM/Cont to Call - NON FINAL") (same dispositions as the named plaintiff) | (2,166,998) |
|---|---|
| Remval of any call that was not on the DNC list for more than thirty days | (1,592,930) |
| Removal of calls that were connected, but there were not two (2) or more calls within 365 days: | (8,066) |
| Quantity of unique numbers to which the **1,551,924** calls were placed, where the # was on the DNC list for more than thirty days, and 2 or more calls within 365 days resulted in a call that did not contain a disposition of **"Answering Machine"** or **"No Answer/VM/Cont to Call - NON FINAL"** This includes **31** calls to the Named Plaitiff's number. | 53,113 |

**Waterfall Analysis 2**. **Steps that I applied to the Defendant's data determine the number of calls and the quantity of unique numbers that received calls where the number had been wireless and had not been ported within fifteen days of the call, and the call result in the conveyance of a pre-recorded message.**

43.    I started with the set of data that was provided, which included 5,398,230 calls within the source file listed in paragraph 26(I)(b). I started by removing 2,192 records that appeared that they were duplicative of another call in the production. I then removed 12,861 calls that were made to numbers that was not contained within the FTC's index of TCPA-eligible area codes. This resulted in 5,383,177 remaining calls.

44.    From the remaining 5,383,177 calls, I removed 63,259 calls that indicated a zero duration. From the resulting 5,319,918 remaining calls, I removed 5,185,581 calls to numbers that had not been placed on the Defendant's internal do-not-call list. This left a total of 134,337 remaining calls to numbers that had been tagged as IDNC.

45.    From the 134,337 remaining calls to numbers that had been tagged IDNC, I removed 121,760 calls placed to numbers *before* they had been placed on the IDNC list and 1,473 calls that were placed to numbers *less than* thirty (30) days *after* the number had been tagged as IDNC. I also removed 5,277 calls that did not indicate that a call had connected.

14

Declaration of Aaron Woolfson                                    Case No. 4:24-cv-07877-JST

46.    This left a total of 5,827 calls that had been placed to 199 unique telephone numbers, not less than thirty (30) days after inclusion on the IDNC list.  This includes two (2) calls to the Named Plaintiff's number ending in -5370.

| | |
|---|---:|
| All items within "Defendant Call Records" files [callLogs] : Production: | 5,398,230 |
| Removal of any duplicate call records (e.g. Removal of any records from the remaining call detail records ("CDR") where the call was recorded duplicatively. | (2,192) |
| Removal of any number that was not part of the FTC's list of valid TCPA-eligible north american numbering plan destination area codes, or records indicating a telephone number that was not ten digits, or the record did not have a properly formatted date/time. | (12,861) |
| Calls with zero duration | (63,259) |
| Calls to numbers that were *never* tagged with **"DO NOT CALL"** (e.g. internal DO NOT CALL list) | (5,185,581) |
| removal of any calls to a number on or before the initial DNC tag: calls2_beforeIDNC | (121,760) |
| Removal of any calls that were after the initial DNC tag, but less than thrity (**30**) days *after* the internal DNC tag | (1,473) |
| Removal of any calls that did not appear to contain a disposition indicating a connected call: | (5,277) |
| Quantity of unique numbers to which the **5,827** calls that were tagged as connected, where the # was to which the call had been placed was indicated as having been on the internal DNC, and the call was placed not less than thirty (30) days following the date of having been tagged as "DO NOT CALL", includes two (**2**) calls to named plaintiff. | 199 |

15

Declaration of Aaron Woolfson                                    Case No. 4:24-cv-07877-JST

**Conclusions:**

**Telephone calls to numbers where the number had been on the national DNC list for more than thirty (30) days and had received two (2) or calls within 365 days.**

47.    This left a total of 1,551,924 telephone calls that had been placed to 53,113 unique telephone numbers, where the numbers to which the calls had been placed received two (2) or more calls within 365 days, including thirty-one (31) calls to the Named Plaintiff's number ending in -5370

| Date/Time | Status |
| --- | --- |
| 7/10/24 5:29 PM | No Answer/VM/Cont to Call - NON FINAL |
| 7/10/24 5:30 PM | No Answer/VM/Cont to Call - NON FINAL |
| 7/11/24 5:42 PM | No Answer/VM/Cont to Call - NON FINAL |
| 7/11/24 5:43 PM | No Answer/VM/Cont to Call - NON FINAL |
| 7/11/24 5:44 PM | No Answer/VM/Cont to Call - NON FINAL |
| 7/11/24 5:44 PM | No Answer/VM/Cont to Call - NON FINAL |
| 7/11/24 5:47 PM | No Answer/VM/Cont to Call - NON FINAL |
| 7/11/24 5:48 PM | No Answer/VM/Cont to Call - NON FINAL |
| 7/12/24 5:04 PM | No Answer/VM/Cont to Call - NON FINAL |
| 7/12/24 5:19 PM | No Answer/VM/Cont to Call - NON FINAL |
| 7/12/24 5:58 PM | No Answer/VM/Cont to Call - NON FINAL |
| 7/14/24 5:18 PM | No Answer/VM/Cont to Call - NON FINAL |
| 7/14/24 5:20 PM | No Answer/VM/Cont to Call - NON FINAL |
| 7/14/24 5:22 PM | No Answer/VM/Cont to Call - NON FINAL |
| 7/14/24 5:29 PM | No Answer/VM/Cont to Call - NON FINAL |
| 7/15/24 5:27 PM | No Answer/VM/Cont to Call - NON FINAL |
| 7/15/24 5:47 PM | No Answer/VM/Cont to Call - NON FINAL |
| 7/15/24 5:49 PM | No Answer/VM/Cont to Call - NON FINAL |
| 7/15/24 5:53 PM | No Answer/VM/Cont to Call - NON FINAL |
| 7/16/24 5:41 PM | No Answer/VM/Cont to Call - NON FINAL |
| 7/17/24 5:03 PM | No Answer/VM/Cont to Call - NON FINAL |
| 7/17/24 5:17 PM | No Answer/VM/Cont to Call - NON FINAL |
| 7/18/24 5:18 PM | No Answer/VM/Cont to Call - NON FINAL |
| 7/18/24 5:26 PM | No Answer/VM/Cont to Call - NON FINAL |
| 7/24/24 5:30 PM | Answering Machine |
| 7/30/24 5:06 PM | Answering Machine |
| 8/12/24 5:53 PM | Answering Machine |
| 8/12/24 5:59 PM | Answering Machine |
| 8/13/24 5:54 PM | Answering Machine |
| 8/14/24 5:02 PM | Answering Machine |
| 8/15/24 5:41 PM | Answering Machine |

16

Declaration of Aaron Woolfson                    Case No. 4:24-cv-07877-JST

**Telephone calls to numbers where the number had been on the internal DNC list, and received one or more calls not less than thirty days *after* inclusion on the IDNC.**

48.   I was able to determine that 5,827 calls had been placed to 199 unique telephone numbers where the number had been on the IDNC list not less than thirty (30) days. This includes two (2) calls to the Named Plaintiff's number ending in -5370.

| | |
|---|---|
| 8/14/24 5:02 PM | Answering Machine |
| 8/15/24 5:41 PM | Answering Machine |

49.   Attached as Exhibit 9 are the SQL queries that I ran to conduct my analysis.  Exhibit 10 contains a summary of the results of the analysis of calls that were within the two waterfall categories.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed this January 12th, 2026 in Pleasant Hill, California.

Aaron Woolfson

17

Declaration of Aaron Woolfson                                    Case No. 4:24-cv-07877-JST