# EXHIBIT F

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PEGGY BANKS, individually and on behalf of all others similarly situated, | )CASE NO. )3:24-CV-07877-JST )(updated No. )4:24-CV-07877) |
| Plaintiff, | ) |
| v. | ) |
| SUNRUN INC. | ) |
| Defendant. | ) |

REMOTE VIDEOTAPED DEPOSITION OF PEGGY BANKS, TAKEN PURSUANT TO SUBPOENA AND NOTICE ON BEHALF OF THE DEFENDANT, ON TUESDAY, MAY 5, 2026, AT 9:03 A.M., AT NORCO, CALIFORNIA, BEFORE WENDY DRISCOLL, CERTIFIED SHORTHAND REPORTER NUMBER 12480.

A P P E A R A N C E S

(REMOTELY)

FOR THE PLAINTIFF:

OLIVER LAW CENTER, INC.
BY: DANA OLIVER, ATTORNEY AT LAW
8780 19TH STREET
SUITE 559
RANCHO CUCAMONGA, CALIFORNIA 91707
(855) 384-3262
Dana@danaoliverlaw.com

-- AND --

PERRONG LAW, LLC.
BY: ANDREW PERRONG, ATTORNEY AT LAW
2657 MOUNT CARMEL AVENUE
GLENSIDE, PENNSYLVANIA 19038
(215) 2225-5529
Info@perronglaw.com

FOR THE DEFENDANT:

KELLEY DRYE & WARREN LLP
BY: GLENN T. GRAHAM, ATTORNEY AT LAW
7 GIRALDA FARMS
SUITE 340
MADISON, NEW JERSEY 07940
(973) 503-5900
Ggraham@kelleydrye.com

ALSO PRESENT:

ANGELA LYONS, VIDEOGRAPHER

KIM FURTADO, ESQ.

Q And what was the nature of your testimony, if you can recall?
A Just um, things that happened during the marriage. The reason for the divorce.
Q Where was that proceeding held?
A In -- it was in Pomona courthouse in Los Angeles County.
Q Do you recall the approximate year of the proceeding?
A Um, approximate year, let's see, it would have been like -- we were separated in 2014. And then it took about five years, four to five years to finalize.
Q It was before Covid?
A Yes, it was.
Q Fair to say around 2019?
A Correct. Before, yes.
Q Besides the testimony at your divorce proceeding, have you ever testified under oath in any other manner?
A No.
Q Are you represented by counsel today?
A Yes.
Q Who is your attorney?
A Dana Oliver and Andrew Perrong.
Q Mr. Oliver is here today; is that right?

with Symmetry Financial Group." Do you see that?
A Yes.
Q And underneath is the e-mail, the business e-mail, and the other link is the website, the Peggybankslifeagency.com that we discussed?
A Yes.
Q And further down, it entails, again, the phone number listed again as the -5370 number and the address I believe is your home address in Norco; is that correct?
A Correct.
Q Does this refresh your recollection as to whether you submitted this information?
A I still -- I still don't know if I did. I may -- I must have if it shows claimed. I don't know how else they would have that marked.
Q You can take that exhibit down.
A Okay.
Q Ms. Banks, have you ever filled out any online web forms about solar information or solar quotes?
A Not that I recall, no.
Q Have you ever requested information about solar products or services in any other manner?
A I may have had a conversation with someone, but I never requested phone calls from Sunrun.
Q Let's talk about that conversation. Do you

recall the substance of it?
A It was a post on Facebook. Somebody was asking about solar panels, and there was an agent from a -- it was a different company altogether that was answering questions and I just was answering -- it was all on Facebook. So I was going back and forth -- I don't even remember what the substance was.
Q When was this conversation?
A Um, it would have been quite a few years ago.
Q Prior to May '25?
A Yes.
Q Were you requesting information about solar power or were you responding to questions?
A I was requesting information, but not -- just asking clarifying questions basically.
Q Do you recall who you were requesting this information from?
A Um, I don't know for sure what his name was.
Q Was this conversation happening live time or was it over posting?
A Over posts.
Q Did this individual send you a link to fill out any information?
A No.
Q Did you provide your information to this person?

A Um, not that I recall.
Q Do you delete posts from Facebook?
A I have, in my timeline, if I feel it's not relevant anymore or...
Q Do you recall if this post is still on your timeline or has it been deleted?
A That one wasn't on my timeline, it was a Google group. I wouldn't have access to delete it. It was somebody else's post.
Q So what was the local group?
A Norco, I believe it's called "Norco Uncensored."
Q You still have access to that group?
A I do. But it wasn't my post so I wouldn't be able to find it. Because I -- I didn't post the initial post, so I would have no way of finding it. I wouldn't know what to search for.
Q How did you respond to the initial post?
A I don't even remember, it was so long ago.
Q Do you remember what the initial post was?
A If I recall, it was somebody asking prices and the difference it made for the electricity bill, that type of stuff.
Q Was it a post from a lawyer?
A No, from a local resident, I believe.
Q Do you recall what your response about the

pricing was?
A I -- I don't recall.
Q If you go on the Norco Uncensored Facebook page, do you think you'll be able to locate this posting?
A I -- I wouldn't know how to find it. There's so many posts on that group daily, I wouldn't know how to find it.
Q Do you often submit requests for information via Facebook?
A No.
Q Have you done it in the past?
A For information, general information, I may have --
Q Okay.
A -- in the past.
Q Do you recall in what sort of topics you've requested information on?
A I was looking for duck eggs at one point.
Q You said, "duck eggs"?
A Duck eggs. I'm allergic to chicken eggs so I was looking for duck eggs. I don't know, it's just little, little stuff. I was looking for bikes for my nieces, little small bikes. Yeah, stuff like that. Very rare.
Q Have you ever clicked on any pop-up ads online

A Right.
Q Were you still receiving phone calls at the time of that filing?
A I don't remember if I was.
Q Sitting here today, you don't recall when the calls you're complaining for in this lawsuit occurred?
MR. OLIVER: Objection to the form of the question.
You can answer, if you know.
THE WITNESS: I would like to look at the dates to make sure.
BY MR. GRAHAM:
Q It's -- it's a little different question then. So sitting here today, you don't recall whether the calls had stopped at the time you filed the lawsuit?
A I believe they did, but I'm not positive.
Q When did you first come in contact with your attorneys in this action?
A I found an attorney online, and he referred me to Andrew Perrong. And then I talked to him and that's how I first came in contact with him.
Q Which attorney did you find online?
A I can't remember his name right offhand.
Q Was it Andrew Heidarpour?
A I don't recall, with him. I don't know.

Q How did you find the attorney online?
A I saw a YouTube video with him talking about CPA law.
Q Did you search for that YouTube video or how did you -- how did you come across that YouTube video?
A From what I recall, I was searching for CPA attorneys.
Q How did you reach out to the attorney?
A I don't remember if I called or submitted a form on his website. I can't remember for sure.
Q Do you recall whether you reached out to him first or whether he reached out to you first?
A I don't recall.
Q Have you had other attorneys reach out to you for any potential class action complaints?
MR. OLIVER: Object to the form of the question.
But if you understand, go ahead.
THE WITNESS: Reach out to me as far as first? I'm not sure what you mean.
BY MR. GRAHAM:
Q Have you ever had anyone reach out to you about bringing a class action complaint against the defendant?
A About Sunrun? No.
Q About any company?
A I've talked to other attorneys.

Q My question is a little different. My question is: Have you ever been reached out to by an attorney about bringing a case?
A No. Not for them to reach out to me first, no.
Q On every instance where you have brought a class action complaint, you have reached out to the attorney first?
A Correct.
Q Do you recall how you reached out to them?
A It's either a phone call or, at times, they have online forms.
Q Did you submit the online form?
A Correct.
Q Do you recall when you spoke with Mr. Heidarpour or the other attorney that you saw via YouTube?
A When I first -- no, I -- I don't remember when it would have been.
Q That attorney is the one who introduced you to Mr. Perrong, you stated?
A Correct.
Q What relief are you seeking for in this case?
MR. OLIVER: Objection to the form of the question.
If you understand, go ahead.
THE WITNESS: I -- I'm not understanding.

Q Have you sent other demands to other companies?
A Yes.
Q How many?
A Probably 10 to 15. I don't have the exact number.
Q What companies did you send those demands to?
A I don't have them in front of me. I can probably remember a few of them, but I don't -- I don't recall all of them.
Q What are the ones you remember?
A There was -- the company was called ARC. I don't remember what it stands for. There's another one, BioTRUST. I can't remember any now offhand.
Q In the letter that you sent to Sunrun, did you draft that letter or did someone else draft it?
A It was a template from a kit that I could modify.
Q What kit is that?
A Robocallsforcash -- robocallstocash.com I believe is the website where I bought it.
Q You bought a template from website?
A I bought the whole kit. It was in a PDF form.
Q When did you buy that?
A I'm not positive. I'm going to guess 2022 or before. I don't know. A few years ago.

Q Have you used that kit and template to send all the demands you just discussed here?
A Yes.
Q Have you received money from those demands?
A From the demand letters, no.
Q Have you --
A But --
Q -- received any other than from the demand letters?
A From the attorneys. They came from the attorneys, not from doing it myself.
Q Can you explain what you mean by that?
A From settlements. I send the demand letters, I got no response. So I sent it to Andrew and he took the cases that he wanted and then proceeded with the cases.
Q Who is Andrew?
A Andrew Perrong.
Q Do you have, in your possession, the kit of documents you received from robocalls.cash?
A I'm sure I have it somewhere. I haven't used it for quite a while.
Q Did you find your attorneys through the find a robocall attorney through the robocalls.cash website?
A No.
Q Did you do any investigation into the calls from

Sunrun to determine whether they were robocalls before you sent the template letter?
A No.
Q Do you know what your responsibilities are as a class representative?
A Basically, I'm responsible for submitting the evidence, representing everybody, talking to the attorneys, this deposition kind of stuff.
Q Have you disclosed robocalls.cash kit or any other information to your attorneys in connection with our discovery requests?
MR. OLIVER: Object to the form of the question, but yeah. I'm going to object to the form of the question, but you can -- if -- if you can answer that question without talking about communicating with your counsel, then that's fine, but it doesn't sound like it, you know. But if you can independently, go ahead.
THE WITNESS: Yeah, I -- I don't know.
BY MR. GRAHAM:
Q Have you turned the kit over to your attorneys?
A No, not that I recall.
MR. GRAHAM: I'll ask that that be provided as it's responsive to discovery, but I'll put together a list after this call.
MR. OLIVER: Okay.