**KELLEY DRYE & WARREN LLP**
Lauri A. Mazzuchetti (*pro hac vice*)
Glenn T. Graham (State Bar No. 338995)
7 Giralda Farms, Suite 340
Madison, NJ 07940
Telephone: (973) 503-5900
Facsimile: (973) 503-5950
lmazzuchetti@kelleydrye.com
ggraham@kelleydrye.com
*Attorneys for Defendant Sunrun Inc.*

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| PEGGY BANKS, individually and on behalf of all others similarly situated,<br>Plaintiff,<br>v.<br>SUNRUN INC.<br>Defendant. | Case No. 4:24-cv-07877-JST<br><br>[Assigned to Hon. Jon S. Tigar]<br><br>**DEFENDANT'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**<br><br>**[Declaration of Christine Agualo and Declaration of Glenn T. Graham filed concurrently herewith]**<br><br>Hearing Date: January 7, 2027<br>Time: 2:00 p.m.<br>Place: Courtroom 6 – 2nd Floor |

TO THE COURT, PLAINTIFF, AND HER COUNSEL:

PLEASE TAKE NOTICE that on January 7, 2027, at 2:00 p.m., in the above-captioned Court, located at 130 Clay Street, Oakland, CA 94612, Defendant Sunrun Inc. ("Sunrun") will and hereby does move the Court for an order granting summary judgment to Sunrun and dismissing Plaintiff's Complaint pursuant to Federal Rule of Civil Procedure 56.

Defendant moves for summary judgment on the following grounds:

1. Plaintiff's sole cause of action under the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227 *et seq.*, should be dismissed because it falls outside the zone of interests protected by the Section 227(c);
2. Plaintiff's claim fails because the undisputed record establishes that she provided express permission to receive the calls at issue and developed an established business relationship with Sunrun by submitting an online request for information about solar products and services; and
3. Even if a factual dispute existed concerning Plaintiff's submission of the online request, Sunrun is entitled to the TCPA's safe-harbor defense because it established and implemented reasonable practices and procedures designed to prevent unlawful telephone solicitations and reasonably relied on records showing that Plaintiff had requested contact.

This Motion is based on this Notice of Motion, the attached Memorandum of Points and Authorities, the Declaration of Christine Agualo and accompanying exhibits ("Agualo Decl."), the Declaration of Glenn T. Graham and accompanying exhibits ("Graham Decl."), all pleadings, records, and files in this action, and such evidence and argument as may be presented at or before the hearing on this Motion.

DATED: September 29, 2026

KELLEY DRYE & WARREN LLP

By: [signature]

Lauri A. Mazzuchetti (*Pro Hac Vice*)
Glenn T. Graham
7 Giralda Farms, Suite 340
Madison, New Jersey 07940
Telephone: (973) 503-5900
Facsimile: (973) 503-5950
lmazzuchetti@kelleydrye.com
ggraham@kelleydrye.com
*Attorneys for Defendant Sunrun Inc.*

# TABLE OF CONTENTS

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES ........ 1
INTRODUCTION ........ 1
STATEMENT OF ISSUES ........ 2
STATEMENT OF UNDISPUTED FACTS ........ 2
A. Procedural History and Nature of Plaintiff's Claim ........ 2
B. Plaintiff Deliberately Pursued TCPA Claims for Monetary Recovery ........ 5
C. Sunrun's Consent and Compliance Procedures ........ 7
1. Sunrun Calls Consumers Who Request Information and Provide Permission to Be Contacted ........ 7
2. Sunrun Uses Controls to Verify and Restrict Outbound Calling ........ 7
D. The Events Surrounding the Calls at Issue ........ 9
1. Sunrun Received a Webform Request Containing Plaintiff's Identifying Information and Permission to Call ........ 9
2. Plaintiff Did Not Answer Any of the Calls or Ask Sunrun to Stop Calling ........ 12
3. Sunrun Ceased Calling Upon Receiving Plaintiff's First Indication That She Did Not Want Further Contact ........ 12
4. The Zeus System Suppressed Later Leads Containing Plaintiff's Information ........ 12
LEGAL STANDARD ........ 14
LEGAL ARGUMENT ........ 15
I. Plaintiff's Claim Falls Outside the Zone of Interests Protected by Section 227(c) ........ 15
II. Even If Plaintiff Falls Within Section 227(c)'s Zone of Interests, Sunrun Is Entitled to Summary Judgment on Two Independent Grounds ........ 18
A. Plaintiff Provided Express Permission to Be Called and Established an EBR With Sunrun ........ 18
B. Sunrun Is Independently Entitled to the TCPA's Safe-Harbor Defense ........ 21
1. Any Calls to Plaintiff Resulted From Sunrun's Reasonable Reliance on Documented Permission ........ 22
2. Sunrun Established and Implemented Reasonable Compliance Procedures, Which Satisfy the Safe Harbor's Regulatory Standards ........ 23
CONCLUSION ........ 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**


*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) .......... 14, 15

*Bradford v. Sovereign Pest Control of Texas, Inc.*,
167 F.4th 809 (5th Cir. 2026) .......... 19

*CE Design, Ltd. v. Prism Bus. Media, Inc.*,
606 F.3d 443 (7th Cir. 2010) .......... 23

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) .......... 14

*Clarke v. Sec. Indus. Ass'n*,
479 U.S. 388 (1987) .......... 17

*Forney v. Hair Club for Men Ltd., Inc.*,
No. CV 16-9640-R, 2017 WL 4685549 (C.D. Cal. June 26, 2017) .......... 20

*Garcia v. Credit One Bank, N.A.*,
No. 2:18-cv-191-JCM-EJY, 2020 WL 4431679 (D. Nev. July 31, 2020) .......... 15, 17

*Harrell v. Aquion, Inc.*,
No. 3:23-cv-1222-WWB-LLL, 2024 WL 4188389 (M.D. Fla. Sept. 13, 2024) .......... 18

*Ins. Mktg. Coalition Ltd. v. FCC*,
127 F.4th 303 (11th Cir. 2025) .......... 19

*Johansen v. Efinancial LLC*,
No. 2:20-cv-01351-DGE, 2022 WL 168170 (W.D. Wash. Jan. 18, 2022) .......... *passim*

*Johansen v. Efinancial LLC*,
No. 2:20-cv-01351-RAJ-BAT, 2021 WL 7161969 (W.D. Wash. June 11, 2021) .......... 20, 22

*Klassen v. Advanced Mktg. & Processing, Inc.*,
No. 8:21-CV-761-MSS-MRM, 2023 WL 11910565 (M.D. Fla. Mar. 1, 2023) .......... 22, 23

*Loper Bright Enterprises v. Raimondo*,
603 U.S. 369 (2024) .......... 19

*Mims v. Arrow Fin. Servs., LLC*,
565 U.S. 368 (2012) .......... 18

*Morgan v. Global Payments Check Servs., Inc.*,
No. 2:17-cv-01771, 2018 WL 934579 (E.D. Cal. Feb 15, 2018) .......... 20

*Nidds v. Schindler Elevator Corp.*, 113 F.3d 912 (9th Cir. 1996) ........ 15

*Sapan v. Fed. Sav. Bank*, No. 8:23-CV-00075-CV, 2025 WL 3050064 (C.D. Cal. Sept. 30, 2025) ........ 24

*Van Elzen v. Am. Home Shield Corp.*, No. 24-C-1206, 2026 WL 1078771 (E.D. Wis. Apr. 21, 2026) ........ 18, 19, 25

*Van Patten v. Vertical Fitness Group, LLC*, 847 F.3d 1037 (9th Cir. 2017) ........ 15, 25

*Voll v. HCL Techs. Ltd.*, No. 18-cv-04943-LHK, 2019 WL 144863 (N.D. Cal. Jan. 9, 2019) ........ 20

*Wilson v. Freeway Ins. Servs. of Am.*, LLC, No. 6:25-cv-01869-MC (D. Or.) ........ 6, 13, 17

*Wilson v. Freeway Insurance Services of America, LLC*, No. 6:25-cv-01869-MC (D. Or.) ........ 13, 17

*Wofford v. Portfolio Recovery Assocs.*, No. 24-cv-07509-RFL, 2026 WL 124312 (N.D. Cal. Jan. 16, 2026) ........ 15

**Statutes**

47 U.S.C. § 227(a)(4) ........ 4, 18, 19

47 U.S.C. § 227(c) ........ *passim*

**Other Authorities**

47 C.F.R. § 64.1200(c)(2) ........ 4, 18, 19, 21, 23

Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, 18 FCC Rcd. 14014, 14033–34, 14039–40 (2003) ........ 15

Fed. R. Civ. P. 56(a) ........ 14

# MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

This putative class action concerns calls Sunrun placed to Plaintiff's telephone number after receiving an online request—containing Plaintiff's name, telephone number, email address, and other identifying information—for information about solar products and services. Plaintiff alleges that the calls violated the National Do Not Call Registry ("NDNCR") provisions of the Telephone Consumer Protection Act, 47 U.S.C. § 227 et seq. ("TCPA"). The undisputed record establishes that Sunrun is entitled to summary judgment on three independent grounds.

*First*, Plaintiff's claim falls outside the zone of interests protected by the TCPA's residential do-not-call provisions. Discovery established that Plaintiff purchased and used a program marketed as a means of "turning robocalls into cash," used its templates and strategies to pursue payments for alleged TCPA violations, and referred unresolved demands to counsel for litigation. Although Plaintiff testified that she had sent approximately 10 to 15 demands, her later production identified approximately 100 targets. She also has served as the named plaintiff in at least five putative TCPA class actions filed since 2024. This record does not describe a consumer seeking protection from unwanted solicitations; it describes a deliberate effort to generate and monetize TCPA claims.

*Second*, the undisputed evidence establishes that Plaintiff provided express permission to be contacted and created an established business relationship with Sunrun. Sunrun received an online submission requesting information about solar products and services that included Plaintiff's telephone number, name, email address, and other identifying information. The submission expressly authorized Sunrun to call the number provided, including if the number appeared on a do-not-call list. The submission is independently documented in the lead card, the report accompanying the lead, and Sunrun's contemporaneous business records. Plaintiff does not affirmatively deny submitting the form; she claims only that she does not recall doing so. That claimed lack of recollection does not create a genuine factual dispute in the face of the record.

*Third*, even if Plaintiff's asserted lack of recollection were sufficient to create a factual dispute, which it is not, Sunrun is independently entitled to summary judgment under the TCPA's safe harbor. Sunrun calls only consumers who have requested information and provided permission to be contacted. It maintains written compliance policies, trains its personnel, documents consent,

screens incoming leads through multiple controls, maintains an internal do-not-call list, and suppresses numbers that should not be called. Sunrun reasonably relied on records showing that Plaintiff had requested information and authorized responsive calls. Moreover, Plaintiff never answered any of the calls, and Sunrun stopped calling immediately upon receiving the first indication that she did not want further contact. On either view of the evidence, Sunrun is entitled to judgment.

**STATEMENT OF ISSUES**

1. Whether Plaintiff's claim falls outside the zone of interests protected by the TCPA's residential do-not-call provisions where the undisputed record establishes that she deliberately used alleged TCPA violations as a source of profit rather than seeking protection from unwanted telephone solicitations.

2. Whether Plaintiff's claim fails because the undisputed record establishes that she provided express permission to be called and created an established business relationship with Sunrun by submitting her contact information through a webform requesting information about solar products and services.

3. Whether Sunrun is entitled to the TCPA's safe-harbor defense because it established and implemented reasonable practices and procedures designed to prevent unlawful telephone solicitations and placed the calls in reasonable reliance on records showing that Plaintiff had requested contact.

**STATEMENT OF UNDISPUTED FACTS**

**A. Procedural History and Nature of Plaintiff's Claim**

***Procedural History.*** Plaintiff filed this putative class action on November 11, 2024, asserting a single cause of action under the TCPA, 47 U.S.C. § 227(c). (ECF No. 1.) Plaintiff's claim is based on calls placed to the telephone number ending in -5370 (the "5370 Number") between July 11, 2024, and August 16, 2024 (the "Calls"). Plaintiff alleges that the 5370 Number was listed on the NDNCR during the relevant period and that she did not provide permission to receive the Calls. (ECF No. 1 ¶¶ 14, 15, 20.)

On March 20, 2026, Plaintiff moved for leave to amend her Complaint to add a second cause

of action under the TCPA's internal do-not-call regulations, 47 C.F.R. § 64.1200(d), based on the same Calls. (ECF No. 54.) The proposed claim rested on the allegation that Plaintiff had asked Sunrun during one of the Calls to place the 5370 Number on its internal do-not-call list. Sunrun opposed the motion because Plaintiff had not answered any of the Calls and therefore could not have made such a request during a Call, and no evidence showed that she had made a request through any other means during the time of the Calls. (ECF No. 57.)

At the time Plaintiff pursued the motion, the evidentiary record already established that Plaintiff had not made a do-not-call request. Plaintiff had testified that she never answered any of the Calls and never requested that Sunrun place her on an internal do-not-call list. (Graham Decl., Ex. 1 at 88:13–16.) Sunrun's call records likewise reflected no conversation with Plaintiff and no do-not-call request. (Agualo Decl. ¶ 36.) Plaintiff nevertheless continued to pursue the proposed claim.

Plaintiff's expert, Aaron Woolfson, also testified before the Court ruled on the motion that the call dispositions did not reflect a live conversation, a stop request, or an internal do-not-call request during any of the Calls. (Graham Decl., Ex. 2 at 76:8–77:2, 201:19–202:4.) Woolfson further admitted that Plaintiff's number appeared in the results of his internal do-not-call analysis only because he manually inserted it. (Graham Decl., Ex. 2 at 56:11–16.) His report did not disclose that manual step. (*Id.* at 61:15–20; Graham Decl., Ex. 3 at 271:3–16.) Thus, the evidence on which Plaintiff relied did not establish that she had made an internal do-not-call request; it merely included her number in an analysis because her expert had manually placed it there.

On August 19, 2026, the Court granted Plaintiff leave to amend. At the pleading stage, the Court was required to accept as true Plaintiff's allegation "that she asked to be placed on Sunrun's do-not-call list." (ECF No. 66 at 3.) The Court's ruling therefore addressed the sufficiency of the proposed allegation, not whether the existing evidentiary record supported it.

Plaintiff ultimately did not file an amended complaint. Her decision left unrebutted the existing evidence that she had never answered any of the Calls and had never made the alleged do-not-call request. Accordingly, the original Complaint remains the operative pleading, and Plaintiff's NDNCR claim is the sole claim at issue in this action.

***Overview of Plaintiff's NDNCR Claim.*** Section 227(c) authorizes a private action by a person who receives more than one telephone call within a 12-month period by or on behalf of the same entity in violation of regulations prescribed under that subsection. 47 U.S.C. § 227(c)(5). A prevailing plaintiff may recover actual monetary loss or up to $500 for each violation. *Id.*

The applicable regulation generally provides:

> No person or entity shall initiate any telephone solicitation to: . . . A residential telephone subscriber who has registered his or her telephone number on the [NDNCR].

47 C.F.R. § 64.1200(c)(2).

The prohibition does not apply where the caller has the subscriber's "prior express invitation or permission." *Id.* § 64.1200(c)(2)(ii). Relatedly, the TCPA defines a "telephone solicitation" as a call made "for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services." 47 U.S.C. § 227(a)(4); 47 C.F.R. § 64.1200(f)(15). The definition excludes calls made with the recipient's prior express invitation or permission and calls made to a person with whom the caller has an established business relationship. 47 U.S.C. § 227(a)(4); 47 C.F.R. § 64.1200(f)(15).

For purposes of telephone solicitations, an established business relationship includes:

> a prior or existing relationship formed by a voluntary two-way communication between a person or entity and a residential subscriber with or without an exchange of consideration, on the basis of the subscriber's purchase or transaction within the eighteen (18) months immediately preceding the date of the telephone call ***or*** on the basis of the subscriber's inquiry or application regarding products or services offered by the entity within the three months immediately preceding the call, which relationship has not been previously terminated by either party.47 C.F.R. § 64.1200(f)(5) (emphasis added).

Section 227(c) also provides an affirmative defense:

> It shall be an affirmative defense in any action brought under this paragraph that the defendant has established and implemented, with due care, reasonable practices and procedures to effectively prevent telephone solicitations in violation of the regulations prescribed under this subsection.

47 U.S.C. § 227(c)(5).

### B. Plaintiff Deliberately Pursued TCPA Claims for Monetary Recovery

Plaintiff is a prolific TCPA claimant who actively seeks out alleged TCPA violations. In 2022, Plaintiff purchased the "Turning Robocalls Into Cash" kit (the "Kit") from robocalls.cash. (Graham Decl. Ex. 1 at 98:14–25; Graham Decl. Ex. 5 at Banks_RFP2_Supp_000002.) As its name indicates, the Kit was marketed as a means of "turning robocalls into cash." It provided instructions, strategies, and template correspondence for identifying potential TCPA violations, making monetary demands, negotiating settlements, and pursuing litigation. (*See generally* Graham Decl. Ex. 5.)

The Kit provides "soup-to-nuts" guidance on researching companies, logging calls, preparing demand letters, anticipating defenses, and responding to those defenses. (*Id.* at Banks_RFP2_Supp_000014–000044.) It emphasizes the negotiating leverage associated with potential TCPA class-action litigation and states that [redacted] (*Id.* at Banks_RFP2_Supp_000030.)

The Kit also instructs users how to respond when a company produces evidence that the claimant consented to receive the challenged calls. Under the heading [redacted] it supplies a proposed response asserting that the claimant [redacted] challenging the authenticity of the company's records, and threatening to have those records forensically examined. (*Id.* at Banks_RFP2_Supp_000037.) The Kit separately provides responses to defenses that the claimant's number was used for business purposes, that the caller relied on a purchased lead, or that the claimant never asked for the calls to stop. (*Id.* at Banks_RFP2_Supp_000038, 000041.)

The Kit repeatedly directs users to a [redacted] for additional strategies and current information. The Forum was advertised as a community of experienced Kit users who had collected [redacted] and who shared strategies for handling calls, identifying callers, and [redacted] (*Id.* at Banks_RFP2_Supp_000001.) Plaintiff joined the Forum in December 2022 and canceled her membership in January 2023. (*Id.* at Banks_RFP2_Supp_000003–000006.) In August 2024—during the period in which she received the Calls at issue—Plaintiff sought renewed access, writing: [redacted] (*Id.* at Banks_RFP2_Supp_000005.)

Plaintiff used the Kit's materials and strategies to pursue monetary demands against alleged TCPA violators. At her deposition, she testified that she had used the Kit to send approximately 10 to 15 demand letters. (Graham Decl. Ex. 1 at 98:1–5.) Her subsequent document production, however, included a target list identifying approximately 100 entities. (Graham Decl. Ex. 6.) Plaintiff further testified that she forwarded unresolved demands to Andrew Perrong, her counsel in this action, and that "he took the cases that he wanted."[1] (Graham Decl. Ex. 1 at 99:1–17.) Plaintiff testified that all payments she has received through these TCPA pursuits occurred in 2025 or later. (*Id.* at 126:14–17.)

Plaintiff also has served as the named plaintiff in at least five putative TCPA class actions. (*Id.* at 121:16–20.) Each was filed beginning in 2024—the same year in which Plaintiff renewed her request for access to the Members Forum because she was [redacted] to use it. (Graham Decl., Ex. 5 at Banks_RFP2_Supp_000005.)

Those actions followed a recurring pattern. Little, if any, discovery occurred, and none reached class certification before Plaintiff voluntarily dismissed her claims. (*See* Graham Decl., Exs. 8–16.) *Bio Trust* and *Paramount* were the only actions in which the public docket contained sufficient information to identify the defendants' positions concerning consent; the remaining actions were filed and resolved so quickly that the docket did not disclose the defendants' positions on that issue. In *Bio Trust* and *Paramount*, as here, Plaintiff affirmatively alleged in her complaints that she had not provided consent to receive the challenged calls. (Graham Decl., Exs. 9, 15.) After the defendants produced records indicating that webforms containing Plaintiff's contact information had been submitted to request the communications at issue, Plaintiff did not identify evidence

[1] Mr. Perrong also represented the plaintiff in *Wilson v. Freeway Ins. Servs. of Am.*, LLC, No. 6:25-cv-01869-MC (D. Or.), where the court expressed concern that the plaintiff welcomed calls as a source of TCPA recoveries and questioned whether counsel had assumed responsibility for tracking and prosecuting those claims. (Graham Decl., Ex. 19 at 42:21–44:13.) Anthony Paronich, Plaintiff's co-counsel here, represented Plaintiff in other actions involving webform submissions and disputed consent and has held an equal financial interest in any attorneys' fees recovered in this action since before suit was filed. (*See* Graham Decl., Ex. 7.) Sunrun does not rely on counsel overlap or financial interests alone but identifies them as additional context for Plaintiff's referral of selected claims into a recurring litigation structure.

disproving the submissions. Instead, she stated that she did not recall submitting the forms. (*Id.*) In both actions, Plaintiff voluntarily dismissed her claims after the defendant sought to bifurcate discovery so that the parties could first determine whether she had consented to the calls. (Graham Decl., Exs. 11, 16.)

There also is overlap among the attorneys prosecuting these actions. Mr. Perrong appeared as counsel for Plaintiff in *Bio Trust*. Anthony Paronich—whom Plaintiff recently disclosed as holding a financial interest in this action—appeared as Plaintiff's counsel in both *Bio Trust* and *Paramount*. (*Id.*)

### C. Sunrun's Consent and Compliance Procedures

#### 1. Sunrun Calls Consumers Who Request Information and Provide Permission to Be Contacted

Sunrun provides solar-power and battery-storage products and services. (Agualo Decl. ¶ 4.) Sunrun does not cold-call consumers. It places outbound calls only to individuals who have expressed interest in solar products or services and provided a telephone number at which they agreed to be contacted. (Agualo Decl. ¶ 8.)

A consumer may request information directly from Sunrun, including by calling Sunrun or completing a webform on Sunrun's website. (*Id.*) Sunrun also receives consumer inquiries submitted through webforms operated by approved third-party lead vendors. (*Id.*) In either circumstance, the consumer must provide contact information and agree to disclosure language authorizing responsive calls. (*Id.*) Sunrun requires third-party lead vendors with which it contracts to comply with applicable law and maintain evidence documenting each consumer's submission and consent.

#### 2. Sunrun Uses Controls to Verify and Restrict Outbound Calling

***Lead and dialer systems.*** When a vendor transmits a lead to Sunrun, the vendor provides the information entered through the webform—the "lead card"—together with a TCPA Guardian or similar TrustedForm report documenting the lead event, the webform presented to the consumer,

and the consent language displayed at the time of submission. (Graham Decl., Ex. 4 at 33:12–18; Agualo Decl. Ex. G at SUNRUN-PB-000997.)

Each lead received by Sunrun is recorded in its lead-management system, Zeus. (Agualo Decl. ¶ 14.) Before a lead may be transmitted to Sunrun's dialer, Zeus performs three checks: (1) it verifies the lead's compliance token and associated consent language; (2) it determines whether the telephone number was submitted or contacted within the preceding 21 days; and (3) it checks the telephone number against Sunrun's internal do-not-call list. (Agualo Decl. ¶ 14; Graham Decl., Ex. 4 at 30:24–31:6, 98:14–99:6.) Only a lead that passes each check receives a "SOLD" disposition and becomes eligible for transmission to the dialer. (*Id.* Ex. 4 at 27:23–28:4, 98:14–99:6.) If a number was recently contacted or appears on an applicable internal do-not-call suppression list, Zeus assigns a "DNC" tag, and the lead is not transmitted for calling. (*Id.* at 30:24–31:6.)

During the relevant period, Sunrun used the inContact dialer system. (Agualo Decl. ¶ 16.) The system maintains records of each call, including the number dialed, the date and time, and the call disposition. (*Id.* ¶¶ 17–18.) If a call is unanswered, the agent records a disposition reflecting either an answering machine or no answer. (Graham Decl., Ex. 4 at 20:13–21:7, 74:1–75:10.) If a consumer answers and asks not to receive further calls, the agent enters a DNC disposition. (*Id.* at 104:20–105:23.)

A number associated with a DNC disposition is added to Sunrun's internal do-not-call list and suppressed from future calling activity. (Agualo Decl. ¶ 18.)

***Written Policies.*** During the relevant period, Sunrun maintained written policies governing telemarketing, do-not-call compliance, and the conduct of its marketing vendors. (*Id.* ¶ 21.)

Sunrun's Telemarketing Policy requires consent for outbound telemarketing calls and identifies the records that must be maintained to document consent. (Agualo Decl., Ex. A at SUNRUN-PB-000213–214.) For web-generated leads, those records include the consumer's name and telephone number, the consent disclosure, the IP address associated with the submission, and the date and time of the submission. (*Id.* at 214.) The policy also requires Sunrun to maintain an internal do-not-call list, screen telephone numbers against that list before calling, and preserve corresponding call and consent records. (*Id.* at 215–216.)

Sunrun's Do-Not-Call Policy explains how consumers may request placement on Sunrun's internal do-not-call list and provides for processing those requests within 30 days. (Agualo Decl. ¶ 23; *see* Agualo Decl., Ex. B at SUNRUN-PB-000145.)

Sunrun's Marketing and Advertising Compliance Policy requires marketing vendors to comply with applicable law, including the TCPA. (Agualo Decl. ¶ 24.) The policy authorizes Sunrun to audit a vendor's marketing practices and provides for termination if a vendor does not cooperate with an audit or distributes noncompliant marketing materials. (Agualo Decl., Ex. C at SUNRUN-PB-000171–174.)

***Training.*** Sunrun requires employees engaged in outbound calling to complete compliance training before placing calls. (Agualo Decl. ¶ 25; Agualo Decl. Ex. B at SUNRUN-PB-000145.) Those employees, as well as managers responsible for supervising them, receive additional compliance training at least annually. (Agualo Decl. ¶ 26; Agualo Decl., Ex. A at SUNRUN-PB-000216–217.)

The training addresses consent requirements, permission to contact consumers, the NDNCR, and Sunrun's internal do-not-call obligations. (Agualo Decl. ¶ 27; Agualo Decl., Ex. D at SUNRUN-PB-000153–154.) It also instructs personnel not to use leads obtained through unapproved channels, not to call without documented consent, how to recognize and handle a do-not-call request, and how to record that request in Sunrun's systems. (Agualo Decl. ¶¶ 27–28; Agualo Decl., Ex. D at SUNRUN-PB-000 154–157.)

Sunrun's policies, training, lead-verification procedures, and suppression controls are designed to ensure that outbound calls are placed only in response to documented consumer inquiries and permission to make contact.

### D. The Events Surrounding the Calls at Issue

#### 1. Sunrun Received a Webform Request Containing Plaintiff's Identifying Information and Permission to Call

On July 11, 2024, Sunrun received a webform submission requesting information about solar products and services. (Agualo Decl. ¶ 30; Agualo Decl., Ex. E.) The submission contained the 5370 Number, Plaintiff's name, and email address. (Graham Decl., Ex. 1 at 31:2–5, 79:11–81:8.)

Plaintiff's last name appeared as "Bnaks," and the email address omitted the letter "a" from her actual email address, [redacted]. (*Id.* at 80:4–19.) The following disclosure appeared immediately below the "Submit" button:

> BY CLICKING "SUBMIT" YOU AUTHORIZE UP TO <u>FIVE PARTNERS</u> TO CALL YOU (INCLUDING THROUGH AUTOMATED MEANS; E.G. AUTODIALING, TEXT AND PRE-RECORDED MESSAGING) VIA TELEPHONE, MOBILE DEVICE (INCLUDING SMS AND MMS) AND/OR EMAIL, AT THE NUMBER YOU ENTERED ABOVE, WITH OFFERS ABOUT THEIR PRODUCTS OR SERVICES, EVEN IF YOUR PHONE NUMBER IS ON ANY NATIONAL OR STATE 'DO NOT CALL' LIST AND YOU AGREE TO OUR <u>TERMS OF USE</u> AND <u>PRIVACY POLICY</u>. MESSAGE AND DATA RATES MAY APPLY. YOUR CONSENT HERE IS NOT BASED ON A CONDITION OF PURCHASE.

(Agualo Decl., Ex. G at SUNRUN-PB-000998.) The hyperlinked list of five partners identified Sunrun. (Agualo Decl. ¶ 32.)

The vendor transmitted the lead containing Plaintiff's information exclusively to Sunrun. (Graham Decl., Ex. 4 at 26:5–12, 134:24–135:3; Agualo Decl. ¶ 33.) The accompanying report documents the submission event, the unique lead identifier, the disclosure displayed with the webform, the IP address associated with the submission, and the telephone number entered and verified through the webform. (Agualo Decl., Ex. G at SUNRUN-PB-000998; Agualo Decl. at ¶¶ 8–10.)

The July 11 submission is independently reflected in three sets of records: (1) the lead card transmitted to Sunrun; (2) the accompanying report documenting the submission event; and (3) Sunrun's lead log. Each contains corresponding lead information and identifiers. (Agualo Decl., Ex. H; Agualo Decl., Ex. G; Agualo Decl., Ex. I at Row 3.) Sunrun incorporated the lead information into its business records. (*See* Agualo Decl. ¶ 30.)

The July 11 submission originated from IP address [redacted].[2] (Agualo Decl., Ex. G.)

---

[2] Sunrun sought additional discovery concerning whether Plaintiff, members of her household, her counsel, or any person assisting with or financially interested in her TCPA claims completed, assisted with, directed, arranged, or had advance knowledge of the webform submissions. Sunrun also sought discovery concerning whether the relevant IP addresses were assigned to, used by, or accessible through Plaintiff, her devices, household, accounts, or persons assisting with her claims. Plaintiff opposed that discovery, and Sunrun sought an extension of the summary-judgment schedule so the issue could be developed. (ECF No. 70 at 3–6.) Sunrun expressly preserves its

Four days later, two additional webforms containing Plaintiff's identifying information were submitted from IP address [redacted] to two different entities. (Graham Decl., Ex. 13; Agualo Decl., Ex. L.) The two IP addresses differ only in their final digits. One July 15 submission requested information about solar products and services and was transmitted to Clean Energy Experts, LLC (which did not place any calls to Plaintiff based upon Sunrun receiving an exclusive lead within less than 21 days earlier). (*Id*; Agualo Decl. ¶ 44.) The other was submitted through QuinStreet and concerned a product unrelated to solar. (*See* Graham Decl., Ex. 13.) That submission likewise contained Plaintiff's identifying information and later resulted in separate TCPA litigation brought by Plaintiff against QuinStreet. (*Id.*) The submissions were made within four days of one another, used Plaintiff's identifying information, and originated from closely related IP addresses associated with the same geographic area. (Graham Decl., Ex. 13; Agualo Decl., Ex. L.) Plaintiff resided in Norco, California at the time, maintained internet service at her residence, and used internet-connected devices, including a laptop and mobile telephone. (Graham Decl., Ex. 1 at 29:8–11, 30:6–18, 61:21–25.)

In her Complaint, Plaintiff affirmatively alleged that she had not provided consent to receive the Calls. (ECF No. 1 ¶¶ 14–15.) When questioned about the July 11 webform, however, Plaintiff did not affirmatively deny submitting it. She repeatedly testified that she did not recall doing so. (Graham Decl., Ex. 1 at 79:7–10, 79:21–22.) Plaintiff acknowledged that websites she used had previously populated forms with her name and contact information. (*Id.* at 73:12–15.) That functionality operated through her devices or browser and does not explain how an unrelated person would have obtained and entered her identifying information. When asked whether anyone in her household had requested solar information online, Plaintiff responded, "I have no idea." (*Id.* at 73:5–7.) Plaintiff did not identify any other person who may have completed the webform. Nor did she dispute that the submission contained her telephone number, and other identifying information

---

right to supplement, amend or refile this summary judgment motion based on additional discovery and/or pursue that discovery and to seek sanctions, attorneys' fees, reimbursement, or other appropriate relief based on the resulting evidence.

or otherwise offer evidence showing how the submission occurred without her involvement.

**2. Plaintiff Did Not Answer Any of the Calls or Ask Sunrun to Stop Calling**

After receiving the July 11 lead, Sunrun attempted to contact Plaintiff between July 11 and August 16, 2024. (Agualo Decl. ¶ 37.) Plaintiff did not answer any of the Calls. (*Id.*) Sunrun's dialer records contain only two dispositions for the Calls: "Answering Machine" and "No Answer/VM/Continue to Call—NON FINAL." (Agualo Decl., Ex. J.) Both dispositions indicate that the call was not answered. (Graham Decl., Ex. 4 at 20:13–21:7, 74:1–75:10.) The call recordings likewise confirm that no live conversation occurred. (Agualo Decl. ¶ 41.) Finally, Plaintiff admitted that she did not ask Sunrun during any of the Calls to stop calling or to place the 5370 Number on Sunrun's internal do-not-call list. (*Id.* at ¶ 39.) Sunrun therefore received no indication during the Calls that Plaintiff did not want further contact.

**3. Sunrun Ceased Calling Upon Receiving Plaintiff's First Indication That She Did Not Want Further Contact**

After the Calls, Plaintiff used the Kit to prepare and send a demand letter to Sunrun. Sunrun received the letter on or about August 30, 2024. (Agualo Decl. ¶ 42; Agualo Decl., Ex. K.) In the letter, Plaintiff warned of "a lengthy and detailed discovery process" if Sunrun did not satisfy her demand. (Graham Decl., Ex. 1 at 121:12–15.) The demand letter was the first notice Sunrun received that Plaintiff did not want further calls. Upon receiving it, Sunrun investigated Plaintiff's claim and confirmed that its records reflected permission to contact the 5370 Number regarding solar products and services. (Graham Decl., Ex. 4 at 46:23–47:6, 47:22–48:5.) Sunrun nevertheless added the 5370 Number to its internal do-not-call list and did not call Plaintiff again. (Agualo Decl. ¶ 43.)

**4. The Zeus System Suppressed Later Leads Containing Plaintiff's Information**

Two additional webforms containing Plaintiff's identifying information and requesting solar information were submitted through the same website after the July 11 submission: one on July 15, 2024, and another on March 6, 2025, after this action was filed. (Agualo Decl. ¶ 44.) Both later

submissions contained Plaintiff's correctly spelled name and email address and were transmitted to Sunrun's former subsidiary, Clean Energy Experts, LLC ("CEE"). (Agualo Decl., Exs. L, M.)

For each later submission, Zeus verified the compliance token and associated consent language but separately identified a condition requiring suppression. (Agualo Decl. ¶ 44.) The July 15, 2024 submission was received within 21 days of Sunrun's prior contact based on the July 11 lead. (Graham Decl., Ex. 4 at 30:24–31:6, 98:14–99:6; Agualo Decl. ¶ 44;.) The March 6, 2025 submission was received after the 5370 Number had been added to Sunrun's internal do-not-call list. (*Id.*)

Zeus therefore assigned a "DNC" tag to each lead, and neither was transmitted to CEE for calling. (*Id.*) No additional calls resulted from either submission. (*Id.*)

**Reservation of Rights.** Plaintiff opposed Sunrun's pending motion seeking an extension of the summary-judgment deadline to pursue discovery concerning the origin of the webform submissions, the persons involved in generating and prosecuting Plaintiff's TCPA claims, the roles and financial interests of counsel and other persons associated with those claims, and prior settlements involving Plaintiff and her counsel. (ECF No. 70.) Sunrun maintains its position that the requested discovery is material and may provide additional grounds for summary judgment, sanctions, additional causes of action, or other relief. Much of the need for that discovery arose from information that came to light through the proceedings in *Wilson v. Freeway Insurance Services of America, LLC*, No. 6:25-cv-01869-MC (D. Or.). *Wilson* involved overlapping counsel and revealed evidence concerning the possible generation and monetization of TCPA claims, the use of putative class allegations to obtain substantial individual recoveries, and the financial interests and roles of counsel who had not appeared in the actions. Those developments prompted Sunrun to investigate comparable issues presented by the record here, including whether Plaintiff, her counsel, or any person assisting with or financially interested in her TCPA claims completed, assisted with, directed, arranged, or had advance knowledge of the webform submissions containing Plaintiff's identifying information. Sunrun expressly preserves all rights to seek sanctions, attorneys' fees, reimbursement, and any other appropriate relief based on the existing record and any evidence obtained through further discovery. That reservation includes, without limitation, relief arising from Plaintiff's motion for

leave to amend to assert an internal do-not-call claim despite the evidence then known to Plaintiff and her counsel that Plaintiff had never answered any Call or made the alleged request; the continued pursuit of that proposed claim using an expert analysis that manually included Plaintiff's number without disclosing that step; Plaintiff's prior misrepresentations concerning overlapping counsel and pecuniary interests when opposing Sunrun's pleading-stage motion to strike the class allegations; and the belated and incomplete disclosure of counsel's roles and financial interests. Sunrun also preserves its right to obtain discovery concerning settlements, payments, releases, fee allocations, and related nonprivileged records arising from TCPA demands and actions pursued by Plaintiff and her counsel. The volume and rapid resolution of those actions—often before meaningful discovery or any effort to obtain class certification—support further inquiry into whether putative class allegations were used principally to obtain substantial individual settlements for Plaintiff and counsel rather than to secure relief for a class. Such evidence may bear on Plaintiff's purpose in pursuing the Calls, whether her asserted interest falls within the interests protected by Section 227(c), the propriety of the class allegations asserted here, and Sunrun's entitlement to sanctions, fee reimbursement, or other relief. Nothing in this Motion waives Sunrun's right to pursue that or other additional discovery; to seek leave to supplement or amend this Motion, renew its request for summary judgment, or file a further dispositive motion based on newly obtained evidence; or to seek sanctions, attorneys' fees, reimbursement, or other appropriate relief on a fuller record.

## **LEGAL STANDARD**

Summary judgment should be granted when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). While Defendant bears the initial burden of showing "an absence of evidence to support [Plaintiff's] case" (*Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)), once such a showing is made, Defendant is entitled to summary judgment unless Plaintiff establishes, with concrete evidence, that a genuine issue of material fact remains. *Anderson*, 477 U.S. at 247–48, 256. ""To create a "genuine" issue about a material fact, Plaintiff must produce a "sufficient" "quantum of evidence" that a "reasonable

jury" could return a verdict in her favor; evidence that is "merely colorable, or is not significantly probative," is insufficient. *Nidds v. Schindler Elevator Corp.*, 113 F.3d 912, 916 (9th Cir. 1996), quoting *Anderson*, 477 U.S. at 248–50. Allegation and "[s]peculation is insufficient to show a genuine dispute of material fact." *Wofford v. Portfolio Recovery Assocs.*, No. 24-cv-07509-RFL, 2026 WL 124312, at *1 (N.D. Cal. Jan. 16, 2026) (citing *Nelson v. Pima Cmty. Coll.*, 83 F.3d 1075, 1081–82 (9th Cir. 1996)).

## LEGAL ARGUMENT

### I. PLAINTIFF'S CLAIM FALLS OUTSIDE THE ZONE OF INTERESTS PROTECTED BY SECTION 227(C)

Section 227(c) protects consumers from unwanted telephone solicitations that intrude upon their privacy. *See* Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, 18 FCC Rcd. 14014, 14033–34, 14039–40 (2003); *see also Van Patten v. Vertical Fitness Group, LLC,* 847 F.3d 1037, 1043 (9th Cir. 2017). It does not create a cause of action for a person who welcomes or cultivates calls as opportunities to generate statutory demands and litigation recoveries. *See Garcia v. Credit One Bank, N.A.*, No. 2:18-cv-191-JCM-EJY, 2020 WL 4431679, at *3 (D. Nev. July 31, 2020) (granting summary judgment where the plaintiff intended "to keep receiving unwanted calls" to support TCPA claims). The undisputed record establishes that Plaintiff's asserted interest is the latter, not the former.

A claimant who seeks or welcomes calls to generate TCPA demands does not suffer the unwanted intrusion the statute was enacted to prevent. *See id.* at *3. That is precisely what the record shows here. Plaintiff acquired and used a system designed to monetize alleged TCPA violations, allowed the Calls to continue without answering or stopping them, and used the resulting communications as the basis for a monetary demand and litigation.

The record supports that conclusion. Plaintiff purchased a program expressly marketed as a means of "turning robocalls into cash." The Kit provided templates and strategies for identifying alleged TCPA violations, preparing monetary demands, invoking the leverage associated with putative class litigation, negotiating settlements, and responding when a company produced

evidence of consent. It even prescribed a response asserting that the claimant "never opted-in" and challenging the authenticity of consent records.

Plaintiff then used those materials as intended. She pursued monetary demands against alleged TCPA violators, maintained a target list identifying approximately 100 entities, and referred unresolved demands to Mr. Perrong, who "took the cases that he wanted." She also served as the named plaintiff in at least five putative TCPA class actions beginning in 2024. During the same period in which she received the Calls at issue, Plaintiff renewed access to the Kit's Members Forum because she was "in a better position now to use it." (Graham Decl., Ex. 5.)

Plaintiff's conduct following the Calls is equally inconsistent with a consumer seeking protection from unwanted solicitations. She did not answer any of the Calls, did not ask Sunrun to stop calling, and did not provide any indication during the calling period that she did not want further contact. Instead, after the Calls ended, she used the Kit to prepare a demand letter threatening "a lengthy and detailed discovery process" unless Sunrun satisfied her demand. (*Id.*)

The same pattern appears in Plaintiff's other TCPA actions. In *Bio Trust* and *Paramount*—the only actions whose public dockets contained sufficient information to identify the defendants' consent positions—Plaintiff affirmatively alleged that she had not consented to the challenged communications. When presented with records reflecting webform submissions containing her information, however, she either did not respond or stated that she did not recall them. (Graham Decl. ¶ 9; Exs. 11, 14, 15.) She then voluntarily dismissed each action after the defendant sought discovery directed first to whether she had provided consent. The same progression occurred here: Plaintiff alleged that she had never consented, but when confronted with the July 11 submission and corroborating records, she testified that she did not recall completing the webform.

The evidence surrounding the Calls further distinguishes Plaintiff from the consumers Section 227(c) was designed to protect. The July 11 webform contained Plaintiff's telephone number, name, email address, and other identifying information and expressly authorized responsive calls. Within four days, two additional webforms containing Plaintiff's information were submitted from a closely related IP address, including a second solar inquiry and an unrelated submission that later resulted in separate TCPA litigation. Plaintiff has identified no person who might have

submitted the forms and has offered no evidence explaining how the submissions occurred without her involvement.

The court's reasoning in *Wilson v. Freeway Ins. Servs. of Am., LLC*, No. 6:25-cv-01869-MC (D. Or.), is instructive. In considering similar evidence concerning the monetization of TCPA calls, the court focused on "what Congress was trying to protect" through the do-not-call provisions: consumers who did not want the challenged calls. (Graham Decl., Ex. 19 at 42:24–43:3.) The court contrasted that protected interest with a claimant who was "thriving off of these calls," wanted additional communications rather than stopping them, and treated threatened TCPA class actions as a source of monetary recovery. (*Id.* at 43:3–16, 76:12–77:25.) Although *Wilson* arose in the class-certification context, the court's statutory-purpose analysis underscores the distinction presented here between an unwanted intrusion and a deliberately cultivated source of revenue-generating claims.

The undisputed evidence establishes Plaintiff's purpose. She purchased and used a structured program for monetizing alleged TCPA violations; renewed access to its strategy forum during the calling period; pursued approximately 100 identified targets; referred selected demands for litigation; did not answer or stop the Calls; responded to documented consent evidence with a claimed lack of recollection; and followed a similar course in other actions that ended when consent-focused discovery was proposed. This is not litigation frequency alone. It is a documented course of conduct showing that Plaintiff treated calls as monetizable claims rather than unwanted intrusions.

That course of conduct is materially different from the unwanted intrusion Congress sought to remedy through Section 227(c). Plaintiff's asserted interest is "so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Garcia*, 2020 WL 4431679, at *3, quoting *Stoops v. Wells Fargo Bank, N.A.*, 197 F. Supp. 3d 782 (W.D. Pa. 2016); *see also Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987). Plaintiff therefore falls outside the zone of interests protected by Section 227(c).

## II. EVEN IF PLAINTIFF FALLS WITHIN SECTION 227(C)'S ZONE OF INTERESTS, SUNRUN IS ENTITLED TO SUMMARY JUDGMENT ON TWO INDEPENDENT GROUNDS

### A. Plaintiff Provided Express Permission to Be Called and Established an EBR With Sunrun

The TCPA creates a private right of action for a residential telephone subscriber who receives more than one telephone call within a 12-month period in violation of regulations prescribed under Section 227(c). 47 U.S.C. § 227(c)(5); *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 371–72 (2012). The implementing regulation generally prohibits "telephone solicitations" to a residential telephone number that the plaintiff registers on the NDNCR. 47 C.F.R. § 64.1200(c)(2).

The TCPA excludes from the definition of "telephone solicitation" calls made "to any person with that person's prior express invitation or permission" and calls made "to any person with whom the caller has an established business relationship." 47 U.S.C. § 227(a)(4); *see also* 47 C.F.R. § 64.1200(f)(15). Plaintiff therefore bears the burden of establishing that the Calls were "telephone solicitations," including that they were neither made with her prior express invitation or permission nor placed within an established business relationship. The July 11 submission independently defeats that showing in both respects.

"Express invitation or permission" and "express consent" are interchangeable for purposes of this analysis. *Johansen v. Efinancial LLC*, No. 2:20-cv-01351-DGE, 2022 WL 168170, at *3 (W.D. Wash. Jan. 18, 2022) (quoting *Physicians Healthsource, Inc. v. Cephalon, Inc.*, 954 F.3d 615, 621 (3d Cir. 2020)). A consumer provides express permission by entering contact information and clicking a submission button accompanied by language stating that submission authorizes calls to the number provided. *See Van Elzen v. Am. Home Shield Corp.*, No. 24-C-1206, 2026 WL 1078771, at *7–8 (E.D. Wis. Apr. 21, 2026). For an NDNCR claim, the relevant question is whether the consumer communicated permission that a reasonable person would understand as authorizing the calls. *See Harrell v. Aquion, Inc.*, No. 3:23-cv-1222-WWB-LLL, 2024 WL 4188389, at *3 (M.D. Fla. Sept. 13, 2024); *see also Van Elzen*, 2026 WL 1078771, at *7–8, 10.

The July 11 submission satisfies that standard. It requested information about solar products

and services and contained Plaintiff's telephone number, name, email address, and other identifying information. Immediately below the "Submit" button, the webform stated that submission authorized up to five identified hyperlinked partners—including Sunrun—to call the number entered, even if that number appeared on a national or state do-not-call list. The form therefore communicated express permission to place the Calls.

The submission also satisfies the regulation's written-permission provision, to the extent permission in writing is even required.[3] Section 64.1200(c)(2)(ii) recognizes prior express invitation or permission "evidenced by a signed, written agreement" between the consumer and seller stating that the consumer agrees to be contacted at the specified number. 47 C.F.R. § 64.1200(c)(2)(ii). Plaintiff entered the 5370 Number and other identifying information through the webform and assented to language expressly authorizing the identified partners, including Sunrun, to call that number. The electronic submission and accompanying records therefore evidence the required written agreement. *See Van Elzen*, 2026 WL 1078771, at *7–8.

The July 11 submission separately created an EBR. An EBR includes a relationship formed by a voluntary two-way communication based on "the subscriber's inquiry or application regarding products or services offered by the entity within the three months immediately preceding the date of the call," unless the relationship was previously terminated. 47 C.F.R. § 64.1200(f)(5). The July 11 submission requested information concerning the solar products and services Sunrun offers, and Sunrun placed the Calls within the following five weeks. Because the inquiry occurred within the regulatory three-month period and the relationship had not been terminated before the Calls, the

---

[3] Section 64.1200(c)(2)(ii)'s signed-writing requirement exceeds the statutory text. Congress excluded from "telephone solicitation" calls made with "prior express invitation or permission"; it did not require that permission to be written or signed. 47 U.S.C. § 227(a)(4). Courts must independently determine the statute's meaning, and the FCC may not impose consent requirements Congress did not enact. *See Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 412–13 (2024); *Bradford v. Sovereign Pest Control of Texas, Inc.*, 167 F.4th 809, 811–13 (5th Cir. 2026) (holding that the FCC could not impose a written-consent requirement absent statutory authorization); *Ins. Mktg. Coalition Ltd. v. FCC*, 127 F.4th 303, 312–15 (11th Cir. 2025) (vacating FCC consent restrictions that exceeded the ordinary meaning of the statutory text). Accordingly, prior express invitation or permission is sufficient under the statute without regard to whether it satisfies the regulation's additional signed-writing requirement. In any event, the July 11 electronic submission satisfies that requirement.

Calls also fall within the EBR exclusion from "telephone solicitation." *See Forney v. Hair Club for Men Ltd., Inc.*, No. CV 16-9640-R, 2017 WL 4685549, at *3 (C.D. Cal. June 26, 2017) (EBR defeats claim "despite [plaintiff] registering for the Do–Not–Call list").

The evidence of the submission is not limited to a single record. The submission is independently reflected in the lead card, the accompanying report documenting the submission event, and Sunrun's contemporaneous lead log. Those records contain corresponding lead information and identifiers, document the consent language presented with the webform, and show that the telephone number entered through the form was verified. Sunrun incorporated that information into its business records and placed the Calls only after receiving the documented request.

Plaintiff offers no contrary evidence. Although her Complaint affirmatively alleged that she had not provided consent, Plaintiff did not deny completing the July 11 webform when questioned under oath. She testified only that she did not recall doing so. Plaintiff's claimed lack of recollection does not contradict the affirmative evidence of the submission or create a genuine dispute of material fact. *See, e.g.*, *Voll v. HCL Techs. Ltd.*, No. 18-cv-04943-LHK, 2019 WL 144863, at *5 (N.D. Cal. Jan. 9, 2019) ("lack of memory" as to whether plaintiff "recalls" receiving an email and arbitration agreement does not create a material fact in dispute); *Morgan v. Global Payments Check Servs., Inc.*, No. 2:17-cv-01771, 2018 WL 934579, at * 3 (E.D. Cal. Feb 15, 2018) ("[P]laintiff's failure to remember seeing the terms of an agreement is insufficient to dispute that the plaintiff agreed to those terms").

*Johansen* is instructive. There, the defendant received an online request for an insurance quote containing the plaintiff's contact information and accompanied by consent language located directly below the submission button. 2022 WL 168170, at *1, *3. The plaintiff affirmatively denied submitting the form and identified discrepancies in the submission, including incorrect personal information, an unfamiliar email address, and an IP address associated with a different state and internet provider. *Johansen v. Efinancial LLC*, No. 2:20-cv-01351-RAJ-BAT, 2021 WL 7161969, at *8 (W.D. Wash. June 11, 2021). The court nevertheless held that the defendant's records established consent and that the plaintiff had not produced sufficient evidence to create a

genuine factual dispute. *Johansen*, 2022 WL 168170, at *3–5.

The evidence here is stronger. The July 11 submission contained Plaintiff's telephone number, name, email address, and other identifying information. The minor typographical errors in her last name and email address do not undermine the submission. Plaintiff acknowledged that websites she used had previously populated forms with her name and contact information. The submission also originated from an IP address closely related to an IP address used four days later for two additional submissions containing Plaintiff's information. Unlike the plaintiff in *Johansen*, Plaintiff has not identified an inconsistent location, internet provider, or other objective evidence connecting the submission to someone else. She has identified no person who might have submitted the form and offers only a lack of recollection.

The undisputed record therefore establishes two independent reasons the Calls were not "telephone solicitations." The July 11 submission provided Sunrun prior express invitation or permission to call the 5370 Number, and Plaintiff's inquiry created an EBR with Sunrun. Because Plaintiff cannot establish that the Calls fall within the statutory and regulatory definition of "telephone solicitation," her Section 227(c) claim fails as a matter of law.

**B. Sunrun Is Independently Entitled to the TCPA's Safe-Harbor Defense**

Even if the Court concludes that a factual dispute exists concerning who completed the July 11 webform, Sunrun is independently entitled to summary judgment under the TCPA's safe harbor. Section 227(c)(5) provides an affirmative defense where the defendant "has established and implemented, with due care, reasonable practices and procedures to effectively prevent telephone solicitations in violation of the regulations prescribed under this subsection." 47 U.S.C. § 227(c)(5)(C). The implementing regulation likewise protects a caller that has obtained the NDNCR registration and established procedures meeting specified minimum standards. 47 C.F.R. § 64.1200(c)(2)(i).

The safe harbor applies where a call results from a reasonable mistake despite procedures designed to prevent unlawful solicitations. An "error" is not limited to a mechanical or procedural breakdown; it includes a reasonable mistake concerning whether the recipient authorized the call. *Johansen*, 2022 WL 168170, at *5–6; *Klassen v. Advanced Mktg. & Processing, Inc.*, No. 8:21-CV-

761-MSS-MRM, 2023 WL 11910565, at *5 (M.D. Fla. Mar. 1, 2023).

**1. Any Calls to Plaintiff Resulted From Sunrun's Reasonable Reliance on Documented Permission**

Even if Plaintiff did not complete the July 11 webform, Sunrun called her only because it reasonably believed that she had requested information and authorized responsive calls. Sunrun received a lead requesting information about solar products and services that contained Plaintiff's telephone number, name, email address, and other identifying information. The disclosure immediately below the Submit button expressly authorized Sunrun to call the number entered even if it appeared on a do-not-call list.

The lead was accompanied by a report documenting the submission event, the webform and disclosure presented to the consumer, the IP address associated with the submission, and verification of the telephone number entered through the form. The same submission is reflected in the lead card and Sunrun's contemporaneous lead log. Before the lead became eligible for transmission to the dialer, Zeus verified the compliance token and associated consent language, screened for a recent submission or contact, and checked the number against Sunrun's internal DNC list.

Sunrun therefore did not call the 5370 Number because it disregarded consent requirements or lacked procedures for evaluating incoming leads. It called only after receiving multiple corresponding records indicating that Plaintiff had requested information and expressly authorized contact.

*Johansen* confirms that this constitutes a protected "error." There, the defendant received an online request for an insurance quote containing the plaintiff's telephone number and data indicating consent. The court held that, regardless of whether the plaintiff or a third party submitted the request, the defendant "would be understandably mistaken in its belief that Plaintiff had consented to the call." *Johansen*, 2022 WL 168170, at *3, *5–6; *see also Johansen*, 2021 WL 7161969, at *10.

The record here is stronger. Sunrun received not only Plaintiff's telephone number, but also her name, email address, and other identifying information. The submission also passed Sunrun's lead-verification and suppression checks before any call was made. Even if someone other than

Plaintiff completed the form, Sunrun reasonably relied on objective records showing that the person supplying Plaintiff's information had requested contact.

*Klassen* is consistent. There, the defendant received a lead generated by a webform requesting information. Although the plaintiff demonstrated that the associated IP address did not belong to him, the court granted summary judgment because the defendant placed the calls under the reasonable but mistaken belief that the plaintiff had consented, including in reliance on a Jornaya report. *Klassen*, 2023 WL 11910565 at *1, *2, *4–5.

The same result here aligns with the TCPA's goal of encouraging the use of "reasonable practices and procedures," 47 U.S.C. § 227(c)(5), while limiting the liability of companies seeking to contact existing customers. *See CE Design, Ltd. v. Prism Bus. Media, Inc.*, 606 F.3d 443, 451 (7th Cir. 2010) (broad reading of existing business relationship consistent with regulatory intent).

### 2. Sunrun Established and Implemented Reasonable Compliance Procedures, Which Satisfy the Safe Harbor's Regulatory Standards

Sunrun's practices also satisfy the procedures identified in 47 C.F.R. § 64.1200(c)(2)(i). Those standards include written do-not-call procedures; training of personnel; maintenance of an internal do-not-call list; a process to prevent calls to numbers that should not be contacted; and limitations on the use of the NDNCR. *Id.* §§ 64.1200(c)(2)(i)(A)–(E).

***Written procedures.*** Sunrun maintains written Telemarketing, Do-Not-Call, and Marketing and Advertising Compliance Policies. Those policies require documented consent for outbound telemarketing calls; identify the records that must be maintained for web-generated leads; require maintenance of an internal do-not-call list; require telephone numbers to be screened against that list; establish procedures for recording and honoring do-not-call requests; and require preservation of call and consent records. (*See* Agualo Decl., Exs. A; B; C.)“”

***Training.*** Sunrun requires employees engaged in outbound calling to complete compliance training before placing calls. Those employees and their supervisors receive additional training at least annually. The training addresses consent requirements, the NDNCR, Sunrun's internal do-not-call obligations, recognition and handling of do-not-call requests, and the procedures for recording

those requests in Sunrun's systems. (Agualo Decl. ¶¶ 25–27; *See* Agualo Decl., Exs. D; A at 216–217.)

***Internal do-not-call list.*** Sunrun maintains an internal do-not-call list and suppresses numbers associated with a DNC disposition from future calling activity. (Agualo Decl. ¶ 18.) When Plaintiff's August 30 demand letter provided the first indication that she did not want further contact, Sunrun added the 5370 Number to that list and did not call her again. (*Id.* ¶ 42.)

***Lead-verification and suppression procedures.*** Sunrun calls only consumers for whom it receives records reflecting a request for information and permission to make contact. Web-generated leads must include a compliance token and associated consent language. *Cf. Sapan v. Fed. Sav. Bank*, No. 8:23-CV-00075-CV (ADSX), 2025 WL 3050064, at *3, *7 (C.D. Cal. Sept. 30, 2025) (acknowledging Jornaya report may establish consent and EBR for DNC claim). Zeus also screens each lead for recent submissions or contacts and against Sunrun's internal do-not-call list. A lead that does not satisfy all applicable criteria receives a DNC disposition and is not transmitted for calling. (Agualo Decl. ¶ 18; Graham Decl., Ex. 4 at 27:23–31:6, 98:14–99:6.)

The treatment of Plaintiff's later leads demonstrates that those procedures were implemented, not merely written. Zeus suppressed the July 15, 2024 lead because it was received within 21 days of the prior contact and suppressed the March 6, 2025 lead because the 5370 Number had been added to 'the companies' internal do-not-call lists. Neither lead was transmitted for calling, and no additional calls resulted. (Agualo Decl. ¶ 44.)

***Use of the NDNCR.*** Sunrun does not sell, rent, lease, purchase, or use the NDNCR for an improper purpose and does not share the cost of access to the registry. (Agualo Decl. ¶ 11.) Its procedures instead require documented permission before a lead may become eligible for outbound contact and suppress numbers that should not be called.

The fact that Sunrun does not scrub phone numbers against the NDNCR does not preclude the safe harbor's application. The Ninth Circuit recognizes that substantial compliance with procedural regulatory requirements may suffice "when the essential statutory purposes have been fulfilled." *Johansen*, 2022 WL 168170, at *5, quoting *Shotgun Delivery, Inc. v. United States*, 269 F.3d 969, 973–74 (9th Cir. 2001). And courts have recognized that, where a company's procedures

are designed to ensure that calls are made only with consent—like the calls placed by Sunrun—scrubbing against the NDNCR is not necessary for those procedures to fulfill the essential statutory purpose "to protect consumers from the unwanted intrusion and nuisance of unsolicited telemarketing phone calls." *Van Patten v. Vertical Fitness Group, LLC*, 847 F.3d 1037, 1043 (9th Cir. 2017); *see Johansen*, 2022 WL 168170, at *5; *Van Elzen*, 2026 WL 1078771, at *10. Indeed, as in *Johansen*, Sunrun's "internal procedures . . . prevented calls to Plaintiff except for the calls initiated because of the internet request at issue," even though Plaintiff later submitted additional webforms to CEE.

## **CONCLUSION**

The Court should grant summary judgment in Sunrun's favor.

Dated: September 29, 2026

Respectfully submitted,

Lauri A. Mazzuchetti (*pro hac vice*)
Glenn T. Graham (State Bar No. 338995)
**KELLEY DRYE & WARREN LLP**
7 Giralda Farms, Suite 340
Madison, New Jersey 07940
Telephone: (973) 503-5900
Facsimile: (973) 503-5950
lmazzuchetti@kelleydrye.com
ggraham@kelleydrye.com

*Attorneys for Defendant Sunrun Inc.*