# EXHIBIT 1
# FILED UNDER SEAL

Page 1

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

PEGGY BANKS, individually and on )CASE NO.
behalf of all others similarly )3:24-CV-07877-JST
situated, )(updated No.
)4:24-CV-07877)
Plaintiff, )
)
v. )
)
SUNRUN INC. )
)
Defendant. )
______________________________________)

REMOTE VIDEOTAPED DEPOSITION OF PEGGY BANKS, TAKEN PURSUANT TO SUBPOENA AND NOTICE ON BEHALF OF THE DEFENDANT, ON TUESDAY, MAY 5, 2026, AT 9:03 A.M., AT NORCO, CALIFORNIA, BEFORE WENDY DRISCOLL, CERTIFIED SHORTHAND REPORTER NUMBER 12480.

Page 2

A P P E A R A N C E S
(REMOTELY)

FOR THE PLAINTIFF:

OLIVER LAW CENTER, INC.
BY: DANA OLIVER, ATTORNEY AT LAW
8780 19TH STREET
SUITE 559
RANCHO CUCAMONGA, CALIFORNIA 91707
(855) 384-3262
Dana@danaoliverlaw.com
-- AND --
PERRONG LAW, LLC.
BY: ANDREW PERRONG, ATTORNEY AT LAW
2657 MOUNT CARMEL AVENUE
GLENSIDE, PENNSYLVANIA 19038
(215) 2225-5529
Info@perronglaw.com

FOR THE DEFENDANT:

KELLEY DRYE & WARREN LLP
BY: GLENN T. GRAHAM, ATTORNEY AT LAW
7 GIRALDA FARMS
SUITE 340
MADISON, NEW JERSEY 07940
(973) 503-5900
Ggraham@kelleydrye.com

ALSO PRESENT:

ANGELA LYONS, VIDEOGRAPHER
KIM FURTADO, ESQ.

Page 3

I N D E X


| WITNESS | EXAMINATION BY | PAGE |
|---|---|---|
| PEGGY BANKS | MR. GRAHAM | 5 |


E X H I B I T S


| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| D-1 | Check A License application | 58 |
| D-2 | Yelp page "Peggy Banks Life Insurance Broker" | 62 |
| D-3 | Yelp page "Peggy Banks Team" | 64 |
| D-4 | MapQuest advertisement "Peggy Banks Life Insurance" | 65 |
| D-5 | Yellow Pages "Peggy Banks Life Insurance Broker" | 68 |
| D-6 | Document "Gov Solar Programs Bates SUNRUN-PB-000001-000008 | 74 |
| D-7 | Document "JORNAYA" Bates Nos. SUNRUN-PB-000996-000999 | 75 |
| D-8 | Document Bates No. SUNRUN-PB-000066 | 79 |
| D-9 | Class Action Complaint Peggy Banks vs. Sunrun, Inc. | 83 |
| D-10 | Plaintiff's Omnibus Response to Defendant's First Set of Discovery Requests | 112 |
| D-11 | Template letter 8/28/24 Bates Nos. SUNRUN-PB-000149-000150 | 121 |


Page 4

TUESDAY, MAY 5, 2026, 9:03 A.M.

--ooOoo--

THE VIDEOGRAPHER: Good morning. We are now on the record. The time is 9:03 a.m., Pacific on May 5th, 2026. This begins the videoconference deposition of Peggy Banks taken in the matter of Peggy Banks, individually and on behalf of all others similarly situated versus Sunrun, Incorporated, filed in the United States District Court for the Northern District of California. Case No. 3:24-cv-07877-JST.

My name is Angela Lyons. I'm your remote videographer today. The court reporter is Wendy Driscoll.

Will all counsel please introduce themselves and state whom you represent, after which the reporter will swear in our witness.

MR. GRAHAM: Good morning. Glenn Graham for Kelley, Drye and Warren for Defendant Sunrun, Inc.

MR. OLIVER: This is Dana Oliver with Oliver Law Center representing Peggy Banks.

THE STENOGRAPHER: Good morning. My name is Wendy Driscoll. I am a California Certified Shorthand Reporter. My license number is 12480.

////

A David Vanzant.
Q And his family. Married, does he have children?
A Married and his daughter lives here as well.
Q How old is his daughter?
A Um, 21, 22. I believe she's 22.
Q Have they lived with you at that address the entire time, 2019?
A No. My brother moved here last -- I want to say August of last year.
Q August of 2025?
A Yes.
Q So between 2019 and August of 2025, anyone else live with you?
THE STENOGRAPHER: Counsel, I'm so sorry. My Internet connection froze and didn't get the end of your question and if there was an answer. I have, "So between 2019 and August of 2025, anyone else live with you," and everyone froze.
THE WITNESS: I said, "No."
THE STENOGRAPHER: Thank you.
BY MR. GRAHAM:
Q You mentioned it's a -- you live in the back house. Is the property a single-family home?
A Yes, single-family home. She has a half acre. It's a -- it's actually a trailer in the backyard.



Q Okay. You stay in the trailer. Do you spend most of your time in the house with -- where your mother and your brother reside?
A No, I spend most of my time in the trailer house.
Q Do you have an Internet service provider at the trailer?
A No, it's connected to the house.
Q The same Internet service provider provides Internet to the house and the trailer?
A Correct.
Q And what about utilities? Is it the same utilities?
A Yes.
Q Who is the electricity provider?
A I believe Edison.
Q How about the Internet service provider?
A I believe it's Spectrum.
Q Who pays for the utilities at the address?
A My brother started paying for it since he's moved in.
Q Prior to your brother moving in, who paid it?
A My mom.
Q Were you still working as a life insurance broker when you first moved into this address?



A No, I don't believe so.
Q Where did you live prior to the Norco address?
A In -- at the RV park, Shore RV Park.
Q That was the one in San Dimas, California?
A Correct.
Q How long did you live at the RV park?
A I want to say about -- I don't know for sure. I'm going to say about five years.
Q So estimate would be about 2014 to 2019?
A Possibly, yes.
Q Did you live with anybody at the RV park?
A My son.
Q What's your son's name?
A Justin.
Q Justin Banks?
A Yes.
Q How old is your son?
A He is now 26.
Q Did you own the RV at the RV park or did you pay rent?
A I owned the RV, but rented the space.
Q Did you pay the utilities at the RV park?
A No, that was included.
Q Included in the -- the price of the fee you paid to rent the space?



A Correct.
Q Do you recall who the electricity provider was?
A I have no idea.
Q Did you have Internet at the RV park?
A No, I used my cell phone hotspot.
Q It's fair to say you used your cell phone to browse the Internet when you lived at the RV park?
A Yes.
Q Do you still currently use the Internet on your cell phone?
A Yes.
Q Let's go back to the Norco house. Does that house have solar panels?
A No.
Q Did it ever have solar panels?
A No.
Q How about at the RV camp? Were there ever any solar panels installed on the RV?
A There is a couple of small solar panels that came with the RV.
Q That came with your RV?
A Yes.
Q Did you have solar energy when you lived at the RV park?
A No. It's just enough solar to run the lights

when it's unplugged, like, a few lights when it's unplugged.

Q Can you explain what you mean by that?

A Just enough solar -- they're very small solar panels. It's just enough to help run a couple of lights when the trailer is unplugged. You plug the trailer in for power.

Q Plugged in so the trailer primarily was on electricity to get power?

A Yes.

Q But it also had solar as -- if I'm misunderstanding you, it sounds like you said it had solar power as backup?

A Very minimal backup.

Q Did you pay anyone for the -- the use of those solar panels?

A No.

Q Do you know who installed them?

A No.

Q Did you ever call to have them serviced in any manner?

A No.

Q How many RVs were at the RV park, approximately?

A Oh, I -- I'm going to guess, maybe 200.

Q Do you know if any of those other RVs had solar



power?

A I have no idea.

Q When you worked at the RV -- excuse me -- you worked as a clerk at the RV park, was that a separate building or did you work from your RV?

A Separate building.

Q Was it an RV itself or was it a physical building?

A It was a physical building.

Q Did that building have solar panels?

A I have no idea.

Q Do you know your mailing address when you lived in San Dimas?

A At the RV park?

Q Correct.

A It was Camper View Road, but I don't -- I don't recall the address.

Q Does the address [redacted] sound familiar to you?

A That sounds correct, yes.

Q That was your address?

A Yes.

Q Did you sell the RV when you moved from San Dimas to Norco?

A No. I moved the RV and that's what I'm in now.



Q That's the -- so it's the same -- the same RV physically, just you moved the address?

A Correct.

Q Okay. Do you still have the solar panels on the RV?

A Yes.

Q Do you still use them?

A I don't use them per se, they're still there, they're still plugged in. I'm plugged into the house so they -- they're not in use.

Q So currently, you're primarily plugged in to the electricity at the physical house in Norco?

A Correct.

Q I'm just trying to get a sense of the setup. When you say the solar panels are still plugged in, can you explain what you mean, what they're plugged into, et cetera?

A They're just wired into the trailer on the roof. I've never been on the roof to undo them or service in any way.

Q So then how does it work? If you unplug the RV, the trailer, from the physical house, solar power would kick in as a backup? Is that fair to say?

A Only for one or two lights it works, but it doesn't work for anything else. As far as running TV or



the appliances, it will not work.

Q If you lose power in a storm or whatever, would the solar panels kick on the few lights that we're talking about?

A Probably, yes.

Q Since you lived at the Norco address, have you called anyone to service or otherwise maintain the solar panels?

A No.

Q And I apologize if I asked this already. When you purchased the RV, was there a line item for the solar panels?

A I'm not understanding.

Q Sure. I'll -- I'll -- I'll rephrase it. So when did you purchase the RV?

A The same time that I moved in the San Dimas park.

Q Was the RV already in the park?

A No, I purchased it and had it moved there.

Q Do you recall who you purchased it from?

A It was a very small dealership in Glendora. I don't recall the name.

Q It was from a dealership, not an -- not an individual person?

A Correct.

Q Is it the same laptop and the same phone you have today?
A Correct.
Q Besides you, who had access to those devices?
A Only myself.
Q Do you save your web browser history?
A Computer probably does automatically, but I -- I don't save it.
Q Let me ask it a better way. Do you delete -- have you ever deleted your web browser history?
A I have had to when they slow down too much, yes.
Q When you say "they slow down too much," what do you mean?
A The computer crashes or I'm having trouble accessing different websites, trying to troubleshoot and I've gone in and deleted the history.
Q Do you know the last time you deleted your browser history from your phone?
A My phone? I don't know if I've done it with my phone, only my laptop.
Q When was the last time you deleted the browser history from your laptop?
A Quite a while now.
Q Was it after July 2024?
A Probably.



Q When you worked as a life insurance agent, Ms. Banks, did you post your -- your company's name information in the yellow pages?
A No, not that I recall.
Q Do you recall if you listed your company's name and information on any other site or search engine other than your own website that we talked about?
A I may have put it on Google at one point.
Q Did you -- when you worked as a life insurance agency -- excuse me, when you worked as a life insurance broker, did you have any employees or subcontractors or other independent contractors that worked with you?
A No.
Q You worked alone?
A Correct.
Q Did you ever refer to your company or agency as the "Peggy Banks team"?
A I don't remember if I did. I might have.
Q Do you recall whether you ever listed your company's information on Yelp?
A I don't recall.
Q I'm going to drop another exhibit in the chat, this is Exhibit D-2 I'd like to introduce.
(Exhibit D-2 marked for identification.)



THE WITNESS: I've seen that it shows up there, but I didn't submit it myself that I -- no.
BY MR. GRAHAM:
Q Let me know when you have a chance to see the exhibit.
A Okay. I have it up.
Q This -- this is a Yelp page. Have you seen this before?
A I have.
Q And so this -- it says, "Peggy Banks life insurance broker." Is that referring to you?
A That's referring to me, yes.
Q And Bankslifeagency.com is the website we discussed, that's your website that's referring to on the right-hand side right there?
A Correct.
Q The number listed, the business phone number listed here is the -5370 number; is that right?
A Yes.
Q Do you recall whether or not you submitted this information to Yelp?
A I did -- I don't believe I did. It shows unclaimed under my name. Unclaimed. It indicates to me that I did not.
Q Do you know if anybody else submitted that



information to Yelp?
A I don't know. I don't know how they get the information.
Q I'm going to introduce now Exhibit D-3.
(Exhibit D-3 marked for identification.)
BY MR. GRAHAM:
Q Let me know when you have D-3, Ms. Banks.
A Okay, I have it open.
Q This is the Yelp page for the Peggy Banks team. Do you see that?
A Yes.
Q Have you seen that before?
A I don't remember this one, no.
Q The address on the right-hand side it says, "Triple Diamond Realty, San Dimas, California." Do you see that?
A Let's see. I'm not sure where that one -- I don't see that.
Q The blue heading in the right that says, "Get directions."
A I'm not seeing it. To the right it says, "Reach out to other business owners request" -- oh, okay. It's very small. I'm sorry. I -- I see it now.
Q You see where it says the, "Triple Diamond

and filled out information requesting -- or filled out a form requesting information about any products?
A About any products? I -- I don't know. Not that I can remember.
Q Do you know whether anyone in your household has ever requested information about solar online?
A I have no idea.
Q Have you ever requested on phone or online information regarding a product or service about which you were not actually interested?
A No.
Q Have you ever gone on a website online and it autopopulates your information, your name and contact information?
A Possibly.
Q When you've done that, have you ever noticed that your name or contact information is a typo or is otherwise inaccurate?
A Not that I remember.
Q Do you know if the IP address [redacted] is associated with you or anyone in your household currently or in the past?
A I have no idea.
Q Do you know how to look up your IP address?
A I don't.



MR. GRAHAM: I'd like to mark, I believe we are up to Exhibit D-6.
(Exhibit D-6 marked for identification.)
BY MR. GRAHAM:
Q I'm going to introduce a document that has been marked D-6. I'll say for the record, this has been Bates labeled SUNRUN-PB-000001 through -8.
Ms. Banks, can you tell me when you've see that?
A Okay, I have it open.
Q Just scroll through it. I know it's eight pages long, you could just scroll through. And have you seen this before?
MR. OLIVER: Make sure you look at it well, Ms. Banks.
THE WITNESS: Okay. I see that it was done in San Dimas, out in San Dimas. E-mail address is -- doesn't show that it's my e-mail address, but it's phone number and characters. No name on this document.
BY MR. GRAHAM:
Q This appears to be a web form; is that right?
A Yeah.
Q Have you seen this web form before?
A I don't -- so no. (Inaudible.)
MR. GRAHAM: I'm going to mark Exhibit D-7.



(Exhibit D-7 marked for identification.)
BY MR. GRAHAM:
Q Let me know when you have that. I'll represent that this exhibit is Bates Numbered SUNRUN-PB-000996 through -99.
Have you seen this exhibit before?
A Just yesterday.
Q Do you know what this is?
A It looks like a -- a lead form.
Q We can go to the second page. And I'll ask Kim if it's easier to share the screen so we can all look at the same?
A Okay.
Q So -- so you looked at this yesterday when you were preparing?
A Correct.
Q So this document you looked at in addition to the other two documents that we discussed earlier?
A Correct.
Q Were there any other documents, other than those three documents that you looked at in preparation for this deposition?
A Um, let me see this -- was this -- I don't know if I recall this -- I didn't call it a document. I guess



it is. It was about 14 different documents that were sent to me to review.
Q Do you recall what those were?
A Let's see here. We have to open some of them to --
MR. OLIVER: Yeah. Ms. Banks, don't -- don't do any searching at the moment, just --
THE WITNESS: Okay. Okay. I don't recall what they all are.
BY MR. GRAHAM:
Q That's a fine answer. If you don't recall, that's the answer.
A Okay.
Q So this, if you look at the second page, this is a guardian TCPA report. It says, "Who is Jornaya," in the middle there. Scroll down, Kim. It says, "Jornaya provides neutral third-party technology based platform that tracks the origin and the history of a lead event and the consumer actions that occurred at the event."
A Okay.
Q And "How does Jornaya help companies keep TC- -- or excuse me. "How does Jornaya help keep companies TCPA compliant?" Do you see that section?
A Yes.
Q It says, "As a neutral third-party witness to

Page 77

the events that take place on the website or a call center and provides facts on what happened during a consumer's visit to the website or direction."
Do you see that?
A Yes.
Q "It helps" -- "helps companies to verify, among other things, disclosure language. Was a TCPA disclosure displayed or provided to the consumer?" Do you see that?
A Yes.
MR. GRAHAM: Go down to the next page, Kim.
Q It lists an event date of July 11th, 2024.
A I see it.
Q Event time of 7:27 p.m. and an IP address of [redacted] And there is a label "TCPA disclosure statement." Do you see that?
A Yes.
MR. GRAHAM: Go down to the next page, Kim.
Q The number listed there is [redacted] Do you see that?
A Yes.
Q Is that your phone number?
A Yes.
MR. GRAHAM: And I'll ask Kim to play the -- on the visual playback link. This has match data for --
MR. PERRONG: Hold on, hold on. I'm going to

Page 78

object here because A, the visual playback has not been made an exhibit. B, there is a disclosure pop-up that was shown when the link is clicked that was omitted from the witness's visual -- visual -- what you're showing the witness right now.
MR. GRAHAM: Can you re- -- reload the link, Kim?
MR. PERRONG: And I want that disclosure put in the record.
MR. GRAHAM: Your objection is noted, Mr. Perrong. I would ask that Mr. Oliver or you coordinate on who is making objections.
BY MR. GRAHAM:
Q If you're ready, Ms. Banks, we can move forward.
A Okay, I see it.
MR. GRAHAM: Kim, if you can just play.
Q So you can see the web form displayed there, Ms. Banks?
A Okay, yes.
Q Does that refresh your recollection as to whether you've seen this web form?
A I didn't see it online that it was filled out. I saw it yesterday, plain as --
Q Have you ever seen this on your phone?
A No.

Page 79

Q Sitting here today, can you state whether or not you submitted a web form via your phone?
A Any web form?
MR. OLIVER: Object to the form of the question.
MR. GRAHAM: I'll rephrase it.
BY MR. GRAHAM:
Q Can you state, sitting here today, whether you recall ever submitting a web form that looked like this via your phone?
A Not that I recall.
MR. GRAHAM: Can you take that down, Kim? We're up to Exhibit D-8; is that correct?
(Exhibit D-8 marked for identification.)
BY MR. GRAHAM:
Q I'm going to introduce Exhibit D-8 to the chat. Ms. Banks, let me know when you've got that. It's a document that's been Bates labeled SUNRUN-PB-000066.
Do you see that?
A It's pulling up. I see it.
Q Have you ever seen this document before?
A Not that I can recall.
Q I'll represent to you that this is the information in Sunrun's system that was submitted via web form you just reviewed.

Page 80

A Okay.
Q The first name is Peggy; is that correct?
A Correct.
Q Is that your e-mail address listed, [redacted]?
A It's spelled wrong, the A was omitted.
Q I believe you testified earlier that you also have a [redacted]?
A No.
MR. OLIVER: Objection. Yeah, objection to the form, but go ahead.
THE WITNESS: I testified that's not my e-mail.
BY MR. GRAHAM:
Q My apologies. And do you see the last name is spelled --
A Wrong.
Q -- incorrectly as well. It's spelled B-n-a-k-s; is that correct?
A Correct. That's spelled wrong.
Q The A and the N are inverted?
A Right.
Q And the phone number listed, [redacted]; is that right?
A Yes.
Q Is that your phone number?

A Yes.
Q And the electric utility is Southern California Edison. Is that your utility provider?
A I believe so. I don't pay the bill.
Q The address is the [redacted] address. That is the address from the RV park; is that right?
A Correct.
Q Sitting here today, does that recall whether you ever submitted this information online regarding solar?
A No. I didn't live at that park at that time. The time that the calls started, the lead was submitted.
Q Do you recall ever submitting your information online via an autofill form?
A Not that form, I don't recall.
Q Do you know if anybody else would have submitted your information online?
MR. OLIVER: Objection to --
THE WITNESS: I --
MR. OLIVER: -- the form. Apologies. Objection.
If you -- if you know the answer, you can provide it.
THE WITNESS: I have no idea if anybody else would submit my information.



BY MR. GRAHAM:
Q When you fill out a form online, do you know if you have autofill set up on your phone?
A I believe I do.
Q How long have you had autofill set up for?
A Quite some time.
Q More than three years?
A Yep.
Q More than five years?
A Probably.
MR. GRAHAM: We've been going about another hour. Why don't we take -- do you want to take another five-minute break?
THE WITNESS: Okay.
MR. OLIVER: That's fine.
THE VIDEOGRAPHER: All right. Off video record at 11:13 a.m., Pacific time.
(Off the record at 11:13 a.m. and resumed at 11:21 a.m.)
THE VIDEOGRAPHER: We are back on video record at 11:21 a.m., Pacific time.
MR. GRAHAM: Welcome back, Ms. Banks.
THE WITNESS: Thank you.
BY MR. GRAHAM:
Q I'll ask again, did you speak with anybody



during the break?
A No, I didn't.
Q Did you text with anybody?
A No.
Q You mentioned before, before I introduce this.
Ms. Banks, what is your understanding of why we're here today?
MR. OLIVER: Object to the form of the question.
You can answer, if you understand.
THE WITNESS: Can you rephrase the question?
BY MR. GRAHAM:
Q Sure. We're sitting here today in your deposition; is that right?
A Correct.
Q Do you know why you're being deposed?
A Because the PCA violations of the unwanted phone calls.
Q Can you explain what you mean by that?
A The unwanted phone calls that I got on my phone, as well as everybody else in the class action lawsuit. I'm not understanding if you need more.
MR. GRAHAM: I'm going to introduce Exhibit D-9.
(Exhibit D-9 marked for identification.)
//



BY MR. GRAHAM:
Q Introducing Exhibit D-9. Let me know when you open that up and you can see that.
A Okay. Okay, I have it.
Q This is entitled, "Class Action Complaint of Peggy Banks versus Sunrun, Inc."
Do you see that on the first page?
A Yes.
Q Do you see that blue bar on the top of the first page --
A Yes.
Q -- numbered document?
And then it says, "Filed 11-11-24." Do you see this?
A Yes.
Q I'll represent this is the initial complaint filed in this matter. Have you seen this document before?
A Yes.
Q Can you tell me what it is?
A It's a complaint for class action lawsuit of unwanted phone calls.
Q Do you know -- you mentioned it was a class action before. Do you understand what a class action is?
A Yes.
Q What is it?

MR. OLIVER: Objection to the form of the question.
If you know it, answer.
THE WITNESS: Basic information, what a class action is is representing a class of other people, providing my testimony and evidence for the whole class to -- to Sunrun and unwanted phone calls.
BY MR. GRAHAM:
Q What classes of persons are you seeking to represent?
MR. OLIVER: Objection to the form of the question.
If you understand, you can answer.
THE WITNESS: I'm not sure what you mean.
BY MR. GRAHAM:
Q You stated before that this is a class action and there's other persons that you're seeking to represent; is that right?
A Correct.
Q So what -- what other persons are you seeking to represent?
MR. OLIVER: Objection --
THE WITNESS: The other people that --
MR. OLIVER: One second. I'm sorry. Just a little pause there.



Objection to the form of the question, but you can answer.
THE WITNESS: Other people that received the unwanted phone calls.
BY MR. GRAHAM:
Q How do you know a phone call is unwanted?
MR. OLIVER: Objection to the form of the question.
If you understand, you can answer.
THE WITNESS: They weren't requesting the information and unwanted phone call.
BY MR. GRAHAM:
Q If somebody requested information and received a call, they would be part of your class?
A Probably not, yes.
Q Are there any other persons you're seeking to represent in this -- this action?
MR. OLIVER: Objection to the form of the question.
If you understand, you can answer.
THE WITNESS: I'm not sure.
BY MR. GRAHAM:
Q Other than those who allegedly received unwanted calls, is there anybody else you're seeking to represent?
MR. OLIVER: Same --



THE WITNESS: No.
MR. OLIVER: -- objection.
THE WITNESS: Sorry.
BY MR. GRAHAM:
Q Sitting here today, can you identify any people that you believe would be members of the class you're seeking to represent?
A I can't identify myself, no.
Q What -- what do you mean you can't identify yourself?
A Myself, I can't identify other people.
Q Got it. Can you scroll through Exhibit D-9.
A Okay.
Q Did you review and approve of this document before it was filed?
A Yes.
Q Can you tell me, in your own words, what you're claiming for in this action?
MR. OLIVER: I'm going to object to the form of the question.
And you can answer, if you know.
THE WITNESS: I -- I don't know what you mean.
BY MR. GRAHAM:
Q You filed this case against Sunrun; is that right?



A Correct.
Q Can you explain to me why?
A Because they repeatedly called and request information.
Q What information are you referring to?
MR. OLIVER: Objection to the form of the question, but go ahead.
THE WITNESS: About solar specs.
BY MR. GRAHAM:
Q Did you ever speak with anyone from Sunrun on any of these calls?
A Not that I can recall.
Q Did you ever answer any of the phone calls?
A Not that I can recall.
Q Did you ever tell Sunrun to stop calling you?
A No.
Q Do you recall the time frame of these phone calls?
MR. OLIVER: I'm going to insert a late objection to the last question. Not this last one, but the one before that.
But go ahead, please.
THE WITNESS: I don't -- I don't recall.
BY MR. GRAHAM:
Q Do you know how many phone calls you're seeking

case.
BY MR. GRAHAM:
Q Are you seeking any monetary relief?
A It goes with it, yes.
Q What are you seeking?
MR. OLIVER: Objection to the form of the question.
If you understand, you can answer.
THE WITNESS: I don't have a number, an amount.
BY MR. GRAHAM:
Q You're seeking monetarily, but you don't know the number that you're seeking?
A Correct.
Q Have you ever made any demand to Sunrun in connection with these calls?
A I did.
Q What monetary demand did you make?
A I don't recall the number right now, it's not in front of me.
Q When did you make that demand?
A I sent them out a letter.
Q Who did you send the letter to?
A I believe it was the CEO of Sunrun.
Q Did you receive a response to that letter?
A No response.



Q Have you sent other demands to other companies?
A Yes.
Q How many?
A Probably 10 to 15. I don't have the exact number.
Q What companies did you send those demands to?
A I don't have them in front of me. I can probably remember a few of them, but I don't -- I don't recall all of them.
Q What are the ones you remember?
A There was -- the company was called ARC. I don't remember what it stands for. There's another one, BioTRUST. I can't remember any now offhand.
Q In the letter that you sent to Sunrun, did you draft that letter or did someone else draft it?
A It was a template from a kit that I could modify.
Q What kit is that?
A Robocallsforcash -- robocallstocash.com I believe is the website where I bought it.
Q You bought a template from website?
A I bought the whole kit. It was in a PDF form.
Q When did you buy that?
A I'm not positive. I'm going to guess 2022 or before. I don't know. A few years ago.



Q Have you used that kit and template to send all the demands you just discussed here?
A Yes.
Q Have you received money from those demands?
A From the demand letters, no.
Q Have you --
A But --
Q -- received any other than from the demand letters?
A From the attorneys. They came from the attorneys, not from doing it myself.
Q Can you explain what you mean by that?
A From settlements. I send the demand letters, I got no response. So I sent it to Andrew and he took the cases that he wanted and then proceeded with the cases.
Q Who is Andrew?
A Andrew Perrong.
Q Do you have, in your possession, the kit of documents you received from robocalls.cash?
A I'm sure I have it somewhere. I haven't used it for quite a while.
Q Did you find your attorneys through the find a robocall attorney through the robocalls.cash website?
A No.
Q Did you do any investigation into the calls from Sunrun to determine whether they were robocalls before you sent the template letter?



A No.
Q Do you know what your responsibilities are as a class representative?
A Basically, I'm responsible for submitting the evidence, representing everybody, talking to the attorneys, this deposition kind of stuff.
Q Have you disclosed robocalls.cash kit or any other information to your attorneys in connection with our discovery requests?
MR. OLIVER: Object to the form of the question, but yeah. I'm going to object to the form of the question, but you can -- if -- if you can answer that question without talking about communicating with your counsel, then that's fine, but it doesn't sound like it, you know. But if you can independently, go ahead.
THE WITNESS: Yeah, I -- I don't know.
BY MR. GRAHAM:
Q Have you turned the kit over to your attorneys?
A No, not that I recall.
MR. GRAHAM: I'll ask that that be provided as it's responsive to discovery, but I'll put together a list after this call.
MR. OLIVER: Okay.

Page 121

Q I'm dropping in an exhibit marked D -- D-11.
(Exhibit D-11 marked
for identification.)
BY MR. GRAHAM:
Q Let me know when you've seen that.
A Okay.
MR. OLIVER: One moment, Counsel. Thank you.
BY MR. GRAHAM:
Q Do you recognize Exhibit 11, Ms. Banks?
A Yes.
Q What is it?
A A template letter that I had sent to Sunrun.
Q You sent about 10 or 15 letters of these template letters to other companies; is that fair?
A Sounds about right, yes.
Q I believe you testified, other than this action, you were a plaintiff in five other class actions. Are you familiar with a case captioned Bank versus -- Banks versus Quinn Street?
A Yes.
Q Were you the plaintiff in that case?
A Yes.
Q What were the claims?
MR. OLIVER: Objection to the form of the question.

Page 122

If you know, you can answer.
THE WITNESS: I'm not understanding the questions.
BY MR. GRAHAM:
Q Do you know what your claim against Quinn Street was?
A Two TCP- violations -- -A violations.
Q Did you send Quinn Street a -- a letter?
A I believe so.
Q Did you receive money as a result of that case?
A Um, yes.
Q How much money did you recover?
MR. OLIVER: Objection to the form, but go ahead.
THE WITNESS: I would have to look at it to see how much that particular one was.
BY MR. GRAHAM:
Q Do you have records?
A I do somewhere, yes.
Q Did you claim that money as income?
A Yes.
Q Did you report it to the IRS?
A Not yet. I haven't filed my taxes actually yet from last year.
Q Who's your counsel in that case?

Page 123

A It would have been Andrew Perrong, I believe.
Q Another case is Banks versus Strategic Consulting and Forensics. Does that sound familiar to you?
A Yes.
Q And do you know what your claims in that case were?
A I don't have the numbers in front of me.
Q Do you know what cause of action you brought?
A The same.
Q The TCPA case?
A Yes.
Q And did Strategic -- did you send Strategic Consulting and Forensics a template letter?
A Yes.
Q Who was your attorney in that case?
A That was the, um, the other attorney I spoke with, Calvin Chang. I don't have the exact number in front of me.
Q You have that somewhere?
A Yes.
Q Did you claim that as income?
A It will be when I file taxes, yes.
Q When did you receive that payment?
A It was last year, in 2025. I don't remember the exact date.

Page 124

Q Did you receive the payment for the Quinn Street case in 2025 as well?
A Yeah, I -- I believe so.
Q Another case. Are you familiar with Banks versus Dream Source Consulting, LLC?
A Yes.
Q And what were the claims in that case?
A It was ongoing.
Q What are your causes of action?
A Same, TCPA violations.
Q Who is your attorney in that case?
A Calvin Chang.
Q Is Andrew Perrong or Dana Oliver involved in that case?
A No.
Q That one is ongoing you said?
A Yes.
Q When did you file that case?
A It would have been last year. I don't know. I don't have the date in front of me.
Q How about Banks versus BioTRUST Nutrition?
A Yes.
Q What claims did you bring under that case?
A Same, TCPA violations.

Q Going back to Dream Source, you sent -- did you send them a template letter?
A Yes, I believe so.
Q Did you send a template letter to BioTRUST Nutrition?
A I believe so, yes.
Q Who was your counsel in that case, the nutrition case?
A Andrew Perrong.
Q Did you receive money as a result of that case?
A I did.
Q Do you know how much?
A Um, I don't have it in front of me.
Q When did you receive that payment?
A I believe it was about a month ago for that one.
Q 2026?
A Yes.
Q Are you familiar with Banks versus Paramount Builders?
A Yes, vaguely. Yes.
Q Vaguely?
A I think that was the first one that was settled.
Q Do you know what your claims were in that case?
A The same, TCPA violations.
Q Did you send a template letter to Paramount Builders?



A Yes, I believe so.
Q Who was your counsel in that case?
A I believe that one was Andrew Perrong as well.
Q What money did you recover as a result of that case?
A I -- I don't have it in front of me. I don't recall exactly.
Q You have the records of that one as well?
A I'm sure I do somewhere.
Q When did you receive the payment for that one?
A If I recall correctly, it would have been in the beginning of 2025. I'm not positive.
Q Is it fair to say that all of your payments related to your TCPA causes of action and demands were received in 2025 or later?
A Yes. I believe so, yes.
Q Are there any other cases that you filed that I have not mentioned?
A Not that I am aware of. Not that I could think of at this time.
Q Can you think of any other companies that received demands that we did not discuss?
A Just the ones that I couldn't remember the names of them, and I haven't pursued at this point.



Q Just for clarification, you haven't received money for any of the other -- other demands?
MR. OLIVER: Sorry, Counsel. I didn't understand what you just said.
BY MR. GRAHAM:
Q The other template demands that you can't remember that you sent, you said you sent, but you don't remember to who, you haven't received any payment as a result of those; is that fair?
A Correct, yes.
Q The robocalls.cash kit, do you recall how much you paid for that?
A Um, I believe it was 40 or 50 bucks, somewhere around there.
Q Do you recall when you purchased that?
A Um, about three years ago. I'm not positive.
Q Anybody recommend the robocalls.cash site to you?
A I saw the owner on TikTok talking about it.
Q Do you know who the owner is, what his name is?
A Dock Compton.
Q Dock Compton?
A Yes. I don't know if that's his legal name, but that's what he goes by.
Q I know there's a -- a members forum with respect to that website. Are you a member of the member's forum on Facebook or any other social media?



A No. I joined for a couple of months, but that was it.
Q Did you ever fill out any forms or otherwise submit information concerning any of the recipients of your demand letters through that forum?
A No.
Q Did you ever mention any of your lawsuits?
A No.
Q Did you ever otherwise contact anyone through the robocalls.cash website?
A No.
Q Did you ever disclose to the robocalls.cash website how much money you've made from your various lawsuits and demands?
A No.
Q You have no -- have not authorized a demand with respect to Sunrun; is that true?
A That's accurate, yes. Correct.
MR. GRAHAM: Thank you, Ms. Banks. I have no further questions.
THE WITNESS: Thank you.
MR. OLIVER: I have no questions.
THE VIDEOGRAPHER: Can I please get transcript