# EXHIBIT 19

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

| | | |
|---|---|---|
| CHET MICHAEL WILSON, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>FREEWAY INSURANCE SERVICES OF AMERICA, LLC,<br><br>Defendant. | ) | No. 6:25-cv-01869-MC |

Oral Argument

TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE MICHAEL J. McSHANE

CHIEF UNITED STATES DISTRICT COURT JUDGE

August 19, 2026

APPEARANCES

FOR THE PLAINTIFF:

ANDREW ROMAN PERRONG
Perrong Law LLC
1669 Edgewood Road
Suite 218
Yardley, PA 19067

FOR THE DEFENDANT:

RYAN WATSTEIN
Watstein Terepka LLP
75 14th Street N.E.
Suite 2600
Atlanta, GA 30309

FOR THE DEFENDANT:

REBECCA RHYM
Watstein Terepka LLP
75 14th Street N.E.
Suite 2600
Atlanta, GA 30309

FOR THE DEFENDANT:

JAMES MICHAEL RULEY
Watstein Terepka LLP
75 14th Street N.E.
Suite 2600
Atlanta, GA 30309

FOR THE DEFENDANT:

TIMOTHY J. FRANSEN
Cosgrave Vergeer Kester, LLP
900 S.W. Fifth Avenue
24th Floor
Portland, OR 97204

COURT REPORTER: Lindsey A. Weresch, RMR, CRR, CSR
United States District Courthouse
1000 S.W. Third Avenue, Room 301
Portland, OR 97204
(503)326-8047

(Wednesday, August 19, 2026, 1:29 p.m.)

**P R O C E E D I N G S**

(Whereupon, the following proceedings were held in open court:)

THE COURT: Please remain seated, folks.

Do you need some time to get set up?

MR. WATSTEIN: I think we're all set up, Your Honor. I guess it depends on whether you can see what we can see.

THE COURT: Well, I see something that says Wilson v. Freeway Insurance, so --

MR. WATSTEIN: That's right then.

THE COURT: All right.

MR. PERRONG: I cannot see anything, though, Your Honor.

THE COURT: Let's make sure we get it up on all our screens.

(Whispered discussion, off the record, 1:29 p.m.)

MR. WATSTEIN: There we go.

THE COURT: Okay. Just a reminder our court reporter today is remote from, I assume, Portland. So if you could make sure to keep your microphones close and your voices up, maybe a little slower than what we're used to speaking.

But, with that, Ms. Pew, if you would call the Wilson case.

THE COURTROOM DEPUTY CLERK: Now is the time set for

Civil Case 25-01869, Wilson versus Freeway Insurance Services of America, LLC, oral argument on motion to deny class and motion to voluntary dismiss.

THE COURT: All right. If the attorneys could please introduce themselves for the record, starting with plaintiff's counsel.

MR. PERRONG: Good afternoon, Your Honor. Andrew Perrong for the plaintiff, Chet Wilson.

THE COURT: Thank you, Mr. Perrong.

And for the defense.

MR. WATSTEIN: Good afternoon, Your Honor. Ryan Watstein, with Watstein Terepka, for the defendant.

MR. RULEY: Good afternoon, Your Honor. James Ruley here on behalf of defendant Freeway Insurance Services.

THE COURT: All right.

MR. RHYM: Rebecca Rhym, with Watstein Terepka, on behalf of defendant.

THE COURT: Thank you.

MR. FRANSEN: Tim Fransen, local counsel from Cosgrave Vergeer Kester, for defendant.

THE COURT: All right. Thank you, everybody.

All right. Thank you. I know it's probably late to say this, but I guess I had been anticipating this was going to be done by video. And perhaps you folks had talked and preferred to come to Eugene, Oregon. I do appreciate you

coming here.

I know that's an added cost that, had we maybe had more of a discussion, I would've happy to defer. I do think it's more helpful in person, so I hope it wasn't too burdensome to have you travel here. At least it's the summer and the weather's not bad, so I hope you have at least a moment to enjoy Oregon.

I thought -- I probably have more questions for Mr. Perrong, but I think it's appropriate -- because really the fundamental piece of the motion is really the defense motion to deny certification, we can start with them. It sounds like we have a PowerPoint presentation, so why don't we start with that.

MR. WATSTEIN: Sure. Thank you, Your Honor. And I have a brief note on my phone, so I'm not -- I'm not reading my phone.

Before I get into the PowerPoint, I just want to say something briefly about my firm because it's pertinent to the motion that we filed. We're not a defense-only firm. We prosecute class actions, too, many of them.

Right now, in courts across the country, we have -- we are representing classes of people who were genuinely harmed, like kidney transplant patients who were subject to a race-based algorithm and didn't get a transplant, many other cases.

We've invested millions of dollars of our firm's own money into prosecuting those cases to try to recover something for the class. We believe in the class action mechanism. We're not anti-class action.

But this record shows the opposite of a class action. And the distance between this case and the types of cases that I just talked about is why we're here today. Rule 23 exists for fiduciaries to step into the shoes of absent class members, subject to a court's supervision.

Now, Mr. Wilson and his lawyers have done the exact opposite of what the class mechanism is intend for: 85 class actions in Wilson's name, not one certified, not a dollar to any class member, 90 percent or more to the lawyers, most of whom never appear in court, relying on --

THE COURT: This says quite a bit about the defense attorneys who are so quick to settle. I mean, it's -- there is some blame there that -- I mean, you're the only firm that's really contested anything in these cases.

I have a number of these cases that I've joined to this motion that have already reached settlement agreements, you know, before the -- you know, the pen's dried on an answer.

MR. WATSTEIN: That's right. And I'll talk a little bit about why our hand was forced. We -- our client made a settlement offer, you know, to say -- not to be crass; but, you know, we call it paying the terrorist -- because the reality,

Your Honor, is that it is -- no matter how frivolous a claim is, a putative class action is going to cost a defendant a lot of money to defend.

I have had conversations in these types of TCPA class actions with small businesses -- a lot of the defendants are not like Freeway. A lot of the defendants are small businesses. And the request is, "You will pay me 20X my max statutory damages under a statute that doesn't shift fees. Or I will steamroll you; and you will spend more money than you have, and I'll chase you in bankruptcy."

And that's why people pay. I have hundreds and hundreds of examples. And Freeway is not happy it's here. It's not happy that they're paying all this money to get here, but their hand was forced.

But the point that I'm getting at -- and to answer your question -- is that the class allegations serve one purpose in this type of case, supplying leverage for a large individual settlement.

And by combining the leverage with the fee agreements that we've discovered in this case and the terms that are in those fee agreements, the lawyers have designed a mechanism really unlike anything we've ever seen before: A mechanism to extract more from a statute where Congress says fees are not permitted than from a fee-shifting statute, a way to get larger hourly payouts than by pursuing a common fund settlement and

asking the court for a multiplier.

I mean, they've actually written a multiplier into their contract under a statute that doesn't shift fees; and you can't even get, under federal law, a multiplier in an individual claim anyways. It's really remarkable.

And every time a scheme like this happens -- and this one has really proliferated: Hundreds and hundreds cases, 85 just in Wilson's name -- it teaches the courts and the public to distrust the class mechanism.

They're going to distrust the next class action filed. You know, defendants get this attitude that class action is -- class actions are a baseless device. Everybody uses arbitration provisions. Companies wouldn't use arbitration provisions if cases like this were not taking up so much of the docket.

And it's not just the primary harm to the -- to the mechanism and to the public trust. It's tens of millions of dollars spent by defendants who pay instead of fight. Like I said, it includes a bunch of small family businesses.

And then there's the cost to taxpayers, and there's the cost to the court. I mean, the Court now has -- what? -- 14 consolidated cases. And there are other Wilson cases across the country.

And, Your Honor, Wilson and his counsel know what they're doing is wrong. The --

THE COURT: I'm going to interrupt you for just a moment.

MR. WATSTEIN: Sure.

THE COURT: On the consolidation of cases, I really didn't consult you yesterday in front of too many attorneys, who I really didn't allow anyone to speak. But I did consolidate, at least for purposes of this motion, all the other cases.

And what are your thoughts on whether that's a good or bad idea, from your client's perspective? I didn't really give you a voice in that.

MR. WATSTEIN: Well, I suppose it's a bit different from a normal consolidation in the sense that, you know, we don't represent the other parties. We're not going to be litigating their claims going forward.

I mean, I think that the reality is that the issues that we've asked the Court to look at impact all the other cases. And so, regardless of whether they were formally consolidated or informally consolidated, the Court's decision is going to impact those cases the same way.

So, I mean, to me it makes sense; but, I mean -- thank you for asking our opinion, but I don't think it really requires anything more of us than just coming in and telling our story.

THE COURT: Okay. Down the road I'm curious where

things are going to go, but we'll have that conversation at a later time.

MR. WATSTEIN: Sure.

And so, as I was saying, Your Honor, Wilson and his counsel know what they're doing is wrong. And that's not just argument or rhetoric. The moment that we asked the Court to look under the hood, they moved to dismiss their client's own case with prejudice, for nothing, after he supposedly rejected an individual settlement offer months earlier.

And when we subpoenaed the firm that has originated all of these cases, and thousands more, and that is supplying litigation counsel, including Mr. Perrong and his colleagues with all of these claims, they hired a former acting U.S. solicitor general and a team of white-collar defense lawyers at Milbank at $3,000 an hour to defend a subpoena.

And we told them, "We will hold the subpoena in abeyance if you will answer one question for us: Tell us who signed the 2025 engagement agreement. Was it Mr. Wilson, or was it the Heidarpour Law Firm acting under the power of attorney that they have in their omnibus engagement agreement with Mr. Wilson?"

THE COURT: Can I do a quick timeout?

MR. WATSTEIN: Sure.

THE COURT: Sorry. I will just disclose that Mr. Carpenter, the clerk that is working with me on this case,

will be starting with Milbank, coincidentally, later this fall. He will not be working on this case after today because we really just found out about this Milbank issue.

And there will be a certain cone of silence that his firm will have to surround him with, with regard to any further litigation related to this case. But I can tell you he wasn't assigned with the understanding that his law firm -- his future employer would have anything to do with this.

And, given the timing, I really couldn't just switch clerks. He's already done the work for -- to prepare me for this motion, so I -- he won't be working on any of the issues related to the D.C. case that's been transferred to me.

I haven't really looked closely at what those issues are and what we're going to do. I may ask you some questions about that later.

MR. WATSTEIN: Sure. And thank you for telling us that, and that doesn't bother us.

Congratulations to you. It's a great firm.

My point, of course, was not to disparage Milbank. It was to make the point --

THE COURT: I know. You can disparage Milbank all you want. We make fun of it all the time with Colbey here, so --

MR. WATSTEIN: I'll leave that to you.

But, you know -- and then, beyond that, the same

lawyers then moved to dismiss basically their entire portfolio of class actions -- TCPA class actions that they had against our firm out of nowhere. These are cases where they were defending dispositive motions, were arguing them --

THE COURT: These are all TCPA cases?

MR. WATSTEIN: All TCPA cases.

THE COURT: How many of them were there?

MR. WATSTEIN: I believe there were seven that were dismissed, some with prejudice.

THE COURT: Okay.

MR. WATSTEIN: And another dismissal with prejudice occurred the day after we subpoenaed the Heidarpour Law Firm in another case, the Bronston v. Southern California Edison case. So this all happened after we filed our motion in this case.

And one other thing I guess I'll say at the outset is none of this that I'm talking about now says anything about who Wilson is. We'll get into that: The things that he said, the violent hate speech, the bragging about using the number as a source of income. The point is that's not a class fiduciary, but that is really sort of a -- as I view it, a tertiary issue.

If the Court gives them what -- the other side what they want here, after our client invested probably more than a half million dollars in outing this scheme, before we get a ruling, before the discovery that we've served and that they declined to answer under a stay that they imposed themselves,

that would be blessing a roadmap for avoiding scrutiny that actually punishes the victims of -- for exposing the scheme that they were subject to. And we would never know the full extent of it.

So, in our view, it should be an easy decision not to do what they ask. And what we would ask the Court to do instead is to deny certification -- I'll get into the grounds why and answer the Court's questions -- let us finish the very limited discovery that we've already served, then dismiss the case. It's a timing issue. It's in the Court's discretion.

THE COURT: Explain that to me because you haven't filed -- I mean, I suppose one option was to file a counterclaim for some kind of fraud. You didn't do that. It'd be dismiss the case, but then the discovery that you're seeking would somehow then lead to sanctions or some attorney fees, something else down the road?

MR. WATSTEIN: Sure. So I think -- and this kind of jumps ahead a bit, but I'm happy to.

I think there are two reasons why the discovery needs to occur. One is because we anticipate filing a motion for sanctions. And, I mean, this district just heard one that was similar in the Slevin case, except we would contend much less serious.

It was an individual plaintiff claim. And I think that was decided by Magistrate Judge You, and then it was

appealed to the district judge and affirmed.

THE COURT: That was the -- was that the ADA case?

MR. WATSTEIN: It was an ADA case. That's right.

THE COURT: Okay. I'm familiar with that.

MR. WATSTEIN: And so, in our view, this is -- this is Slevin on steroids, many times over. So we do intend to move for our fees, and not just under the, you know, grounds that they moved in Slevin.

We also conferred, under the local rules, about the motion that we were going to file. They told us to pound sand. And only then did we invest all these resources. And then, once they saw, oh, how deep we've gone into the Heidarpour Law Firm and the abuse of the class mechanism, that's when they tried to get out from under it.

But we had already incurred all the expense at that point, so -- but the other reason, Your Honor, to allow the discovery to be finished is, you know, as the court in Slevin pointed out, the Court has a -- an obligation to determine whether its auspices have effectively been abused and to look at has there been misconduct before the Court.

And, I mean, that's not -- again, that's not rhetoric. That's what this district just said in the Slevin case. And so, in our view, it would do a public disservice not to just finish up the limited discovery.

The sanctions motion, could we file it now? Sure, we

could file it now. Could we have -- could we move for leave to file counterclaims? Probably.

Do we really want to drag the case out in that manner? Not really, because we don't need to file counterclaims. We just -- there's a mechanism that already exists that doesn't require, you know, a whole nuther proceeding; and it was just exercised in the Slevin case.

But, even though we could do all that now, we could file the motion now, we want several important questions answered; and the discovery that we've served is targeted to that. We served it before they moved to dismiss.

And, you know, fundamentally we've shown -- we don't know the full extent -- but these -- the lawyers and Wilson have made millions and millions and millions of dollars doing this. It's not too much to ask that they answer discovery in the case that they filed.

And, by the way, the discovery that we're asking for is largely discovery that they produced in other cases. The Heidarpour Law Firm is subject to the subpoena. They -- at the same time they were opposing our subpoena with a motion to quash in D.C., they were producing most of the same documents in this Robertson case. And that's why we filed that notice of supplemental evidence. We obtained it after the briefing was closed.

So I hope I answered your --

THE COURT: You did.

MR. WATSTEIN: -- questions.

THE COURT: Thank you.

MR. WATSTEIN: And, with that said, you know, I'll turn to this PowerPoint presentation. Feel free to tell me to skip ahead or jump in. But I want to start with how we got here in the first place, so -- because I know there's a lot of material, and I know it's hard to internalize everything that we've spent months on.

And, by the way, the only reason we were able to put together the presentation of evidence that we put together is because I've personally spent thousands of hours working on these other cases.

I have historic knowledge that we never -- most -- you asked why haven't other lawyers filed such a motion. A lot of it is because, you know, I've defended 600 TCPA class actions. Somebody who hadn't done that would not have the degree of institutional knowledge about how this particular arrangement has worked.

So Mr. Wilson gets this 999-9999 number, and he trades a car for it. At some point after that, he signs up with the Heidarpour Law Firm. And we'll look at that engagement agreement.

But it basically gives the Heidarpour Law Firm a permanent right to litigate, prosecute, sign agreements for,

take escrow funds for all TCPA claims in perpetuity, with a power of attorney and a termination penalty that makes it effectively impossible to terminate because they control the portfolio, with somebody like Wilson, thousands of cases.

And he has to pay them what they've incurred if he wants to fire them. So then under this agreement they file 83 TCPA class actions.

THE COURT: Within the deposition does Mr. Wilson describe how he came into contact with Heidarpour?

MR. WATSTEIN: I don't believe he does.

James, do you have insight into that?

MR. RULEY: Not in the deposition. That's information we obtained from Heidarpour Law Firm through the D.C. action.

THE COURT: Okay.

MR. WATSTEIN: Yeah. I mean, most of these -- just to -- I don't purport to know all the inner workings of the Heidarpour Law Firm; but what we have described and what we have seen is that the claims start out generally, in our view, legitimate. They're legitimate claims.

I don't know if they're procured by Internet advertising or whatnot. But I don't know that there's anything nefarious going on in the acquisition of the claims. This isn't really relevant to what I'm talking about right now, but it is relevant to something you alluded to yesterday.

What we have seen in other cases, and we describe with specific case examples -- and we've seen it with Wilson, too -- is after these claimants sign with the Heidarpour Law Firm, turn over their iCloud, claims start appearing that don't make any sense.

And every time we've raised those issues in active litigation, four or five class actions, a half dozen demand letters, every single claim is dismissed, always. So, again, why don't defendants get to the bottom of this? Well, a lot of times we're not given a choice, especially if we're in a voluntary dismissal window.

And most of the time the client says, "I'll take the dismissal. I'm not interested in spending half a million dollars to try to, you know, do a public good. I have a board of directors to report to."

THE COURT: Well, when you say that some of these claims just don't make sense, is that -- underlying that is your belief they're maybe just AI-generated claims or --

MR. WATSTEIN: So our belief is that somebody with a financial interest -- remember, almost all these claims originate with somebody who goes online and says, "I want an insurance quote."

THE COURT: Right.

MR. WATSTEIN: And they put in their number. And so it is very easy to log into a VPN, fill out an insurance quote,

put in 999-9999, whether by -- whether because you're trying to avoid contact or because you are trying to create a TCPA claim. And then the response from Wilson is, "Well, I don't -- I have nothing to do with this. I didn't submit that claim."

We have seen evidence, and we detailed it in our motion with Wilson, for example, where we received a demand letter from the Heidarpour Law Firm claiming that Wilson got these unsolicited text messages.

But the service, Your Honor, was realtime stock alerts. There was no product. So who signs up for realtime text alerts with a fake number? When we explain this to outside counsel and explained what we thought was happening with the Heidarpour Law Firm, as we've done before, they abandoned the claim.

This is not -- this has happened over and over and over again. In any event, this -- this scheme results in millions of dollars in individual settlements. As I mentioned before, 90 to 95 percent goes to the lawyers, nothing to the class.

At the same time, Mr. Wilson is engaged in these violent, you know, racist public rants. He's removed by Facebook 12 times for incitement of violence, hate speech. So Wilson sues Freeway as part of all of this, our client.

And -- but Freeway -- as I just alluded to a moment ago, Freeway only contacts people who request contact. And

that's the case with almost all of our clients. We don't represent overseas call centers that blast robocalls in the United States. It's -- people opt in, and that's the only way they ever get a communication.

So we go to -- we go to plaintiff's counsel, and we tell them what the evidence shows. It's not a class action. Freeway only contacts people with consent. You've got serious adequacy problems.

We conferred under the local rules, told them what we were going to do if they don't dismiss the case. They told us to pound sand. So we did what the Ninth Circuit said is appropriate, and we have a quote from the Ninth Circuit here.

"If a plaintiff appends class claims to increase leverage, such maneuvering would make the plaintiff an inadequate class representative, and a motion for denial of class certification would be in order."

So that's exactly what we did. We spent the resources, and we filed the motion. What did plaintiff's counsel do in response? Well, before I answer that, it's important to note what they were doing the morning of our filing.

The morning of our filing, they requested a conferral with us to add claims and to add a new defendant in this case. Later that same day, during that phone call, when I spoke with Mr. Perrong, I explained to him some of what we -- some of the

speech that we'd seen his client engage in, 'cause we're right on the precipice of filing this motion.

And we said something like, you know, "If this -- lawyer to lawyer, I don't understand how you can represent somebody who is saying these things, especially in a putative class action."

The response that we get was effectively being yelled at for -- for, you know, criticizing his client's integrity. So I called his co-counsel, who I know much better than Mr. Perrong. He thought better of it. That's when they tried to dismiss the case, after I told them exactly what we would be putting in our motion.

The reason that they gave was Wilson's rhetoric. So I said, "Okay. We're all smart people here. You want me to believe that excuse. Are you going to dismiss Wilson's other cases? I know the number.

"Oh, well, we're not going to do that."

Now, later they did dismiss seven more class actions against our firm. And another remarkable thing happened. And this was not Mr. Perrong, but this was another one of the Heidarpour referral counsel.

They went underground, and they did something that I've never seen before, after having 50 to 100 class actions against them. They sent draft TCPA class action complaints directly to clients, that then forwarded them to us, with

$100,000 individual demands, which I'm pretty sure is the textbook definition of extortion.

But the point is, with our motion pending, they do something new that they haven't done before because the public action has drawn scrutiny. So why do this? Well, I mean, we think it's pretty clear: Because our motion shows that Wilson and his counsel are abusing the class mechanism.

So we file our motion. We have three grounds, each with subgrounds, as to why the Court should deny class certification: Typicality, predominance, inadequacy. Any of those are independently dispositive.

And I know there's been some discussion with this court and other courts about Mr. Wilson's typicality. Those discussions occurred at a much earlier stage of the case, without the record that we have.

And I think it's important to just level set on what typicality -- what is the problem that the typicality requirement is trying to solve for? The problem is, in a class action, you have to have a plaintiff in the witness box who can serve as a stand-in for all the absent class members.

So he has to have been exposed to the same conduct as the absent class members, and he has to have -- not have unique defenses that will prejudice the absent class members. The flip side of that coin is the defendant must be able to assert their defenses through the named plaintiff. That's why the

typicality requirement exists.

But why isn't Mr. Wilson typical? Two quick reasons. Number one, we have evidence of fraudulently submitted claims. I know we talked earlier about the claims that we believe might have been -- the opt-ins that we believe might have submitted by somebody with a financial interest.

But it's important to point out to the Court what the record in Wilson's own cases -- other cases already shows. In the MAH Group case, they have established that the opt-in they -- that Wilson sued on was filled out from Mr. Wilson's unique IP address. So Wilson is also submitting these lead forms that he's suing on.

And, by the way, they may deny that. We think the evidence is dispositive, but it doesn't matter for typicality purposes. The point is he's got to sit in the witness box and represent a class of other people.

Is it fair for the class if their class representative, who can extinguish all of their claims in a class judgment, has these types of skeletons in their closet? And the answer is no. That's why typicality exists.

THE COURT: Does that just kind of flow into predominance because there's separate defenses, separate claims here? I mean --

MR. WATSTEIN: And the link between typicality and predominance in this case is very significant because, again,

it doesn't matter if Mr. Wilson actually submitted these leads or if the Heidarpour Law Firm submitted some of them. The point is, for predominance, it's going to take an individual analysis to try to figure it out.

I mean, I can tell you we had to hire a private investigator, a former FBI agent, to try to figure out who filled out Wilson's lead form for Freeway. And we still don't know to an absolute certainty. We haven't been able to locate the person who supposedly fat-fingered their number, as they would put it.

So, you know, under the legal standard we just talked about, he's not typical under any of the three requirements. He can't stand in for a class because his situation is a one-off. Even by his own account, his number was entered by somebody who was trying to avoid a call or somebody who accidentally put in the wrong number.

He's not, for example, a reassigned number recipient. He's not somebody who is receiving calls because he is on some specific uniform list for robocallers, right? I mean, everyone in Freeway's records consented, unless they didn't, right?

And the point is if you look at Freeway's data, it's just a bunch of opt-ins. So how do you figure out if there's another person who submitted a wrong number? You go claim by claim. You call the people. You depose them. And it's impossible.

And, of course, they know this when they're filing all these cases, that they have a plaintiff who is unique. And, of course, Freeway can't assert its defenses through Wilson because imagine Wilson sitting up in the witness box, and Freeway wants to cross-examine Mr. Wilson on the adequacy of its consent forms. Well, he's -- his story is he never agreed to them. So that's the due process problem from -- that typicality is trying to guard against, too.

We already covered the second point, predominance. The only other thing I would say about that is, you know, the claim that's asserted here requires his number to be residential. We know, even without deposing him, that he uses his number for all three of his online businesses.

There's a binding Ninth Circuit case that says, "Look, there's a multifactorial test for determining whether a number's business or residential." That's going to be a fight in this case. And our point isn't that we win it --

THE COURT: Doesn't Judge You -- she looked at that in two different cases involving the TCPA.

Are we talking about the Chennette case?

THE LAW CLERK: Yeah, and Mattson.

MR. WATSTEIN: Chennette.

THE COURT: Chennette. I think she almost found there can't be a class action in a TCPA case. I don't know if you're familiar with her two rulings in Mattson v. Rocket

Mortgage, Mattson v. New Penn Financial, but it was -- the Ninth Circuit remanded back to her to make findings based on Chennette.

And she said the amount of individual inquiry with regard to business versus mixed use versus residential use makes class action impossible.

MR. WATSTEIN: I mean, I personally agree with that. The -- I would distinguish a 227(c) claim, which is what we're dealing with, from a 227(b) claim because the residential/business distinction matters for this case. There are some TCPA cases it doesn't matter for.

So it's not like -- you know, an argument that I frequently hear is, "Well, you know, if you're right a TCPA case could never be certified" -- and that's not true; it's 227(c) cases -- "but, by the same token, you know, that's Congress' problem."

There are a lot of problems with this statute that are, you know, pro-defendant, pro-plaintiff. It was enacted in 1991. I would like to see Congress go and fix a lot of stuff. But that's not, of course, the Court's job.

Now let's talk about adequacy. There are several reasons that Mr. Williams and his counsel are inadequate, and this is a summary of them. I'm not going to go through all of them. I'm just going to go through the primary points.

But the first -- and they're all related to each

other. Most of them are. But the first is Mr. Wilson has been stripped of his ability to control counsel by contract and his will to check counsel.

It's not just the agreements. It's also the actual abuse of the class action mechanism, which we've provided substantial evidence of. Then there are the violent threats against members of the class, and I think there's a misunderstanding about our point with that.

We know that the Court cannot prohibit Mr. Wilson from exercising his right to vindicate his rights or in spewing whatever racist rhetoric he wants to spew. Our issue is with someone who does that being appointed as a fiduciary for other people.

He doesn't have a constitutional right to be a named plaintiff in a putative class action. And, as we'll talk about later, it's not just the violent threats. It's that he tried to lie about it in a declaration in connection with this motion.

He says, "I've never threatened anyone." Well, 16 days before that, he said publicly that we should finish what Hitler started. I don't know how to take that -- I don't know how to read a statement that he doesn't threaten people with a straight face when he said that he has holes dug for Jewish people and that he wants to finish what Hitler started. And it's not just Jews. It's everybody who's not a white male.

THE COURT: How does that realistically play into the mechanics of a class? The notification to class members, if it were certified, I mean, it's not like it's going to have an asterisk, "If you're Jewish or you're gay, you may want to look up his Facebook posts." They wouldn't know.

And it would be, I suppose, unusual for Mr. Wilson to direct counsel not to accept any -- not to send notice to Jews or gays or blacks. I mean, the Court wouldn't allow that. So I'm not sure mechanically really if it makes any difference at all.

MR. WATSTEIN: So I'm glad you asked that question because I spent some time thinking about that. And the answer is two-fold. First of all, it's not just the violent rhetoric. It's also the incorrect statements in his declaration attempting to sidestep the violent rhetoric. And even their own cases say that dishonesty in connection with the litigation is disqualifying.

But, going to the rhetoric itself, what adequacy really asks fundamentally is, can this person and these lawyers be trusted to serve as a fiduciary for absent people? And our position is not that Mr. Wilson is going to discriminate against blacks or homosexuals or Jews in certifying the class. It's that everything we have compiled shows that Mr. Wilson doesn't care about anybody but himself.

And also, by the way, he has publicly stated, perhaps

more aptly, that his number is something to the effect of a cash machine. It's not -- Mr. Wilson is not interested in pursuing the rights of others. And that's more our point than attacking him for what he said.

And I want to make something very clear. We've never -- I've defended 600 TCPA class actions. I've never argued ever in any case -- and I've told many clients that it's a terrible argument -- that there's something wrong inherently with being a serial litigant. I mean, I know better than anybody that many judges have properly shut down that attack. And that is not our criticism. It's very different.

So let's move on to -- oh, and there's one other point. And this is one that I'll mention it now. I won't go into any more detail later. He also doesn't really know what's going on in these cases.

I mean, he's testified, "I don't know what that means," as to class certification, despite supposedly having signed, you know, 80 of these class certification authorization forms. But, again, we have so much else that is so much more persuasive. We don't really rely on that, which is sort of the typical adequacy challenge.

And I think what's become more important since the filing of our initial motion, but that's now been fully briefed, as a result of the surreply we consented to, is counsel's inadequacy because it's really counsel that has

engineered all of this.

And I see -- I saw the Court's reaction, and I guess --

THE COURT: Well, I'm just looking at Mr. Perrong over there, looking a little bit --

MR. WATSTEIN: Sure.

THE COURT: -- like he's the skunk in the room, and I don't want him to -- I want him to feel a little more welcome.

MR. WATSTEIN: Yeah. And, frankly, what I want to say, too, is that -- on that point, is that I feel a bit bad for Mr. Perrong because, you know, we know that his share in this is 10 percent; and that the lawyers with a 30 percent and 60 percent share sent a third-year lawyer to the courtroom to respond to this motion. They didn't bother to appear.

So, you know, I -- I think any member of the bar has to live up to certain rules and norms, but I think that it's -- I think --

THE COURT: We have lost at least one local counsel because of some of these issues that you've just been discussing.

MR. WATSTEIN: Right. So I get the desire not to, you know, expose yourself to the heat. But that's what -- you know, I always tell people at my firm that "I want to be the person to deliver the bad news. You can deliver the good news." And that applies here, too.

There are some significant ethical issues, I mean, more so than in any case that I've ever seen. And we'll look at the provisions in the agreement shortly. But, just to summarize them, there's a power of attorney conferring the ability to bring claims and settle without client input, to be able to sign documents.

That piece alone is what this district just said violates the Oregon Rules of Professional Conduct. And that was an individual case, and here we have a bunch more. We have 95 percent, 90 percent contingent attorney's fees.

And, as the Court knows, a fee has to be reasonable. And no court has ever said that a 95 percent contingency or a 90 percent contingency is reasonable because it's not. But really these aren't contingency fee agreements.

They're ownership interests because the way the agreement -- the secondary agreements are structured is that the -- and it says this -- the attorney owns -- uses that language -- everything above the client's statutory cap.

So the lawyers have an interest in the claim where they -- any time a defendant offers the statutory damages or more than the statutory damages and the lawyers reject it, the -- it's not the client rejecting it. It's the lawyers literally using the contract to negotiate their fees under a non-fee-shifting statute.

And then there are the hundreds of releases that are

extracted. Every settlement that's paid out under this arrangement, there is a settlement statement and a release. Well, the rules of this bar and the D.C. bar require a disclosure to your client to seek independent counsel, for good reason. Well, that wasn't given.

So it's layer upon layer upon layer of ethics issues built into these agreements. And so we talked a little bit about this earlier. What is the legal standard for adequacy? And it's really just answering the question of whether the representative and counsel can be trusted as fiduciaries for absent class members.

And there are some citations to court decisions here talking about not having conflicts with members of the class; you know, demonstrating they can vigorously prosecute on behalf of the class; quotes about when misconduct creates a serious doubt that counsel will represent the class loyally, including provisions in a fee agreement. That's an adequacy concern.

And then, of course, there's the West v. MyPillow case, the last quote on this page, that involved a similar sue-and-settle type arrangement. But there were only eight cases, and it didn't involve any of the other contractual mechanisms that we just talked about. And, of course, certification was denied there.

Here are the quotes from the initial HLF, Heidarpour Law Firm, 2024 engagement agreement. It says that "Client

hereby retains HLF to represent them for any and all claims regarding TCPA violations."

And there's the power of attorney. Neither I nor any of my colleagues have ever seen anything like this in a client engagement agreement. "Client grants HLF power of attorney to execute all claims, contracts, settlements, releases, dismissals, deposits, as though client were personally doing so."

And that's why we asked who signed the 2025 engagement agreement, which they still haven't answered to date. These are the other two relevant provisions of the -- of the 2024 agreement. "Client grants HLF settlement authority to authorize any settlement it, HLF, deems practical and reasonable." That's the delegation of settlement power to the lawyer.

And then probably the most nefarious provision: "HLF -- if the client terminates, if the client has outstanding claims in which HLF has incurred costs or fees, HLF will be reimbursed by the client. And it has 30 days to settle or relinquish any claims that are in negotiation status at the time of the notice."

Let me explain the significance of this in a case like Wilson's. Our law firm has received a dozen presuit class action threats. We're a 25-, 30-lawyer firm. The entire Am Law 100 does TCPA class action defense.

How many presuit claims did Heidarpour Law Firm have in process at the time that we filed our motion and even now? We don't know because they haven't told us. We've asked. But that shows how much power the termination provision gives the lawyers over their client.

Now let's fast-forward to the 2025 agreement with Mr. Perrong, Mr. Paronich, Heidarpour Law Firm, and Mr. Wilson, the one that we still don't know if it was signed by Mr. Wilson.

Now, this agreement has a different fee calculation. It says, "The client gets up to their statutory damages." And then it says, "Everything above that belongs to the lawyers" -- and it uses that language -- "any amount obtained in excess of your statutory damages are either costs or attorney's fees that belong to us."

It also says, "We may request the defendant apply a multiplier based on certain risk factors in bringing this action." Here's the fee split on the next slide: 10 percent to the lawyer in the courtroom, 30 percent to a law firm that has not appeared, 60 percent to another firm that has not appeared.

And here's what the agreements accomplish: They accomplish control, complete control across an entire portfolio of cases. They establish client indifference by design. If Mr. Wilson's capped at his statutory fees, nothing matters to

him once a defendant has offered their statutory fees.

So in this case Freeway offered more than his statutory damages, and he allegedly rejected it. But then later he allegedly dismissed his case with prejudice, without recovering anything.

Well, it doesn't take a genius to figure out that nobody does that. Nobody takes nothing instead of something sooner. That doesn't make any sense. And what that means is what the contracts say: The lawyers made the decision for him to protect themselves.

The termination penalties that we just talked about also make policing impossible. How can Mr. Wilson go to his counsel and say, "I disagree with your decision. I want you to do X, Y, Z"? They have portfolio-wide control that he's making hundreds of thousands of dollars off of, by the way.

These are a list of some of the ethics rules that are implicated by this arrangement, quoted directly from the Oregon rules, although the D.C. rules are substantially similar.

The first is that "A lawyer shall not enter into an agreement for, charge, or collect an illegal or clearly excessive fee." Well, there's plenty of case law that says what an acceptable contingency fee is, and it does not include 90 or 95 percent.

The next is that it's up to the clients, and not the lawyers, to decide whether to settle a matter. The fee

agreement -- and we'll look at the paragraph on the next slide -- makes this decision the lawyer's decision in Mr. Wilson's case.

And then the last quote on this page is the rule that prohibits a lawyer from getting a release without advising the client in writing of seeking independent counsel. They didn't do that.

And now let's talk about how they've used the agreement to extract what I call the extortion premium. And that's not my term. It's a term that's used in these circumstances quite frequently.

As you see here, the TCPA does not permit attorney's fees. Congress was very clear when they passed the statute. They affixed the statutory damages so high per call that it would enable people to bring claims in small claims court.

Or if lawyers wanted to pursue the claims, they could take a percentage of the maximum statutory damages, or they could pursue a class case and ask for a multiplier if a common fund settlement was established.

It's not rocket science, ordinary fee recovery rules. Importantly, even under a fee-shifting statute, which the TCPA is not, the Supreme Court has said you cannot get a contingency multiplier in a single-plaintiff case, only if there's a common fund settlement, subject to very rare exceptions that the court has to approve.

So what did they do? They contractually invented a mechanism that allows themselves to get more fees from a non-fee-shifting statute than a fee-shifting statute and even built a contingency multiplier that is not permitted, per Supreme Court authority, in a -- in a fee-shifting case.

And this is the language -- this is some of the language, I think the last piece that we haven't looked at from the 2025 agreement. And this is important because the last sentence says, "Client agrees not to waive, in whole or in part, the right to recover attorney's fees and/or costs as a condition of settlement."

And what that means is if we offer $7,500 and Mr. Wilson's statutory damages are 2500, he can't say, "Okay. I want you to take the deal," because they will say, "Well, we've given ourself this much in fees plus a multiplier. And so until they agree to pay that amount, you can't settle."

And that explains the dismissal for nothing after the settlement offer for something. In the Robertson case that we learned about because their counsel reached out to us, we have seen the economics behind this -- these two engagement agreements with respect to another plaintiff, but not Wilson.

And what we've seen is there were $733,000 -- $633,000 paid. 90 percent of it went to counsel. And there was a release signed in every single case by the client as a condition of getting paid.

You'll also see there's an electronic signature on that release. We don't know who signed it. There is a power of attorney giving Heidarpour Law Firm power of attorney to sign releases.

What we don't know is how much deeper Wilson's abuse of the class mechanism goes. We know it's substantially worse than in the Robertson case because he has five times as many public claims -- or six or seven times as many public claims. And we know that there's an inordinate number of demand letters, too. Could be thousands, but at least hundreds.

Why don't we know that? Well, he imposed a unilateral stay on our discovery, refused to sit for a deposition. And Heidarpour moved to quash, even though they had produced the same documents that we're asking for to other counsel when there wasn't a motion to deny certification pending.

And so the outcome of this contractual arrangement and the way that it is being used is millions of dollars for counsel; hundreds of thousand dollars for Mr. Wilson; nothing for any class; enormous costs for defendants; strain on the courts; and, maybe the most important problem, the delegitimization of the important class action mechanism.

Certification was denied in the West case on a fraction of this record. And we have this nifty chart. I don't think I need to go through it piece by piece, but I

invite the Court to look at it and see how much worse this situation is.

Then there is the independent reason of the speech. I'm sure the Court and your law clerks have looked at it. I won't repeat the phrases here, but I will just point out that this is not the type of speech that was at issue in the cases that plaintiff points to.

And if you want to see an example of why that's the case, you look at the next slide. The offensive speech in the Gaertner case that plaintiff relies on is right there in front of you. It's a joke that says, "Cousins by chance, lovers by choice."

And the defendant's foolish argument was, "Well, this shows how bad the class representative's judgment is," implying that he's having a relationship with his cousin. Give me a break. I mean, it's a joke. And who cares?

Compare that with Mr. Wilson's speech. He says, "Was Hitler wrong to stand for what he believed was right? He seems to be the greatest protector of Christianity that I've found." And he goes on and on and on and says we should finish what Hitler does. They're categorically different.

But, setting that aside, he also attempted to lie about it. Here are the quotes.

THE COURT: I think we covered this.

MR. WATSTEIN: Okay. I'll move on.

THE COURT: Here's my concern there, is that, you know, a class member chooses to object to any class settlement, if this class were ever certified. And let's say that class member was Jewish or gay or black or anything other than Mr. Wilson.

I'd be a little nervous about objecting to the settlement, coming into court in front of Mr. Wilson to say, "I don't like this settlement." I just -- I can't imagine anybody would feel comfortable doing that if they took the time to see some of these posts of Mr. Wilson. And that's probably one of the bigger concerns I would have if this were a class.

MR. WATSTEIN: And I would -- the only point that I would add to that, Your Honor, because I agree, is that I'm not going to lie that there were significant security concerns circulated at the firm because of this. And it's not like we received any threats or anything, so I don't want to imply that.

But if you look, as we have, at what Mr. Wilson has said, and the vitriol and the anger with which he has said it, it's actually scary. And that's why we requested, and they agreed, that if the deposition was to occur that we would want to take it in a secure location.

There's no way that I'm getting into a room -- my last name happens to be Watstein; but, even if it wasn't, I wouldn't get into a room with Mr. Wilson where there was not

some sort of security. So I agree.

And those are all the reasons, Your Honor, why we believe the Court should deny class certification. The only other point that I'll hit was the one that you asked about yesterday, which is what should the Court do procedurally.

And we think it's pretty straightforward. We think that the Court should deny class certification, let us finish discovery so Freeway can move for sanctions on a full record and the Court can fulfill its obligation to police its processes.

And it has two options for how the Court wants to do that. It could hold the dismissal motion in abeyance and just not rule on it until the discovery is complete for -- 60 days is all we asked for -- then rule on it. We don't oppose the dismissal.

Or the Court could rule now and give Freeway 60 days of post-dismissal discovery because, as the Court knows, it has jurisdiction to sanction. It has jurisdiction to investigate a fraud on the Court. I think that is the less clean way.

In our view, it just makes sense to time the ruling on the Court's motion such that you just wait 60 days. I mean, we did file our motion first. And either path provides the Court a way to decide everything on a full record.

THE COURT: I probably won't dismiss now. I want the discovery done first.

MR. WATSTEIN: So, I mean, with that comment, I don't know that I really need to go through the rest of the slides on how you should not dismiss now, unless you want me to.

THE COURT: No. I want to hear from Mr. Perrong. He's been sitting quietly and patiently, and I know there's a lot to respond to.

MR. WATSTEIN: Sure. Thank you, Your Honor.

THE COURT: Mr. Perrong, you know, I'll start with a question. You know, I'm obviously -- if you haven't figured it out with my conversations with defense counsel, it's that I'm -- I am concerned about just the manner in which these cases are coming to the Court.

Obviously, the judges had some discussions when they started seeing 14 of these cases come in. And it does raise concerns, although, you know, we perfectly understand that people troll certain kinds of cases. Some people are serial litigators. That's great. That's how sometimes these rights are effectuated.

I don't think I have class derangement syndrome here when I am starting to be concerned about ethical issues from some of the attorneys involved. I'm, quite frankly, concerned about whether criminal fraud is taking place.

There's a lot of questions. But my overall question is let's look at the TCPA and what was Congress trying to protect here. They were trying to protect, at least in this

particular part of the statute, residential consumers from unwanted calls or texts. Pretty simple, pretty straightforward.

But that's not Mr. Wilson. He's not -- he's not a consumer who does not want these calls. In fact, he is thriving off of these calls. It puts him in such a remarkably different position than any class that would have been offended by being called or texted following the fact that they went on the no-call list.

You know, Mr. Wilson not only wants to be called and texted; he's not going to stop them once they do. He's not going to hit stop after that first one. He wants a second one or a third one. And, quite frankly, I'm not sure if he's even the one who's anymore keeping track of these calls. There's a concern that this has just been preempted by the Heidarpour Law Firm.

So I guess when I'm looking at the purpose of the statute, is Mr. Wilson the kind of case, or now cases, that Congress intended to protect as opposed to, you know, unwitting consumers who are on the no-call list?

MR. PERRONG: Certainly, Your Honor.

And the answer is Congress designed the statute in such a way to protect consumers. And, as my colleague on the other side points out, these are Congress' problems. Congress did not create a perfect statute. I think we disagree with

why, but Congress did not create a perfect statute.

But Congress wrote into a law a statute that allows an individual or a group of individuals that receive these calls to obtain their damages of -- statutory damages of 500 to $1,500 per -- per violation.

So the entire premise that Mr. Wilson wants these calls is wrong. Mr. Wilson --

THE COURT: I was born at night, not last night. Mr. Wilson and the lawyers who represent him are making a cottage industry out of this. Do not tell me that Mr. Wilson is up at night thinking, "Oh, my God, I got a robocall." He's calling the law firm saying, "Oh, my God, I got a robocall. Cha-ching." Please don't take me for an idiot up here.

MR. PERRONG: And certainly, Your Honor, I don't want to --

THE COURT: You're simplifying things in ways that -- you're not hitting really the issues of the fee agreement, which is, quite frankly, baffling to me.

And the key point here is that you are putting Mr. Wilson up as somebody who has the fiduciary capacity to represent a class when he has no say under his agreement, decision-making at all under his fee agreement, with the Heidarpour Law Firm.

He, quite frankly, is a racist, homophobic, Jew-hating individual who is concerned about making money from

the threat of class certification, not following through with it. Has he ever -- has there ever been a class certification that Mr. Wilson wittingly supported?

MR. PERRONG: Yes, Your Honor. And that's the PacifiCorp case.

THE COURT: And tell me about how that -- was that a stipulated class certification for purposes of settlement? Or was it actually challenged?

MR. PERRONG: That was a stipulated class certification that was entered after a mediation between the plaintiff and the defendant before a mediator at JAMS.

THE COURT: Okay. And did they pursue any of the kind of investigation into the Heidarpour Law Firm, into the background of Mr. Wilson that has occurred here?

MR. PERRONG: I don't believe that there was any investigation into that. But let me just be clear, Your Honor: We disagree with defendant's characterization of what the Heidarpour Law Firm has done and that --

THE COURT: Well, why didn't they cough up the discovery then?

MR. PERRONG: Well, sir, I don't represent --

THE COURT: I know. The -- one of the largest firms in New York City represents them. You know, if -- if, certainly, this is a complete mischaracterization of their agreement with Mr. Wilson, of how these cases are coming to

court, with or without Mr. Wilson's acknowledgment, who's signing these settlement agreements, these are simple things that attorneys talk about and work out. They're not working this one out. They're fighting full throttle on this one.

MR. PERRONG: Well, Your Honor, if you look at the two agreements that are in -- and I have these as exhibits. I would like the Court's permission to share them with the Court and with opposing counsel so we can take a look at them.

THE COURT: Yes.

And we will make a copy of the PowerPoint presentation by defense an exhibit. It'll be made part of the record as well.

MR. PERRONG: So if Your Honor looks to the first page, which is the contingent fee agreement that Mr. Wilson signed with the Heidarpour Law Firm in 2024, if you look at paragraph three and the last four sentences of -- or last four lines of paragraph three, it states that "The client understands that a new fee agreement acknowledging co-counsel's role may need to be executed by client. The client understands that the new fee agreement should supersede this agreement for this specific claim in which the new agreement was drafted for."

That agreement is the agreement that's the -- the following pages, which is the contingent fee agreement in this case, which is what this motion for class certification is on,

which is what this -- which is what Rule 23 asks. And this is the operative fee agreement in this case.

This fee agreement does not contain any of the problematic provisions that Slevin identified. It doesn't contain a blanket power of attorney, and it doesn't contain any sort of blanket settlement authority.

What it does say in paragraph two is that Mr. Wilson agrees to represent the interests of the class, and not just his own interests, and agrees to cooperate in discovery and then understands the -- his role.

If you look at -- paragraph seven is -- states that any resolution must be structured in terms of the best interest of the class as a whole; and, moreover, that Mr. Wilson will never recover more than his best day in court, which is the exact problem that -- that the West v. MyPillow case identified, where the plaintiff was sharing in the fees that his attorneys were collecting.

And then paragraph eight states that -- again, that the plaintiff will recover his full statutory damages and no more. That contract puts Mr. Wilson's Rule 23 duties in writing and removes the incentives that the West case, the Murray case, and the Slevin case police.

THE COURT: Okay. I get that. But historically, in terms of how these cases are actually presented to defendants and how they are settled, they're not settled as class actions.

MR. PERRONG: Your Honor, and that -- that -- that is a problem, again, that lies with Congress. Rule 23 expressly permits -- and this is the Deposit Guarantee case that we cite, as well as the U.S. Parole Commission case, and the -- the law review article -- there are certain free-rider problems and issues that come about when we -- when we bring a class action.

And a class action might not be to certification for any number of reasons. For some of Mr. Wilson's cases, it's because of admittedly individualized issues, such as when somebody, thinking that it's -- Mr. Wilson's number is a placeholder, enters in Mr. Wilson's number as all nines on a web form.

The rate at which Mr. Wilson has sought certification is not abnormal and is, in fact, in line with the majority of TCPA --

THE COURT: Doesn't his telephone number make him somewhat unique?

MR. PERRONG: Mr. Wilson's telephone number is a unique number, but it doesn't make him unique in the sense that his defense -- the claims and defenses of Mr. Wilson are the same claims and defenses for each other class member.

So Mr. Wilson, like every class member, did not enter in his telephone number and, in fact, was never a customer of the defendant. So just like every other member of, for example, the PacifiCorp class, which was a wrong number class,

Mr. Wilson did not -- there was no way that Mr. Wilson could have even put in his telephone number because these -- these were wrong number calls related to a utility.

So Mr. Wilson received these calls from PacifiCorp. Every other class member in the wrong number class received these calls because their numbers are wrong numbers. The fact that Mr. Wilson's number comes at the end of the line of the 503 telephone area code does not make him any different than somebody that's a thousand numbers in or 2,000 numbers in.

THE COURT: Well, it makes him somebody who has purchased a number and is using it to benefit himself financially. That just -- he looks a lot different than any other class member coming in here.

MR. PERRONG: Certainly, Your Honor. I appreciate that sentiment. But I would want to point out two salient points. The first is that Mr. Wilson obtained his number almost ten years ago, prior to filing any litigation under the TCPA, for longer than he's -- for a longer time that he's had the number than he's been filing litigation.

The second point is -- and defendant points out in its slide show regarding the IP address information from the MAH Group case. We dispute, obviously, the implication of that IP address and what the evidence shows because Mr. Wilson clicked on a link, and we believe that's how they captured his IP address.

Regardless, it's undisputed in that case that Mr. Wilson sent a message that the messages stop and received almost 60 text message calls after he sent a request that they stop. So -- and Mr. Wilson, of course, has put his number on the "Do Not Call" list, indicating to the world that he does not, you know, desire to have his life disrupted.

Those are certainly -- you know, so I don't think that it's -- it's necessarily completely fair to say that he wants these calls. Certainly, I think Congress has incentivized him to --

THE COURT: That would be an understatement.

Let's talk about just -- away from Mr. Wilson -- just the issues that, for instance, Judge You raised in the Mattson cases, versus Rocket Mortgage versus New Penn Financial.

There is some individualized inquiry regarding, you know, arbitration, consent, mixed use, business versus personal. I mean, is -- are these kind of claims the kind that have -- well, do they have the kind of predominance of issues that lend themselves to class certification?

MR. PERRONG: I think that the Ninth Circuit's decision in the Porch.com case, certainly -- obviously, being the binding decision here, has a lot of things to say on that.

The issue -- and I think that the big distinction in the Rocket Mortgage cases -- I'm familiar with them -- and the cases involving a specific plaintiff were facts which were very

much different than Mr. Wilson putting one or two posts online about healing or trying to sell some used military equipment.

These -- this -- I believe that this particular plaintiff in the Rocket Mortgage case was using his cell phone number and actually putting it out there on, I believe, a real estate website -- I could be wrong. The facts, I don't have them off the top of my head -- but I believe that the -- he was actually operating an actual really -- a large operating business and extensively putting out that number, which I think, again, when you turn to the factors that the Chennette case identifies, we look at, for example, the nature of the communication, whether or not the calls are to advertise business products or advertise residential products.

Here the calls were to advertise residential insurance. Things like the degree to which the telephone number is used for business purposes, whether there are other business numbers, whether there are other personal numbers.

And those cases, if the circumstances show that a class might be certified on some of those cases -- some of those factors, I think that it's still an open question as to whether or not a case in which residential or business use of the number is raised as a defense is a -- is an issue bearing wholesale on typicality.

What I will say, Your Honor, is I don't feel that, you know, just given the factors and the balancing that the

Porch.com case mentions -- and, as my colleague also mentions, there are certain types of TCPA claims where residential use of a number is not a defense. It only applies to "Do Not Call" claims because only residential numbers can be added onto the "Do Not Call" list.

And, again, there's also an interplay with FCC guidance, to the extent that that's not binding anymore, but the FCC has held in prior rule-making decisions that all cellular numbers are presumptively residential. Of course, the Porch.com case has, you know --

THE COURT: Even Mr. Wilson stated he uses the same number for his business.

MR. PERRONG: Mr. Wilson has businesses, and he has used the number from time to time for -- to advertise that, but I don't think that it's to such an extent to render his number a business number ineligible for registration.

THE COURT: This number is kind of his business in some ways.

What about the MyPillow case? Can you differentiate that?

MR. PERRONG: Yes, Your Honor.

So MyPillow is differentiable on two major points. The first is -- and, again, I cannot stress enough how much we strenuously disagree with defendant's characterization of Mr. Wilson allegedly submitting information online.

He's put his number on the "Do Not Call" list. He's stated that he doesn't want to receive these calls. He would have no reason --

THE COURT: But you do realize there's some character flaws regarding your client that make people a little suspicious. If he's willing to say, "I want to kill Jews," he may be the kind of person who's willing to put his own number into a computer system to rip off the Government.

I'm not saying he did it. But, boy, I'd want to find out if I were the defense, and I certainly want to find out as -- presiding over these cases.

MR. PERRONG: Certainly, Your Honor. And I think -- well, I'm -- I'd like to address the --

THE COURT: It's a rhetorical question. I'm sorry, Mr. Perrong. It's almost impossible to answer that one. I understand.

MR. PERRONG: Yes. But --

THE COURT: Back to MyPillow.

MR. PERRONG: So MyPillow. So there's two big distinctions in MyPillow. In MyPillow the plaintiff actually had, I believe at his attorney's direction, called up various companies, including MyPillow, major companies to take advantage of a California law that says that if you are not informed that a defendant is recording a telephone call, you have a statutory private right of action.

So Mr. West actually manufactured his own claims by calling in to MyPillow, tricking the agent into not saying that the call was being recorded, and then suing for recording the call.

Here, again, we're certainly not asking you to -- to make a determination, but there has been no evidence -- at this stage of the proceedings, there has been no evidence that Mr. Wilson is going out and submitting information.

THE COURT: Okay.

MR. PERRONG: The second point is in the West case the -- counsel engaged in an unethical and illegal fee-splitting arrangement where they were sharing some of the attorney's fees that they were receiving with the client, above Mr. West's statutory damages.

Here that agreement makes that impossible. It explicitly states that Mr. Wilson will not receive more than his statutory damages and that all attorney's fees are attorney fees that belong to the client -- or I'm sorry -- that belong to the attorneys.

THE COURT: I'm going to take a break here because I know there's a case that has been waiting in the back here. I do need to take a plea in a criminal case. I do want the defense to have an opportunity to respond to the exhibits in terms of the contingency fee agreement. I'll let Mr. Perrong wrap up any closing thoughts. My thought is to take about 20

minutes to resolve the next matter, but we are going to take a quick break so we can do that.

MR. PERRONG: Certainly.

MR. WATSTEIN: Sure. Thank you, Your Honor.

(Recess taken, 2:49 p.m. - 3:15 p.m.)

THE COURT: Okay. We'll go back on the record on the Wilson case.

And, Mr. Perrong, I kind of interrupted and we took a break. I'll let you wrap up with anything you want to tell me, and I'll try not to interrupt you.

MR. PERRONG: Thank you, Your Honor.

I think we look at -- and I want to just address why Mr. Wilson's number does not render him atypical, why Mr. Wilson's speech does not impact his adequacy, which really are the two questions that this Court is being asked on this record under Rule 23 and in the context of this motion.

First, on Mr. Wilson's typicality, Rule 23(a)(3) asks whether the representative's claim is reasonably coextensive with other class members, but it doesn't ask whether they're identical. The inquiry is whether other members have suffered the same injury from the same course of conduct.

So this is why -- and, as I've explained, Mr. Wilson's number is unusual; but in a number of his cases the discovery has borne out the same fact pattern, that someone unrelated to him has filled out a form because they didn't want

to give a real telephone number and typed his.

That's a fact about how Mr. Wilson became a recipient of the calls; but it's not a fact about Freeway's conduct, and it's not a defense that belongs to Mr. Wilson alone. Freeway's own position that they've conceded is that someone else -- at least what the discovery has shown so far, is that someone else submitted Mr. Wilson's number.

That makes him a wrong number recipient. And every class member that Freeway called would have also been a recipient like that, having no prior business relationship with Freeway. And the course of conduct is identical to everybody because Freeway called numbers on the strength of lead forms that it did not verify. That does not change because of whose number was typed in.

So the defense that the number generates is consent, and that same defense that Freeway asserts against every class member is a defense that's common to the class. And that's inapposite of a unique type of defense under Hannon.

So if the Court, nevertheless, concludes that Mr. Wilson's number renders his claims atypical, I would ask that the order state whether it's on the basis of his number or on the basis of the number as applied to this record and the way that it came to be on a lead form.

And I, finally, want to just close with the hardest part of the record for us. And I'm not going to stand here --

or sit here and pretend it's not hard. And that's that Mr. Wilson's social media statements are ones that I want to make very clear today are ones that I do not share, that I do not defend, and that my co-counsel do not share or defend. And, quite frankly, this is not a position that we've ever been in before.

But, turning to Rule 23, it asks a very specific legal question; and, that is, do the representative's interests conflict with the class? A -- holding views that the Court finds repugnant or that his counsel find repugnant is not the test. A conflict with the class is.

And, as Your Honor pointed out, Mr. Wilson does not write the class definition. The Court approves a class definition under Rule 23. Mr. Wilson cannot exclude anybody. And membership turns on objective facts, i.e., whether or not Freeway called somebody without having a business relationship with them.

Mr. Wilson does not administer claims or approve claims, and he can't allocate the fund only to certain members. And that's why Polaroid came out as it did. In Polaroid the plaintiff made much worse statements than those that Freeway brought up in its PowerPoint.

And the court called those statements repugnant and bigoted; but it still found that the representative was adequate because he had not acted on any of the views, and he

stayed aligned with other members of the class in seeking to maximize the recovery of the class.

And to assuage the --

THE COURT: And I agree with you, everything you're saying about character. I mean, people can be awful, and they still get to sue. And who knows? I mean, for all I know, Mr. Wilson's just a -- wants attention on social media. I mean, I don't know Mr. Wilson, and I'm not here to beat up on him.

But when you say that, you know, he has the interest of the class, I'm not -- first of all, I'm looking at agreements where he doesn't even have the authority to settle. It's the attorneys who have the authority to settle.

And they're settling without ever pursuing class action, seemingly, even in this case, without intending to, because the minute there's pushback, they move to dismiss. It seems to be, you know, Mr. -- whether it's Mr. Wilson's interest or whether it's his attorneys interest, the interest is in getting fees.

And the way they do that -- they can't do it unless they bring a class action. Once they bring a class action, they know it's cheaper for the defendants to pay. And it's not benefiting or really advocating for a class at all.

MR. PERRONG: Well --

THE COURT: You know, is there a possibility of a

class? Mr. Wilson, that doesn't seem -- it seems like his interest is in cashing out quickly. It's -- I mean, in this case, for instance, the minute there's pushback, there's a motion to dismiss.

MR. PERRONG: Certainly, Your Honor. And I'd like to address those two points.

THE COURT: Okay.

MR. PERRONG: The first is, obviously, I can't get into the confidential and privileged conversations that I've had with my client regarding dismissal of this case. What I can say that this case was not dismissed over -- when I first had that conversation after the meet and confer that Mr. Watstein described, was not over any sort of alleged impropriety or wrongdoing on behalf of the Heidarpour Law Firm or the way that Mr. Wilson is pursuing these cases.

And, additionally, Your Honor, I -- I just want to make clear: We bring every case that we bring and -- and, again, I think that the -- the settlement agreement -- this is not a case in which attorneys are unilaterally exercising the ability to dismiss Mr. Wilson's cases. The operative agreement in this matter does not provide for that.

Mr. Wilson has testified that we've -- or has sworn in a declaration, A, that we've presented him the offer, which he rejected; and, B, that we've consulted with him on this dismissal issue and that he -- this was authorized by the

client.

But we bring every case intending to pursue certification. It's very fact-dependent and very case-dependent. And that's why the statistics that we've put before the Court in our surreply -- and personally, myself, I've filed -- prior to becoming an attorney, I've filed, as a plaintiff, almost 200 TCPA cases. Two of those were certified. That tracks the general rate at which TCPA litigation is certified and goes to a decision in the federal courts. It's about 1 to 2 percent.

Whatever issues that -- that Congress has in making a law that makes it difficult to pursue call centers that operate overseas or evidentiary issues or, as Your Honor pointed out, issues of whether or not a number is business or residential, those are all issues with Congress and Rule 23 and the TCPA.

That's not what the analysis before this Court is today. The analysis is whether Mr. Wilson is a typical class representative. I believe -- you know, obviously, I realize that the Court may not hold that view; but that is our view, that he is a typical class representative, that these are not individualized issues, and that the motion for certification has been -- should be denied [sic].

And, you know, in closing, Your Honor, I think I would just point out that defendant's statement in their argument in chief, "We don't need to drag this case out," and I

think we fully agree with that analysis.

Whether or not the Court grants or denies -- or grants or denies Freeway's motion, you know, we share in the view that this case should -- should proceed to be dismissed; and, ultimately, that we're asking that the case not be held open while that happens; and that, once the Court rules on certification, in the event it denies that, that each case would, you know, return to its own defendant and its own record. And Mr. Wilson here has asked to dismiss this case and take nothing.

THE COURT: But not the other cases, I assume?

MR. PERRONG: Your Honor, consistent with this Court's guidance, we are -- we've -- with full knowledge, of course, of the proceedings and allegations being levied here, we've settled with four of the defendants at the other -- that -- in cases currently pending before Your Honor.

And then we're prepared to move forward and go as the Court has directed, either in terms of dismissal, resolution, or potential trial, in the event that the Court denies certification.

I would ask, ultimately, whatever the Court concludes, that whatever order be entered be limited to the record developed in this case because the -- especially because of the PacifiCorp class.

Those class members are not before this Court and --

and a ruling confined to Mr. Wilson on this record, on this case, would decide this motion and within the context of Rule 23 as it pertains to this defendant. A broader one decides claims that no one here represents.

Thank you, Your Honor.

THE COURT: Do you mean a broader ruling as to class certification in the cases I've joined for purposes of this motion?

MR. PERRONG: Yes, Your Honor. Your Honor has joined PacifiCorp, in which the parties have executed a release and an 850,000 non-reversionary fund that's -- essentially, in the event that the Court does deny certification, it would put 14,000 potential class members whose interests would be implicated in that settlement --

THE COURT: Have I certified a -- has there been a certified class in that or --

MR. PERRONG: There has been no certified class, Your Honor, no.

THE COURT: So the plan was to come to me with a stipulated certification?

MR. PERRONG: Yes, Your Honor. That stipulated certification motion was previously pending and then was reassigned to Your Honor.

THE COURT: Okay. Well, that's -- we have some talking to do.

Okay. Let me hear from the defense then on final reply.

MR. WATSTEIN: Sure. Thank you, Your Honor.

THE COURT: Especially with respect to maybe these -- and I'm sorry -- these may have been available to me earlier as part of the final filings, and I haven't -- hadn't looked at the contingent fee agreements that were just forwarded until now.

MR. WATSTEIN: Yes, Your Honor. You're talking about the two documents that Mr. Perrong handed to Your Honor and to us?

THE COURT: Yes. And let's just -- to clarify, let's call them Exhibit 1 and 2, for purposes of this motion, and we'll call -- what can we -- what exhibit number can we put on the PowerPoint presentation? Or were you not intending on --

MR. WATSTEIN: Oh, no, we did intend to -- we can call it Exhibit 3, I suppose.

THE COURT: You'll be 10-something. So 101. Do you have other exhibits in already?

MR. WATSTEIN: There are no -- there's no exhibit format, I guess you could say.

THE COURT: Okay. We'll call this 101.

MR. WATSTEIN: Okay. So, just to be clear, the PowerPoint's 101; and the fee agreements that Mr. Perrong distributed are?

THE COURT: 1 and 2.

MR. WATSTEIN: Okay. Okay. So, yes, I will absolutely address the fee agreements. I think I'll -- unless you'd prefer that I go straight to that, I'd like to start where Mr. Perrong left off, which is PacifiCorp.

THE COURT: Yeah. I guess I -- I'm concerned. Quite frankly, I'm concerned that they've jumped the gun in settling a case that I'm not prepared to dismiss either. So we'll go from there.

MR. WATSTEIN: Okay. And so what I'll -- we did address PacifiCorp -- I mean, we brought it up affirmatively as an example of why someone who is atypical and inadequate, and counsel who we believe are also inadequate, cannot be trusted with the class' interest.

So I just want to say something that is a very basic indisputable statement. In any putative class action, a defendant will agree to a class settlement if the dollars are right. Maybe that's 1 dollar in a case where they really believe they did nothing wrong. And maybe it's, you know, may be a great deal in a case that's $5 million or $10 million.

My point is the existence of one agreed settlement does not show adequacy or typicality. You don't have to prove those things in the normal sense when you're agreeing to settle.

But if you look at the terms, which we did -- and in

the -- I think the most comprehensive discussion of this -- of our view on PacifiCorp is in both our filing the other night, which I believe is Doc 43, filed on 8-17, on Monday evening, and also our surreply in support of our -- or, no, our reply in support of our motion to deny class certification.

So, as we explained in those papers, PacifiCorp shows why you can't trust Mr. Wilson and counsel here with the class. And you have a release -- first of all, it's a payment of something like $34 per potential class member. But the -- about 50 percent of the entire settlement amount goes to plaintiff's attorney's fees and administrative fees. So half of it's gobbled up from the outset. Any remaining funds go to a charity that's aligned with PacifiCorp.

Your Honor asked, did they pursue the type of investigation at issue here before they agreed to pay that?

THE COURT: I have to apologize. I didn't realize PacifiCorp was one of the cases wrapped up in -- this happened kind of quickly.

MR. WATSTEIN: Sure.

THE COURT: But I think both sides will agree any agreement that involves a putative class still has to be certified by the Court.

MR. PERRONG: Yes, Your Honor.

THE COURT: Okay.

MR. WATSTEIN: Of course.

THE COURT: And it's in front of me.

MR. WATSTEIN: Yes. And I -- what I'm trying to convey about PacifiCorp -- well, a couple of things. You asked if they pursued the type of investigation that we did, and the answer's no. We know that because we've talked to them and other counsel.

And I won't speak for PacifiCorp, but my understanding is they never would've agreed to the settlement if they did. And I'll let them speak for themselves in front of Your Honor.

But, you know, like I said, the fact that there is a defendant willing to strike a deal that involves a release of all federal and state claims related to phone calls dating back five years, in a reassigned number case -- so the release is not limited to reassigned numbers. The release is everything.

The claim -- the class is a reassigned number class, right? Like, if I get a cell phone number and I give it up, I get a new cell phone number, and somebody gets a call for Ryan Watstein on my old number, that's a reassigned number case.

And there's something really important about a reassigned number case and how it plays into today's discussion. Every company on earth calls reassigned numbers every day. Why? Because people's cell phone numbers change, and any company with any volume calls reassigned numbers.

So what does the fact that they pursued a class

settlement exactly once, with a super broad release and a low amount, so a defendant would agree to it, say about whether they are prosecuting each of these cases to certification based on the facts of each case?

Well, it proves it false. If they thought that Mr. Wilson, even though he's not a reassigned number recipient in this case, is an appropriate class representative -- typical, adequate -- and that they could certify a reassigned number class in his name, they would be pursuing reassigned number classes against every one of the defendants in all of these cases because all of them call reassigned numbers.

The reality is they're not doing that because the cases aren't actually certifiable. But if you can get somebody to agree, then it's an agreement, right?

So they say in their papers that -- and you heard Mr. Perrong say just now that they -- they file all these intending to pursue class claims; and it just so happens that this one -- this PacifiCorp case is the only one that was amenable to that sort of treatment.

That is not true. Every one of the defendants in every one of these cases called reassigned numbers. They never tried to pursue a reassigned number class in our case.

And, by the way, many of those cases, Your Honor, settled before any discovery at all. So it's just not true that they're filing these intending to pursue them as class

actions. The data proves it. And they can't hide behind privilege to avoid that conclusion because it's obvious.

We have heard from defendants that are before the Court as part of your consolidation order, for lack of a better term, that have been the recipients of quarter-million-dollar individual settlement demands. It wasn't about the facts. It was about the dollars. And we've witnessed similar -- similar demands that are in no way tethered to the facts.

And, as I mentioned, after we filed our motion, the operation went underground. And some of these HLF referral firms started sending our clients settlement demands before they even spoke to the defendant.

I want to take a look at the fee agreements that Mr. Perrong presented to the Court. Of course, we did not have these fee agreements when we initially filed our motion to deny certification.

We obtained them after that, and that's why there was additional briefing. But we have addressed, and I addressed earlier today, both of these fee agreements. But there are a couple of things that I want to point out.

Mr. Perrong has been arguing, and argued in the papers as well, that the 2025 agreement, Exhibit 2, is the operative agreement; so nothing in the 2024 agreement matters. I'm not going to, you know -- Mr. Perrong doesn't want to get into the ethics of the 2024 agreement, so he says the 2025

agreement is operative.

Well, there's a couple of problems with that. Number one, we have been asking for months who signed the 2025 agreement? Was it Mr. Wilson, or was it the Heidarpour Law Firm under the power of attorney from the 2024 agreement that permits them to do exactly that?

Regardless of the answer to that question, both agreements remain in effect. And this has been our position ever since we found out about the agreements. Mr. Wilson has more presuit claims than he has filed claims. Heidarpour effectively owns all of them under the 2024 agreement, has portfolio-wide control, has portfolio-wide termination penalties.

So, regardless of which of these agreements provide the financial terms for this case -- we're not saying it's not the 2025 agreement. In fact, that's what I presented to the Court in my PowerPoint. I assumed that the 2025 agreement applies here.

But the 2025 agreement contains all of the problematic provisions that we talked about earlier, namely the cap on their counsel's -- or the cap on their own client's recovery in the provision that says counsel owns every dollar on top of that.

They tried to pitch that as a good thing, because it removes the bad incentives for a named plaintiff, because we

all know all named plaintiffs are bad, and they're going to just take the money every time; so we handcuffed them. We built in a contractual provision that removes their ability to make those bad decisions that we knew they were going to make.

And, you know what, what did we do with that money? We gave it all to ourselves. Every dollar above the fee cap they imposed are attorney fees under a non-fee-shifting statute.

And, by the way, the whole point of a class representative is to serve as a check on counsel. There's a reason why the system wasn't set up for lawyers to just prosecute class actions in their firm's name.

It has to be in the name of the client, and they have to be adequate to represent the interests of the class. If your clients are so inadequate that they need a provision to be stripped of their ability to make decisions, then maybe you shouldn't have them as clients in the first place.

Mr. Perrong mentioned that it's not his problem that these cases settle individually; it's Congress' problem; and, you know, they're allowed to do what they have done. But I want to go back to maybe the first -- one of the first slides we looked at earlier today, and it's that quote from the Ninth Circuit.

And that quote says it's the Court's problem. It says, "If a plaintiff appends class claims to increase leverage

for individual settlement, that would make the plaintiff an inadequate representative, and a motion for denial of certification would be in order." And, again, that's exactly what we did.

And I take umbrage, as a lawyer whose firm also represents plaintiffs, that what is being done here is permissible. It is not permissible to use unethical engagement agreements and the in terrorem threat of class action expense costs and class action discovery that's recycled verbatim and served on defendants to extract attorney fees at whatever multiple they choose that Congress said they cannot get.

That is not permissible, and that is exactly what we asked the Court to issue a ruling on. And to that point -- Mr. Perrong said there are two questions the Court's being asked to decide, whether Mr. Wilson's number renders him atypical and whether it renders him inadequate, and also his hateful statements. Those are not our arguments.

THE COURT: I understand that.

MR. WATSTEIN: Okay. I won't go into any more detail on that.

THE COURT: It's sort of the totality of circumstances, but --

MR. WATSTEIN: The totality of circumstances. But the much bigger issue, in our view, is the way they have structured their engagement agreements to -- and then the way

they have used that structure to impose enormous expense and recover extra-statutory fees.

Mr. Perrong mentioned the MAH Group case and said that his client sent a stop request. I will not argue for MAH. They can do that. But I will say that on the break MAH reached out to us to tell us that is not true. He did not sent a stop request. Instead Mr. Wilson repeatedly engaged with our messages. And that does make some degree of sense because MAH Group sells tactical gear, and Mr. Wilson is into tactical gear and sells military equipment.

We also added a slide onto our presentation with a screenshot of the text messages from the MAH Group case. And, as you can see from the screenshot, at least there, there are no stop requests.

But so what? The argument misses our point. Our point is that there is evidence -- substantial evidence, much beyond the MAH Group case, that either Wilson and/or somebody with a financial interest is entering his information in lead forms and filling out other lead forms in other cases.

It doesn't matter if it's true or not. We don't need to prove it. The question that class certification asks is, does that pose a typicality problem? Does it potentially prejudice other class members? And does it pose a predominance problem? And the answer to both is yes, regardless of what -- whether what MAH Group or Mr. Perrong says is true.

And the same goes for the points that Mr. Perrong made about the Chennette and business number issue. Maybe he's right. Maybe a jury would believe at the end of the day that Mr. Wilson's number is residential. The point that we are making is that the named plaintiff in this case establishes how individualized that question is for one person, and it would have to be done as to everyone.

On the West v. MyPillow case, we have a chart in our PowerPoint explaining how this case isn't even in the same universe as the West v. MyPillow case in many ways. I'll let the Court read it. I don't need to go through that point by point.

But the bottom line is West v. MyPillow did not have the contractual arrangement that violates multiple ethics rules, that has been used to perpetrate this scheme on a scale far beyond what was happening in the MyPillow case.

On the hate speech point -- and I'm almost done -- Mr. Perrong says that they don't defend it, and he wants to be very clear with the Court about that. But they don't have any problem enriching Mr. Wilson and themselves using the class action mechanism and punishing clients like ours that, admittedly, in a worst-case scenario, are the victims of somebody intentionally putting in the wrong number.

They know -- they've admitted to Your Honor they know, even under their own story, it's a one-off. But they

still file 85 class actions and send thousands of class action demand letters to enrich themselves.

And I know they say they don't defend it now, and they -- but that's what they told me, when we approached them about it in the first place, and they said, "Well, we'll dismiss the case.

"Well, what about the others?

"Well, we won't dismiss those."

So the reality is they wanted to get rid of us, and they wanted to keep Mr. Wilson and keep using him to make money. But I want to be very clear that we intentionally did not make the type of personal attacks that are made in these cases sometimes.

We left out -- and we pointed this out in our papers -- they pointed to cases about criminal convictions and so on and so forth. We left all that out as to Mr. Wilson. We didn't move on the fact that he has multiple criminal convictions. We didn't move on the -- his --

THE COURT: Yes, but you're bringing it up now.

MR. WATSTEIN: Well -- but we're not. And I will say to Your Honor I don't think that makes him inadequate, on the record. That is not the basis -- that type of attack is not the basis of our challenge.

THE COURT: I understand.

MR. WATSTEIN: The last point I want to make is

Mr. Perrong's statement that, "Well, Your Honor, dismissal was not -- dismissal in these cases was not based -- in Mr. Wilson's cases, was not based on the allegations of wrongdoing by the Heidarpour Law Firm. That's not why we dismissed. But I can't get into why because it's attorney-client privileged."

I can tell you definitively that that is the reason why, because I'm the one that had the phone conversation with Mr. Perrong's co-counsel. And let's let objective evidence speak for itself.

They were actively -- Mr. Perrong was actively and aggressively prosecuting the Bronston TCPA class action. We filed this motion. We subpoenaed the Heidarpour Law Firm in that case. They dismissed the case with prejudice the next day.

They dismissed every other case against us, knowing that we were the ones who could raise this argument against them. And in every single Heidarpour Law Firm case that our firm has handled, where we presented evidence of what we believe to be fraud, in not a single case did the lawyers defend it. They dismissed every single one.

So for Mr. Perrong to sit there and say that, "Our dismissals are not based on the allegations of wrongdoing by the Heidarpour Law Firm," you should take that with a grain of salt. And, with that, Your Honor, unless you have any other

questions for me, that's all I have for the Court.

THE COURT: No.

Mr. Perrong, I don't want really go back and forth forever; but if there's anything you want to clarify, now's the time to do it.

MR. PERRONG: The only thing I would clarify about the MAH Group case is I did misspeak. The -- I -- I meant to say that the calls -- that the text messages continued after the lawsuit was filed. So that's just -- I just wanted to clarify that on the record.

THE COURT: Thank you.

All right. On the issue of whether Mr. Wilson can adequately serve as a class fiduciary as a class representative, I don't think this is a close case. I'm going to grant the motion to deny class certification.

I just want to get it out there now because I know there are defendants who have joined in this action, for purposes of this motion, and it will apply to every single pending case in front of me. Class certification will be denied. I will issue an opinion. We'll get it out, I imagine -- I'm hoping to get that out in a couple weeks.

But it's clear to me, under the totality of the circumstances -- and there's a lot of totality here -- that there are just issues of typicality. There's issues of predominance. There's issue of adequacy.

On the adequacy issue, I just do not believe that Mr. Wilson has the interests of any -- any class, nor do I think his law firm's. The history of dismissing cases when there's any pushback about what's going on here is -- I think, speaks for itself.

I think there's a lot of defendants out there who have no idea this is any -- anything other than an individual who was on the "Do Not Call" list. And they see class action coming their way, and they -- they choose to pay up and -- and it's not a congressional issue.

I disagree with the plaintiff on that. The Court, under United States -- the United States Supreme Court case law, is to rigorously review certifications for class action. And the defense has presented me with a lot of facts to look at. Rigorously would probably be an understatement. I don't think I've seen this much fighting over class certification under so many different kinds of issues.

And, you know, I agree this isn't about, you know, Mr. Wilson's personal views. You know, does it play into whether -- whether he has the kind of character that is concerned enough for a class? Probably plays in a little bit; but not enough, I think, to be significant.

I think the overriding issue is that Mr. Wilson's stated interest has been making money off of threatening class actions under the TCPA. And that is not a class-conscious

approach as an individual.

So I'm a little less clear on what becomes of some of these cases that have settled, specifically the PacifiCorp case. I am not going to authorize or certify a class under some settlement agreement in this case; so I do think the parties do need to go back to the drawing board on that case because it seems to me your settlement is a legal impossibility in this case. I'm telling you that there's -- Mr. Wilson is not going to be approved as a class representative.

I'm not dismissing the case at this time. I do think there needs to be some relatively robust discovery. I'm ordering the Heidarpour Law Firm to preserve all electronic documentary evidence in its possession regarding all TCPA claims, specifically the Wilson representation and claims.

I'm ordering Mr. Wilson to preserve all electronic devices that he has with regard to communications with the Heidarpour Law Firm, anyone else regarding his TCPA filings. I will certainly consider an order requiring Mr. Wilson to appear for a deposition, an order requiring him to turn over his electronic devices to a third-party forensic expert, if necessary.

I do think there needs to be some robust discovery to determine exactly what is going on with the Heidarpour Law Firm and this litigation. And it will obviously also impact the litigation in the other 13 cases in front of me.

I'm going to stay all litigation in those cases at this time, unless they choose, in an agreement with the Freeway defendants, to join specifically in some discovery and motion practice. But that's entirely an agreement that would have to be made among defendants. I'm not going to force it.

But that litigation is stayed until I get a better idea of these claims. They're very serious claims that the defense in this case is making against the Heidarpour firm and Mr. Wilson.

I don't know where we are exactly with -- is the subpoena issue -- are those briefed before the D.C. court, and they just -- it's been all transferred to me and --

MR. PERRONG: Yes, Your Honor.

THE COURT: We probably need to set --

MR. WATSTEIN: They're fully briefed.

THE COURT: -- some sort of oral argument on that. Are we -- I haven't -- I'll be honest: I've had family issues going on over the course of the last two weeks, and I have not caught up on the D.C. transfer case. So I will take a look at that. A new clerk will be reviewing that with me, and we'll kind of go from there.

So anything in the written opinion will take precedent over anything I've said today with regard to class certification, but it will be denying class certification.

Anything else we need to discuss?

MR. WATSTEIN: I just have one question, Your Honor. Is it the Court's desire that we go ahead and proceed with the discovery that we --

THE COURT: Yes.

MR. WATSTEIN: Okay.

THE COURT: I'm not staying your case.

MR. WATSTEIN: That's what I thought. I just -- I didn't know if you wanted us to wait on an order, but -- okay.

THE COURT: No. You know, I guess what I'd like you to do is confer about what discovery you're agreeing on and not agreeing on. And if there are some disagreements over what it is and how far -- I have no idea if your intent is to go so far as to wanting a court order regarding turning over electronic devices.

I don't know. I don't want to pretend to guess what kind of discovery you need or desire or want to pay for. But if we need to have a further discussion about what that looks like, I think we can easily do that. I'm just going to need to know what you agree on and don't.

MR. WATSTEIN: Do you have a preferred -- we'll, of course, confer and try to work out any issue that we have. But do you have a preferred method for us alerting the Court to where we have disagreement, if at all?

THE COURT: My preferred method is not a motion to compel and a briefing schedule. It's really a status report

saying what your positions are and get me on the phone so we can resolve them quickly.

MR. WATSTEIN: Thank you.

THE COURT: And then if you could maybe discuss with Ms. Pew when we're going to discuss the issues regarding the subpoena that was transferred to this Court.

MR. WATSTEIN: And I think that the Heidarpour Law Firm has counsel that -- I don't know if they'll have other counsel now that it's in your court, so -- I mean, we can reach out to them.

THE COURT: Yeah. Confer and see what we need to do. But I'm willing to set -- and it doesn't have to be in person. Although, if you want it in person, we're always here. But I think some of these issues around discovery, around the issue of the subpoena, can be handled via video.

Again, I'm a little unclear the status of some of these other cases that I'm staying. I'm not approving settlements and dismissals at this -- at this hour, though. And it may require some renegotiating among those parties. I will not stay it for purposes of, I guess, settling or dismissing other -- other cases. But, in terms of any ongoing litigation, it's stayed.

All right. Thank you, folks. I appreciate all the time you've put into this. And you both did very well in court. Thanks.

MR. WATSTEIN: Thank you, Your Honor.

* * *

(Court adjourned, 8-19-26 at 4:00 p.m.)

C E R T I F I C A T E

Chet Michael Wilson v. Freeway Insurance Services of America

Case No. 6:25-cv-01869-MC

Oral Argument

August 19, 2026

I certify, by signing below, that the foregoing is a true and correct transcript of the record, taken by stenographic means, of the proceedings in the above-entitled cause. A transcript without an original signature, conformed signature, or digitally signed signature is not certified.

/s/Lindsey A. Weresch, RMR, CRR, CSR

Official Court Reporter Signature Date: 8/20/2026
Oregon CSR No. 14-0427 CSR Expiration Date: 6/30/2029

**MR. FRANSEN: [1]** 4/19
**MR. PERRONG: [32]** 3/13 4/7 43/21 44/14 45/4 45/9 45/15 45/21 46/5 46/13 48/1 48/18 49/14 50/20 52/13 52/21 53/12 53/17 53/19 54/10 55/3 55/11 58/24 59/5 59/8 61/12 62/9 62/17 62/21 65/23 76/6 79/13
**MR. RHYM: [1]** 4/16
**MR. RULEY: [2]** 4/13 17/12
**MR. WATSTEIN: [58]** 3/7 3/11 3/18 4/11 5/14 6/22 9/3 9/12 10/3 10/23 11/16 11/24 12/6 12/8 12/11 13/17 14/3 14/5 16/2 16/4 17/10 17/16 18/19 18/24 23/24 25/22 26/7 28/11 30/6 30/9 30/21 39/25 40/12 42/1 42/7 55/4 63/3 63/9 63/16 63/20 63/23 64/2 64/10 65/19 65/25 66/2 71/19 71/23 74/20 74/25 79/15 80/1 80/5 80/7 80/20 81/3 81/7 82/1
**THE COURT: [92]**
**THE COURTROOM DEPUTY CLERK: [1]** 3/25
**THE LAW CLERK: [1]** 25/21

**$**

**$1,500 [1]** 44/5
**$10 [1]** 64/20
**$10 million [1]** 64/20
**$100,000 [1]** 22/1
**$3,000 [1]** 10/15
**$34 [1]** 65/9
**$5 [1]** 64/20
**$5 million [1]** 64/20
**$633,000 [1]** 37/23
**$7,500 [1]** 37/12
**$733,000 [1]** 37/22

**'**

**'cause [1]** 21/1

**/**

**/s/Lindsey [1]** 83/15

**0**

**01869 [1]** 4/1
**0427 [1]** 83/17

**1**

**10 percent [2]** 30/12 34/18
**10-something [1]** 63/18
**100 [2]** 21/23 33/25
**1000 [1]** 2/24
**101 [3]** 63/18 63/22 63/24
**12 [1]** 19/22
**13 [1]** 78/25
**14 [2]** 8/22 42/14
**14,000 [1]** 62/13
**14-0427 [1]** 83/17
**14th [3]** 2/9 2/13 2/17
**16 [1]** 27/19
**1669 [1]** 2/5
**17 [1]** 65/3
**19 [3]** 1/19 3/1 83/6
**19067 [1]** 2/6
**1991 [1]** 26/19
**1:29 [1]** 3/1
**1:29 p.m [1]** 3/17

**2**

**2 percent [1]** 60/10
**2,000 [1]** 49/9
**20 [1]** 54/25
**200 [1]** 60/7
**2024 [7]** 32/25 33/12 46/15 68/23 68/25 69/5 69/11
**2025 [10]** 10/18 33/9 34/6 37/8 68/22 68/25 69/3 69/16 69/17 69/19
**2026 [4]** 1/19 3/1 83/6 83/16
**2029 [1]** 83/17
**20X [1]** 7/7
**218 [1]** 2/5
**227 [3]** 26/8 26/9 26/15
**23 [10]** 6/7 47/1 47/20 48/2 55/16 55/17 57/7 57/14 60/15 62/3
**24th [1]** 2/21
**25 [1]** 33/24
**25-01869 [1]** 4/1
**2500 [1]** 37/13
**26 [1]** 82/3
**2600 [3]** 2/9 2/13 2/17
**2:49 [1]** 55/5

**3**

**30 [1]** 33/19
**30 percent [2]** 30/12 34/19
**30-lawyer [1]** 33/24
**301 [1]** 2/24
**30309 [3]** 2/10 2/14 2/18
**326-8047 [1]** 2/25
**3:15 [1]** 55/5

**4**

**43 [1]** 65/3
**4:00 [1]** 82/3

**5**

**50 [1]** 21/23
**50 percent [1]** 65/10
**500 [1]** 44/4
**503 [2]** 2/25 49/8

**6**

**6/30/2029 [1]** 83/17
**60 [4]** 41/13 41/16 41/21 50/3
**60 percent [2]** 30/13 34/20
**600 [2]** 16/16 29/6
**6:25-cv-01869-MC [2]** 1/8 83/4

**7**

**75 [3]** 2/9 2/13 2/17

**8**

**8-17 [1]** 65/3
**8-19-26 [1]** 82/3
**8/20/2026 [1]** 83/16
**80 [1]** 29/18
**8047 [1]** 2/25
**83 [1]** 17/6
**85 [3]** 6/11 8/7 74/1
**850,000 [1]** 62/11

**9**

**90 [3]** 19/18 31/13 35/23
**90 percent [3]** 6/13 31/10 37/23
**900 [1]** 2/21
**95 percent [4]** 19/18 31/10 31/12 35/23
**97204 [2]** 2/22 2/24
**999-9999 [2]** 16/20 19/1
**9999 [2]** 16/20 19/1

**A**

**abandoned [1]** 19/14
**abeyance [2]** 10/17 41/12
**ability [5]** 27/2 31/5 59/20 70/3 70/16
**able [4]** 16/10 22/24 24/8 31/6
**abnormal [1]** 48/14
**about [67]** 5/18 6/7 6/15 6/23 11/3 11/15 12/16 12/16 12/18 14/9 16/18 17/24 22/13 23/4 24/12 25/10 25/20 26/21 27/8 27/15 27/17 28/12 28/24 32/8 32/13 32/15 32/22 35/11 36/8 37/19 39/23 40/6 41/4 42/11 42/20 42/22 44/25 45/6 46/3 48/6 50/12 51/2 52/19 54/25 56/2 56/3 58/5 60/10 63/9 65/10 66/3 66/20 67/2 68/6 68/7 69/9 69/20 73/2 73/19 74/5 74/7 74/15 76/6 77/4 77/18 80/10 80/17
**above [5]** 31/18 34/12 54/13 70/6 83/10
**above-entitled [1]** 83/10
**absent [6]** 6/8 22/20 22/22 22/23 28/20 32/11
**absolute [1]** 24/8
**absolutely [1]** 64/3
**abuse [3]** 14/13 27/5 38/5
**abused [1]** 14/19
**abusing [1]** 22/7
**accept [1]** 28/7
**acceptable [1]** 35/22
**accidentally [1]** 24/16
**accomplish [2]** 34/22 34/23
**account [1]** 24/14
**acknowledging [1]** 46/18
**acknowledgment [1]** 46/1
**acquisition [1]** 17/23
**across [3]** 5/21 8/22 34/23
**acted [1]** 57/25
**acting [2]** 10/13 10/19
**action [35]** 6/3 6/4 6/5 7/2 8/10 8/12 17/14 20/6 21/6 21/24 22/5 22/19 25/24 26/6 27/5 27/15 33/24 33/25 34/18 38/22 48/6 48/7 53/25 58/15 58/21 58/21 64/16 71/8 71/9 73/21 74/1 75/12 76/17 77/8 77/13
**actions [17]** 5/20 6/12 7/5 8/12 12/2 12/2 16/17 17/7 18/7 21/18 21/23 29/6 47/25 68/1 70/12 74/1 77/25
**active [1]** 18/6
**actively [2]** 75/11 75/11
**actual [2]** 27/4 51/8
**actually [11]** 8/2 13/2 24/1 40/20 45/8 47/24 51/5 51/8 53/20 54/1 67/13
**ADA [2]** 14/2 14/3
**add [3]** 20/23 20/23 40/13
**added [3]** 5/2 52/4 72/11
**additional [1]** 68/18
**additionally [1]** 59/16
**address [9]** 23/11 49/21 49/23 49/25 53/13 55/12 59/6 64/3 64/11
**addressed [2]** 68/18 68/18

## A


**adequacy [11]** 20/8 25/5 26/21 28/18 29/21 32/8 32/17 55/14 64/22 76/25 77/1
**adequate [3]** 57/25 67/8 70/14
**adequately [1]** 76/13
**adjourned [1]** 82/3
**administer [1]** 57/18
**administrative [1]** 65/11
**admitted [1]** 73/24
**admittedly [2]** 48/9 73/22
**advantage [1]** 53/23
**advertise [4]** 51/12 51/13 51/14 52/14
**advertising [1]** 17/22
**advising [1]** 36/5
**advocating [1]** 58/23
**affirmatively [1]** 64/11
**affirmed [1]** 14/1
**affixed [1]** 36/14
**after [18]** 10/8 11/2 12/12 12/14 12/22 15/23 16/21 18/3 21/11 21/23 37/17 43/12 45/10 50/3 59/12 68/9 68/17 76/8
**afternoon [3]** 4/7 4/11 4/13
**again [14]** 14/21 18/8 19/16 23/25 29/19 47/18 48/2 51/10 52/6 52/23 54/5 59/18 71/3 81/16
**against [11]** 12/2 21/19 21/24 25/8 27/7 28/22 56/16 67/10 75/16 75/17 79/8
**agent [2]** 24/6 54/2
**aggressively [1]** 75/12
**ago [2]** 19/25 49/17
**agree [12]** 26/7 37/16 40/13 41/1 58/4 61/1 64/17 65/20 67/2 67/14 77/18 80/19
**agreed [5]** 25/7 40/21 64/21 65/15 66/8
**agreeing [3]** 64/23 80/10 80/11
**agreement [51]** 10/18 10/20 16/23 17/6 31/3 31/16 32/17 32/25 33/5 33/10 33/12 34/6 34/10 35/20 36/1 36/9 37/8 44/17 44/21 44/22 45/25 46/14 46/18 46/20 46/20 46/21 46/23 46/23 46/24 47/2 47/3 54/15 54/24 59/18 59/20 65/21 67/14 68/22 68/23 68/23 68/25 69/1 69/4 69/5 69/11 69/16 69/17 69/19 78/5 79/2 79/4
**agreements [24]** 6/20 7/19 7/21 16/25 27/4 31/14 31/16 32/7 34/22 37/21 46/2 46/6 58/12 63/7 63/24 64/3 68/13 68/15 68/19 69/8 69/9 69/14 71/8 71/25
**agrees [3]** 37/9 47/8 47/9
**ahead [3]** 13/18 16/6 80/2
**AI [1]** 18/18
**AI-generated [1]** 18/18
**alerting [1]** 80/22
**alerts [2]** 19/10 19/11
**algorithm [1]** 5/24
**aligned [2]** 58/1 65/13
**all [70]** 1/6 3/7 3/12 3/15 4/4 4/15 4/21 4/22 7/13 9/7 9/17 10/11 10/13 11/21 11/22 12/5 12/6 12/14 14/11 14/15 15/8 17/1 17/17 18/20 19/23 20/1 21/14 22/20 23/18 25/2 25/13 26/23 26/25 28/10 28/13 30/1 33/1 33/6 41/2 41/14 44/22 48/11 52/8 54/17 58/6 58/11 58/23 60/15 65/8 66/13 67/10 67/11 67/16 67/24 69/11 69/19 70/1 70/1 70/6 74/16 76/1 76/12 78/12 78/13 78/15 79/1 79/12 80/23 81/23 81/23
**allegations [4]** 7/16 61/14 75/3 75/23
**alleged [1]** 59/13
**allegedly [3]** 35/3 35/4 52/25
**allocate [1]** 57/19
**allow [3]** 9/6 14/16 28/8
**allowed [1]** 70/20
**allows [2]** 37/2 44/2
**alluded [2]** 17/25 19/24
**almost [8]** 18/20 20/1 25/23 49/17 50/3 53/15 60/7 73/17
**alone [2]** 31/7 56/4
**already [8]** 6/20 11/10 13/9 14/15 15/5 23/8 25/9 63/19
**also [19]** 14/9 23/11 27/4 28/14 28/25 29/14 34/16 35/12 38/1 39/22 52/1 52/6 56/9 64/13 65/4 71/5 71/16 72/11 78/24
**although [3]** 35/18 42/15 81/13
**always [3]** 18/8 30/23 81/13
**am [4]** 33/25 42/11 42/20 78/4
**amenable [1]** 67/19
**AMERICA [3]** 1/10 4/2 83/3
**among [2]** 79/5 81/19
**amount [5]** 26/4 34/13 37/16 65/10 67/2
**analysis [4]** 24/4 60/16 60/17 61/1
**ANDREW [2]** 2/4 4/7
**anger [1]** 40/19
**another [7]** 12/11 12/13 21/19 21/20 24/23 34/20 37/21
**answer [13]** 6/21 7/15 10/17 12/25 13/8 15/15 20/19 23/20 28/12 43/22 53/15 69/7 72/24
**answer's [1]** 66/5
**answered [3]** 15/10 15/25 33/10
**answering [1]** 32/9
**anti [1]** 6/4
**anti-class [1]** 6/4
**anticipate [1]** 13/20
**anticipating [1]** 4/23
**any [52]** 6/13 11/5 11/11 18/5 19/16 22/10 24/12 28/7 28/9 29/7 29/14 30/15 31/2 31/20 32/21 33/1 33/3 33/13 33/20 34/13 35/8 38/20 40/2 40/16 43/7 45/12 45/15 47/3 47/5 47/12 48/8 49/8 49/12 49/17 54/25 57/25 59/13 64/16 65/12 65/20 66/24 66/24 67/24 71/19 73/19 75/25 77/2 77/2 77/4 77/7 80/21 81/21
**anybody [4]** 28/24 29/10 40/8 57/14
**anymore [2]** 43/14 52/7
**anyone [3]** 9/6 27/19 78/17
**anything [17]** 3/13 6/18 7/22 9/23 11/8 12/16 17/22 33/4 35/5 40/4 40/16 55/9 76/4 77/7 79/22 79/23 79/25
**anyways [1]** 8/5
**apologize [1]** 65/16
**appealed [1]** 14/1
**appear [3]** 6/14 30/14 78/18
**APPEARANCES [1]** 1/20
**appeared [2]** 34/20 34/21
**appearing [1]** 18/4
**appends [2]** 20/13 70/25
**applied [1]** 56/22
**applies [3]** 30/25 52/3 69/18
**apply [2]** 34/16 76/18
**appointed [1]** 27/12
**appreciate [3]** 4/25 49/14 81/23
**approach [1]** 78/1
**approached [1]** 74/4
**appropriate [3]** 5/9 20/12 67/7
**approve [2]** 36/25 57/18
**approved [1]** 78/9
**approves [1]** 57/13
**approving [1]** 81/17
**aptly [1]** 29/1
**arbitration [3]** 8/13 8/14 50/16
**are [99]**
**area [1]** 49/8
**aren't [2]** 31/14 67/13
**argue [1]** 72/4
**argued [2]** 29/7 68/21
**arguing [2]** 12/4 68/21
**argument [11]** 1/15 4/2 10/6 26/12 29/8 39/13 60/25 72/15 75/17 79/16 83/5
**arguments [1]** 71/17
**around [2]** 81/14 81/14
**arrangement [7]** 16/19 32/2 32/20 35/17 38/17 54/12 73/14
**article [1]** 48/5
**as [71]** 10/4 12/18 12/20 14/17 19/13 19/17 19/23 19/24 22/9 22/20 22/21 24/9 27/12 27/15 28/20 29/17 29/24 31/11 32/10 33/7 36/12 37/10 37/24 38/7 38/8 40/18 41/17 43/19 43/23 44/20 46/6 46/12 47/13 47/25 48/4 48/4 48/9 48/11 51/20 51/22 52/1 53/11 55/22 56/22 57/12 57/20 60/6 60/13 61/17 62/3 62/6 63/5 64/11 65/6 67/25 68/4 68/9 68/22 69/24 70/10 70/17 71/5 72/13 73/7 73/10 74/16 76/13 76/13 78/1 78/9 80/13
**aside [1]** 39/22
**ask [8]** 11/14 13/6 13/6 15/15 36/18 55/19 56/20 61/21
**asked [14]** 9/17 10/6 16/15 28/11 33/9 34/3 41/4 41/14 55/15 61/9 65/14 66/3 71/13 71/15
**asking [7]** 8/1 9/22 15/17 38/14 54/5 61/5 69/3
**asks [5]** 28/19 47/1 55/17 57/7 72/21
**assert [2]** 22/24 25/3
**asserted [1]** 25/11
**asserts [1]** 56/16
**assigned [1]** 11/7
**assuage [1]** 58/3
**assume [2]** 3/20 61/11
**assumed [1]** 69/17
**asterisk [1]** 28/4
**Atlanta [3]** 2/10 2/14 2/18
**attack [2]** 29/10 74/22
**attacking [1]** 29/4
**attacks [1]** 74/12
**attempted [1]** 39/22
**attempting [1]** 28/15
**attention [1]** 58/7
**attitude [1]** 8/11

**A**

**attorney [16]** 10/20 13/15 17/2 31/4 31/17 33/3 33/5 38/3 38/3 47/5 54/17 60/6 69/5 70/7 71/10 75/6
**attorney's [8]** 31/10 34/14 36/12 37/10 53/21 54/13 54/17 65/11
**attorney-client [1]** 75/6
**attorneys [10]** 4/4 6/16 9/5 42/21 46/3 47/17 54/19 58/13 58/18 59/19
**atypical [4]** 55/13 56/20 64/12 71/16
**August [3]** 1/19 3/1 83/6
**auspices [1]** 14/19
**authority [5]** 33/12 37/5 47/6 58/12 58/13
**authorization [1]** 29/18
**authorize [2]** 33/13 78/4
**authorized [1]** 59/25
**available [1]** 63/5
**Avenue [2]** 2/21 2/24
**avoid [3]** 19/2 24/15 68/2
**avoiding [1]** 13/1
**away [1]** 50/12
**awful [1]** 58/5

**B**

**back [8]** 26/2 53/18 54/21 55/6 66/13 70/21 76/3 78/6
**background [1]** 45/14
**bad [8]** 5/6 9/10 30/10 30/24 39/14 69/25 70/1 70/4
**baffling [1]** 44/18
**balancing [1]** 51/25
**bankruptcy [1]** 7/10
**bar [3]** 30/15 32/3 32/3
**based [7]** 5/24 26/2 34/17 67/3 75/2 75/3 75/23
**baseless [1]** 8/12
**basic [1]** 64/15
**basically [2]** 12/1 16/24
**basis [4]** 56/21 56/22 74/22 74/23
**be [77]** 4/24 6/24 9/14 11/1 11/2 11/4 11/11 13/1 13/5 13/14 14/17 20/16 21/11 22/24 25/11 25/16 25/24 26/14 27/14 28/6 28/20 30/23 31/5 31/11 32/10 33/18 38/10 39/19 40/6 40/24 42/20 43/10 45/16 46/11 46/19 47/12 48/7 50/11 51/6 51/19 52/4 53/7 56/23 58/5 58/17 60/22 61/4 61/5 61/22 61/22 62/13 63/18 63/23 64/13 64/20 65/21 67/9 70/13 70/14 70/15 71/3 73/7 73/18 74/11 75/20 76/19 77/15 77/22 78/9 78/11 78/22 79/5 79/17 79/20 79/24 81/12 81/15
**bearing [1]** 51/22
**beat [1]** 58/8
**became [1]** 56/2
**because [60]** 5/9 5/18 6/25 11/2 13/11 13/20 15/4 16/7 16/12 16/16 17/3 19/1 19/2 22/4 22/6 23/22 23/25 24/13 24/18 25/4 26/9 28/12 29/25 30/11 30/19 31/13 31/15 34/3 37/8 37/14 37/19 38/7 40/13 40/15 41/17 48/9 49/2 49/6 49/23 52/4 54/20 55/25 56/12 56/13 57/25 58/16 61/23 61/23 66/5 66/23 67/11 67/12 68/2 69/24 69/25 72/8 75/5 75/8 76/16 78/7
**become [1]** 29/22
**becomes [1]** 78/2
**becoming [1]** 60/6
**been [32]** 4/23 11/12 14/19 14/20 22/12 22/21 23/5 24/8 27/1 29/23 30/19 42/5 43/7 43/15 45/2 49/19 54/6 54/7 54/21 56/9 57/5 60/22 62/15 62/17 63/5 68/5 68/21 69/3 69/8 73/15 77/24 79/12
**before [25]** 1/17 5/17 6/21 7/22 12/23 12/24 14/20 15/11 19/13 19/18 20/19 21/23 22/4 27/20 45/11 57/6 60/5 60/16 61/16 61/25 65/15 67/24 68/3 68/11 79/11
**behalf [5]** 1/6 4/14 4/17 32/14 59/14
**behind [2]** 37/20 68/1
**being [11]** 21/7 27/12 29/9 38/18 43/8 50/21 54/3 55/15 61/14 71/6 71/14
**belief [2]** 18/18 18/19
**believe [20]** 6/3 12/8 17/10 21/15 23/4 23/5 41/3 45/15 49/24 51/3 51/5 51/7 53/21 60/18 64/13 64/19 65/3 73/3 75/20 77/1
**believed [1]** 39/18
**belong [3]** 34/15 54/18 54/18
**belongs [2]** 34/12 56/4
**below [1]** 83/8
**benefit [1]** 49/11
**benefiting [1]** 58/23
**best [2]** 47/12 47/14
**better [5]** 21/9 21/10 29/9 68/4 79/6
**between [3]** 6/6 23/24 45/10
**beyond [3]** 11/25 72/17 73/16
**big [2]** 50/23 53/19
**bigger [2]** 40/11 71/24
**bigoted [1]** 57/24
**binding [3]** 25/14 50/22 52/7
**bit [8]** 6/15 6/23 9/12 13/18 30/5 30/10 32/7 77/21
**black [1]** 40/4
**blacks [2]** 28/8 28/22
**blame [1]** 6/17
**blanket [2]** 47/5 47/6
**blast [1]** 20/2
**blessing [1]** 13/1
**board [2]** 18/14 78/6
**born [1]** 44/8
**borne [1]** 55/24
**both [6]** 65/2 65/20 68/19 69/7 72/24 81/24
**bother [2]** 11/17 30/14
**bottom [2]** 18/9 73/13
**box [3]** 22/19 23/15 25/4
**boy [1]** 53/9
**bragging [1]** 12/18
**break [5]** 39/16 54/20 55/2 55/9 72/5
**brief [1]** 5/15
**briefed [3]** 29/24 79/11 79/15
**briefing [3]** 15/23 68/18 80/25
**briefly [1]** 5/18
**bring [8]** 31/5 36/15 48/6 58/21 58/21 59/17 59/17 60/2
**bringing [2]** 34/17 74/19
**broad [1]** 67/1
**broader [2]** 62/3 62/6
**Bronston [2]** 12/13 75/12
**brought [2]** 57/22 64/11
**built [3]** 32/7 37/4 70/3
**bunch [3]** 8/19 24/22 31/9
**burdensome [1]** 5/4
**business [16]** 25/16 26/5 26/10 50/16 51/9 51/13 51/16 51/17 51/21 52/12 52/16 52/17 56/10 57/16 60/14 73/2
**businesses [5]** 7/5 7/7 8/19 25/13 52/13

**C**

**calculation [1]** 34/10
**California [2]** 12/13 53/23
**call [25]** 3/23 6/25 20/2 20/24 24/15 24/24 36/9 36/14 43/9 43/20 50/5 52/3 52/5 53/1 53/24 54/3 54/4 60/12 63/13 63/14 63/17 63/22 66/18 67/11 77/8
**called [9]** 21/9 43/8 43/10 53/21 56/9 56/12 57/16 57/23 67/21
**calling [2]** 44/12 54/2
**calls [20]** 24/18 43/2 43/5 43/6 43/14 44/4 44/7 49/3 49/4 49/6 50/3 50/9 51/12 51/14 53/2 56/3 66/13 66/22 66/24 76/8
**came [3]** 17/9 56/23 57/20
**can [35]** 3/8 3/8 5/11 10/22 11/6 11/21 21/4 22/19 23/18 24/5 28/19 30/24 32/10 32/14 35/12 41/8 41/9 46/8 52/4 52/19 55/2 58/5 59/11 63/14 63/14 63/16 67/13 72/5 72/13 75/7 76/12 80/18 81/2 81/9 81/15
**can't [13]** 8/4 24/13 25/3 25/24 37/13 37/16 40/8 57/19 58/20 59/8 65/7 68/1 75/5
**cannot [7]** 3/13 27/9 36/22 52/23 57/14 64/13 71/11
**cap [4]** 31/18 69/21 69/21 70/6
**capacity [1]** 44/20
**capped [1]** 34/25
**captured [1]** 49/24
**car [1]** 16/21
**care [1]** 28/24
**cares [1]** 39/16
**Carpenter [1]** 10/25
**case [132]**
**case-dependent [1]** 60/4
**cases [71]** 5/25 6/2 6/6 6/18 6/19 8/7 8/14 8/22 8/22 9/4 9/8 9/18 9/20 10/11 12/3 12/5 12/6 15/18 16/13 17/4 18/1 21/16 23/8 23/8 25/2 25/19 26/11 26/15 28/16 29/15 32/21 34/24 39/6 42/12 42/14 42/16 43/18 45/25 47/24 48/8 50/14 50/24 50/25 51/18 51/19 53/11 55/23 59/15 59/20 60/7 61/11 61/16 62/7 65/17 67/3 67/11 67/13 67/21 67/23 70/19 72/19 74/13 74/15 75/2 75/3 77/3 78/3 78/25 79/1 81/17 81/21
**cash [1]** 29/2
**cashing [1]** 59/2
**categorically [1]** 39/21
**caught [1]** 79/19
**cause [1]** 83/11
**cell [4]** 51/4 66/17 66/18 66/23
**cellular [1]** 52/9
**centers [2]** 20/2 60/12
**certain [7]** 11/4 30/16 34/17 42/16 48/5 52/2 57/19
**certainly [13]** 43/21 44/14 45/24 49/14

**C**

**certainly... [9]** 50/7 50/9 50/21 53/10 53/12 54/5 55/3 59/5 78/18
**certainty [1]** 24/8
**certifiable [1]** 67/13
**certification [37]** 5/11 13/7 20/16 22/10 29/17 29/18 32/23 38/15 38/23 41/3 41/7 45/1 45/2 45/7 45/10 46/25 48/7 48/13 50/19 60/3 60/21 61/7 61/20 62/7 62/12 62/20 62/22 65/5 67/3 68/16 71/3 72/21 76/15 76/19 77/16 79/24 79/24
**certifications [1]** 77/13
**certified [12]** 6/12 26/14 28/3 40/3 51/19 60/7 60/9 62/15 62/16 62/17 65/22 83/13
**certify [3]** 67/8 78/4 83/8
**certifying [1]** 28/22
**Cha [1]** 44/13
**Cha-ching [1]** 44/13
**challenge [2]** 29/21 74/23
**challenged [1]** 45/8
**chance [1]** 39/11
**change [2]** 56/13 66/23
**character [3]** 53/4 58/5 77/20
**characterization [2]** 45/17 52/24
**charge [1]** 35/20
**charity [1]** 65/13
**chart [2]** 38/24 73/8
**chase [1]** 7/10
**cheaper [1]** 58/22
**check [2]** 27/3 70/10
**Chennette [6]** 25/20 25/22 25/23 26/3 51/10 73/2
**CHET [3]** 1/5 4/8 83/3
**chief [2]** 1/18 60/25
**ching [1]** 44/13
**choice [2]** 18/10 39/12
**choose [3]** 71/11 77/9 79/2
**chooses [1]** 40/2
**Christianity [1]** 39/19
**Circuit [5]** 20/11 20/12 25/14 26/2 70/23
**Circuit's [1]** 50/20
**circulated [1]** 40/15
**circumstances [5]** 36/11 51/18 71/22 71/23 76/23
**citations [1]** 32/12
**cite [1]** 48/3
**City [1]** 45/23
**Civil [1]** 4/1
**claim [16]** 7/1 8/5 13/24 18/8 19/2 19/4 19/14 24/23 24/24 25/11 26/8 26/9 31/19 46/21 55/18 66/16
**claimants [1]** 18/3
**claiming [1]** 19/7
**claims [46]** 9/15 10/13 17/1 17/19 17/20 17/23 18/4 18/17 18/18 18/20 20/13 20/23 23/3 23/4 23/18 23/22 31/5 33/1 33/6 33/18 33/20 34/1 36/15 36/15 36/16 38/8 38/8 48/20 48/21 50/17 52/2 52/4 54/1 56/20 57/18 57/19 62/4 66/13 67/17 69/10 69/10 70/25 78/14 78/14 79/7 79/7
**clarify [4]** 63/12 76/4 76/6 76/10
**class [160]**
**class' [1]** 64/14
**class-conscious [1]** 77/25
**classes [2]** 5/22 67/10
**clean [1]** 41/19
**clear [11]** 22/6 29/5 36/13 45/16 57/3 59/17 63/23 73/19 74/11 76/22 78/2
**clearly [1]** 35/20
**clerk [2]** 10/25 79/20
**clerks [2]** 11/10 39/4
**clicked [1]** 49/24
**client [33]** 6/23 12/22 18/12 19/23 21/1 31/5 31/22 32/4 32/25 33/4 33/5 33/7 33/12 33/17 33/17 33/19 34/5 34/11 34/24 36/6 37/9 37/24 46/17 46/19 46/19 53/5 54/13 54/18 59/10 60/1 70/13 72/4 75/6
**client's [5]** 9/10 10/7 21/8 31/18 69/21
**clients [8]** 20/1 21/25 29/7 35/24 68/11 70/15 70/17 73/21
**close [3]** 3/21 56/24 76/14
**closed [1]** 15/24
**closely [1]** 11/13
**closet [1]** 23/19
**closing [2]** 54/25 60/23
**co [4]** 21/9 46/18 57/4 75/9
**co-counsel [3]** 21/9 57/4 75/9
**co-counsel's [1]** 46/18
**code [1]** 49/8
**coextensive [1]** 55/18
**coin [1]** 22/24
**coincidentally [1]** 11/1
**Colbey [1]** 11/22
**collar [1]** 10/14
**colleague [2]** 43/23 52/1
**colleagues [2]** 10/12 33/4
**collect [1]** 35/20
**collecting [1]** 47/17
**combining [1]** 7/19
**come [4]** 4/25 42/14 48/6 62/19
**comes [1]** 49/7
**comfortable [1]** 40/9
**coming [7]** 5/1 9/23 40/7 42/12 45/25 49/13 77/9
**comment [1]** 42/1
**Commission [1]** 48/4
**common [4]** 7/25 36/18 36/23 56/17
**communication [2]** 20/4 51/12
**communications [1]** 78/16
**companies [3]** 8/13 53/22 53/22
**company [2]** 66/22 66/24
**Compare [1]** 39/17
**compel [1]** 80/25
**compiled [1]** 28/23
**complaints [1]** 21/24
**complete [3]** 34/23 41/13 45/24
**completely [1]** 50/8
**comprehensive [1]** 65/1
**computer [1]** 53/8
**conceded [1]** 56/5
**concern [3]** 32/17 40/1 43/15
**concerned [7]** 42/11 42/20 42/21 44/25 64/6 64/7 77/21
**concerns [3]** 40/11 40/14 42/15
**concludes [2]** 56/19 61/22
**conclusion [1]** 68/2
**condition [2]** 37/11 37/25
**conduct [5]** 22/21 31/8 55/21 56/3 56/11
**cone [1]** 11/4
**confer [4]** 59/12 80/10 80/21 81/11
**conferral [1]** 20/22
**conferred [2]** 14/9 20/9
**conferring [1]** 31/4
**confidential [1]** 59/9
**confined [1]** 62/1
**conflict [2]** 57/9 57/11
**conflicts [1]** 32/13
**conformed [1]** 83/12
**Congratulations [1]** 11/18
**Congress [14]** 7/23 26/19 36/13 42/24 43/19 43/22 43/24 44/1 44/2 48/2 50/9 60/11 60/15 71/11
**Congress' [3]** 26/16 43/24 70/19
**congressional [1]** 77/10
**connection [2]** 27/17 28/16
**conscious [1]** 77/25
**consent [4]** 20/7 25/6 50/16 56/15
**consented [2]** 24/20 29/24
**consider [1]** 78/18
**consistent [1]** 61/12
**consolidate [1]** 9/7
**consolidated [3]** 8/22 9/19 9/19
**consolidation [3]** 9/4 9/13 68/4
**constitutional [1]** 27/14
**consult [1]** 9/5
**consulted [1]** 59/24
**consumer [1]** 43/5
**consumers [3]** 43/1 43/20 43/23
**contact [3]** 17/9 19/2 19/25
**contacts [2]** 19/25 20/7
**contain [3]** 47/3 47/5 47/5
**contains [1]** 69/19
**contend [1]** 13/22
**contested [1]** 6/18
**context [2]** 55/16 62/2
**contingency [7]** 31/12 31/13 31/14 35/22 36/22 37/4 54/24
**contingent [4]** 31/10 46/14 46/24 63/7
**continued [1]** 76/8
**contract [4]** 8/3 27/2 31/23 47/20
**contracts [2]** 33/6 35/9
**contractual [4]** 32/21 38/17 70/3 73/14
**contractually [1]** 37/1
**control [6]** 17/3 27/2 34/23 34/23 35/14 69/12
**conversation [3]** 10/1 59/12 75/8
**conversations [3]** 7/4 42/10 59/9
**convey [1]** 66/3
**convictions [2]** 74/15 74/18
**cooperate [1]** 47/9
**copy [1]** 46/10
**correct [1]** 83/9
**Cosgrave [2]** 2/20 4/20
**cost [4]** 5/2 7/2 8/20 8/21
**costs [5]** 33/18 34/14 37/10 38/20 71/9
**cottage [1]** 44/10
**cough [1]** 45/19
**could [20]** 3/20 4/4 14/25 15/1 15/1 15/1 15/8 15/8 26/14 36/16 36/18 38/10 41/12 41/16 49/1 51/6 63/21 67/8 75/17 81/4
**couldn't [1]** 11/9
**counsel [39]** 4/6 4/19 8/24 10/5 10/12 19/12 20/5 20/19 21/9 21/21 22/7

C

counsel... [28] 26/22 27/2 27/3 28/7 29/25 30/18 32/4 32/10 32/16 35/13 36/6 37/19 37/23 38/15 38/19 42/10 46/8 54/11 57/4 57/10 64/13 65/7 66/6 69/22 70/10 75/9 81/8 81/9
counsel's [3] 29/25 46/18 69/21
counterclaim [1] 13/13
counterclaims [2] 15/2 15/5
country [2] 5/21 8/23
couple [4] 66/3 68/20 69/2 76/21
course [15] 11/19 25/1 25/3 26/20 32/18 32/22 50/4 52/9 55/21 56/11 61/14 65/25 68/14 79/18 80/21
court [77] 1/1 1/18 2/23 3/4 3/19 6/14 8/1 8/21 8/21 9/17 10/6 12/21 13/6 14/17 14/18 14/20 22/9 22/13 23/7 27/9 28/8 31/11 31/12 32/12 36/15 36/22 36/24 37/5 39/1 39/4 40/7 41/3 41/5 41/7 41/9 41/11 41/16 41/17 41/19 41/23 42/12 46/1 46/7 47/14 55/15 56/19 57/9 57/13 57/23 60/5 60/16 60/19 61/2 61/6 61/18 61/19 61/21 61/25 62/12 65/22 68/4 68/14 69/17 71/13 73/11 73/19 76/1 77/11 77/12 79/11 80/13 80/22 81/6 81/9 81/25 82/3 83/16
court's [12] 6/9 9/19 13/8 13/10 26/20 30/2 41/21 46/7 61/13 70/24 71/14 80/2
Courthouse [1] 2/23
courtroom [2] 30/13 34/19
courts [5] 5/21 8/8 22/13 38/21 60/9
cousin [1] 39/15
Cousins [1] 39/11
covered [2] 25/9 39/24
crass [1] 6/24
create [3] 19/2 43/25 44/1
creates [1] 32/15
criminal [4] 42/22 54/22 74/15 74/17
criticism [1] 29/11
criticizing [1] 21/8
cross [1] 25/5
cross-examine [1] 25/5
CRR [2] 2/23 83/15
CSR [4] 2/23 83/15 83/17 83/17
curious [1] 9/25
currently [1] 61/16
customer [1] 48/23
cv [2] 1/8 83/4

D

D.C [7] 11/12 15/21 17/14 32/3 35/18 79/11 79/19
damages [14] 7/8 31/20 31/21 34/11 34/14 35/3 36/14 36/17 37/13 44/4 44/4 47/19 54/14 54/17
data [2] 24/21 68/1
date [3] 33/11 83/16 83/17
dating [1] 66/13
day [6] 12/12 20/24 47/14 66/23 73/3 75/15
days [5] 27/20 33/19 41/13 41/16 41/21
deal [3] 37/14 64/20 66/12
dealing [1] 26/9
decide [4] 35/25 41/23 62/2 71/15
decided [1] 13/25
decides [1] 62/4
decision [10] 9/19 13/5 35/9 35/13 36/2 36/2 44/22 50/21 50/22 60/9
decision-making [1] 44/22
decisions [4] 32/12 52/8 70/4 70/16
declaration [3] 27/17 28/14 59/23
declined [1] 12/25
deems [1] 33/13
deep [1] 14/12
deeper [1] 38/5
defend [7] 7/3 10/15 57/4 57/4 73/18 74/3 75/21
defendant [26] 1/11 2/7 2/11 2/15 2/19 4/12 4/14 4/17 4/20 7/2 20/23 22/24 26/18 31/20 34/16 35/1 45/11 48/24 49/20 53/24 61/8 62/3 64/17 66/12 67/2 68/12
defendant's [4] 39/13 45/17 52/24 60/24
defendants [17] 7/5 7/6 8/11 8/18 18/9 38/20 47/24 58/22 61/15 67/10 67/20 68/3 71/10 76/17 77/6 79/3 79/5
defended [2] 16/16 29/6
defending [1] 12/4
defense [21] 4/10 5/10 5/19 6/15 10/14 33/25 42/10 46/11 48/20 51/22 52/3 53/10 54/23 56/4 56/15 56/16 56/17 56/18 63/1 77/14 79/8
defense-only [1] 5/19
defenses [6] 22/23 22/25 23/22 25/3 48/20 48/21
defer [1] 5/3
definition [3] 22/2 57/13 57/14
definitively [1] 75/7
degree [3] 16/18 51/15 72/8
delegation [1] 33/14
delegitimization [1] 38/22
deliver [2] 30/24 30/24
demand [4] 18/7 19/6 38/9 74/2
demands [4] 22/1 68/6 68/8 68/11
demonstrating [1] 32/14
denial [2] 20/15 71/2
denied [4] 32/23 38/23 60/22 76/20
denies [4] 61/2 61/3 61/7 61/19
deny [12] 4/2 5/11 13/7 22/9 23/13 38/15 41/3 41/7 62/12 65/5 68/15 76/15
denying [1] 79/24
dependent [2] 60/3 60/4
depends [1] 3/8
depose [1] 24/24
deposing [1] 25/12
Deposit [1] 48/3
deposition [5] 17/8 17/12 38/13 40/21 78/19
deposits [1] 33/7
derangement [1] 42/19
describe [2] 17/9 18/1
described [2] 17/18 59/13
design [1] 34/24
designed [2] 7/21 43/22
desire [4] 30/21 50/6 80/2 80/16
despite [1] 29/17
detail [2] 29/14 71/19
detailed [1] 19/5
determination [1] 54/6
determine [2] 14/18 78/23
determining [1] 25/15
developed [1] 61/23
device [1] 8/12
devices [3] 78/16 78/20 80/14
did [35] 9/6 14/11 16/1 20/11 20/17 20/18 21/18 21/22 34/1 37/1 41/22 43/25 44/1 45/12 48/22 49/1 53/9 56/13 57/20 63/16 64/10 64/19 64/25 65/14 66/4 66/9 68/14 70/5 71/4 72/6 73/13 74/11 75/20 76/7 81/24
didn't [16] 5/24 9/5 9/6 9/10 13/13 19/4 24/20 30/14 32/21 36/6 45/19 55/25 65/16 74/17 74/18 80/8
difference [1] 28/9
different [10] 9/12 25/19 29/11 34/10 39/21 43/7 49/8 49/12 51/1 77/17
differentiable [1] 52/22
differentiate [1] 52/19
difficult [1] 60/12
digitally [1] 83/12
direct [1] 28/7
directed [1] 61/18
direction [1] 53/21
directly [2] 21/25 35/17
directors [1] 18/15
disagree [5] 35/13 43/25 45/17 52/24 77/11
disagreement [1] 80/23
disagreements [1] 80/11
disclose [1] 10/24
disclosure [1] 32/4
discovered [1] 7/20
discovery [28] 12/24 13/9 13/14 13/19 14/17 14/24 15/10 15/15 15/17 15/18 38/12 41/8 41/13 41/17 41/25 45/20 47/9 55/24 56/6 67/24 71/9 78/11 78/22 79/3 80/3 80/10 80/16 81/14
discretion [1] 13/10
discriminate [1] 28/21
discuss [3] 79/25 81/4 81/5
discussing [1] 30/20
discussion [6] 3/17 5/3 22/12 65/1 66/22 80/17
discussions [2] 22/14 42/13
dishonesty [1] 28/16
dismiss [19] 4/3 10/7 12/1 13/9 13/14 15/11 20/10 21/11 21/15 21/18 41/24 42/3 58/16 59/4 59/20 61/9 64/8 74/6 74/8
dismissal [12] 12/11 18/11 18/13 37/17 41/12 41/15 41/17 59/10 59/25 61/18 75/1 75/2
dismissals [3] 33/7 75/23 81/18
dismissed [9] 12/9 18/8 35/4 59/11 61/4 75/5 75/14 75/16 75/21
dismissing [3] 77/3 78/10 81/21
disparage [2] 11/19 11/21
dispositive [3] 12/4 22/11 23/14
dispute [1] 49/22
disqualifying [1] 28/17
disrupted [1] 50/6
disservice [1] 14/23
distance [1] 6/6
distinction [2] 26/10 50/23
distinctions [1] 53/20
distinguish [1] 26/8

## D


**distributed [1]** 63/25
**district [8]** 1/1 1/2 1/18 2/23 13/21 14/1 14/22 31/7
**distrust [2]** 8/9 8/10
**DIVISION [1]** 1/3
**do [64]** 3/6 4/25 5/3 10/22 11/8 11/14 13/6 13/6 13/13 14/6 14/23 15/3 15/8 17/11 18/14 19/4 20/10 20/19 21/17 22/3 22/5 24/22 35/14 36/7 37/1 41/5 41/11 43/11 44/10 50/5 50/18 52/3 52/5 53/1 53/4 54/22 54/22 55/2 57/3 57/3 57/4 57/8 58/20 58/20 62/6 62/25 63/18 69/6 70/5 70/20 72/5 76/5 77/1 77/2 77/8 78/5 78/6 78/10 78/22 80/10 80/18 80/20 80/22 81/11
**Doc [1]** 65/3
**docket [1]** 8/15
**documentary [1]** 78/13
**documents [4]** 15/21 31/6 38/14 63/10
**does [30]** 17/8 17/10 23/21 27/12 28/1 33/25 35/7 35/22 36/12 39/21 42/14 43/5 47/3 47/7 49/8 50/5 55/13 55/14 56/13 57/12 57/18 59/21 62/12 64/22 66/25 72/8 72/22 72/22 72/23 77/19
**doesn't [25]** 7/8 8/3 11/17 15/6 23/14 24/1 25/18 26/11 27/14 27/22 28/24 29/14 35/6 35/8 47/4 47/5 48/16 48/19 53/2 55/19 58/12 59/1 68/24 72/20 81/12
**doing [7]** 8/25 10/5 15/14 20/20 33/7 40/9 67/12
**dollar [5]** 6/12 64/18 68/5 69/22 70/6
**dollars [11]** 6/1 8/18 12/23 15/14 18/14 19/17 35/15 38/18 38/19 64/17 68/7
**don't [59]** 5/12 9/14 9/22 15/4 15/12 17/10 17/17 17/21 17/22 18/4 18/9 18/17 19/3 20/1 20/10 21/4 24/7 25/24 27/21 27/21 29/16 29/20 30/8 34/3 34/8 38/2 38/5 38/11 38/25 40/8 40/16 41/14 42/1 42/19 44/13 44/14 45/15 45/21 50/7 51/6 51/24 52/15 58/8 60/25 64/22 72/20 73/11 73/18 73/19 74/3 74/21 76/3 76/14 77/15 79/10 80/15 80/15 80/19 81/8
**done [12]** 4/24 6/10 11/10 16/17 19/13 22/4 41/25 45/18 70/20 71/6 73/7 73/17
**doubt [1]** 32/16
**down [3]** 9/25 13/16 29/10
**dozen [2]** 18/7 33/23
**draft [1]** 21/24
**drafted [1]** 46/21
**drag [2]** 15/3 60/25
**drawing [1]** 78/6
**drawn [1]** 22/5
**dried [1]** 6/21
**due [1]** 25/7
**dug [1]** 27/23
**during [1]** 20/24
**duties [1]** 47/20


## E


**each [6]** 22/8 26/25 48/21 61/7 67/3 67/4
**earlier [8]** 10/9 22/14 23/4 32/8 63/5 68/19 69/20 70/22
**earth [1]** 66/22
**easily [1]** 80/18
**easy [2]** 13/5 18/25
**economics [1]** 37/20
**Edgewood [1]** 2/5
**Edison [1]** 12/13
**effect [2]** 29/1 69/8
**effectively [4]** 14/19 17/3 21/7 69/11
**effectuated [1]** 42/18
**eight [2]** 32/20 47/18
**either [5]** 34/14 41/22 61/18 64/8 72/17
**electronic [5]** 38/1 78/12 78/15 78/20 80/13
**else [6]** 13/16 29/19 56/5 56/6 78/17 79/25
**employer [1]** 11/8
**enable [1]** 36/15
**enacted [1]** 26/18
**end [2]** 49/7 73/3
**engage [1]** 21/1
**engaged [3]** 19/20 54/11 72/7
**engagement [9]** 10/18 10/20 16/23 32/25 33/5 33/10 37/20 71/7 71/25
**engineered [1]** 30/1
**enjoy [1]** 5/7
**enormous [2]** 38/20 72/1
**enough [3]** 52/23 77/21 77/22
**enrich [1]** 74/2
**enriching [1]** 73/20
**enter [2]** 35/19 48/22
**entered [3]** 24/14 45/10 61/22
**entering [1]** 72/18
**enters [1]** 48/11
**entire [5]** 12/1 33/25 34/23 44/6 65/10
**entire Am Law [1]** 33/25
**entirely [1]** 79/4
**entitled [1]** 83/10
**equipment [2]** 51/2 72/10
**escrow [1]** 17/1
**especially [4]** 18/10 21/5 61/23 63/4
**essentially [1]** 62/11
**establish [1]** 34/24
**established [2]** 23/9 36/19
**establishes [1]** 73/5
**estate [1]** 51/6
**ethical [2]** 31/1 42/20
**ethics [4]** 32/6 35/16 68/25 73/14
**EUGENE [2]** 1/3 4/25
**even [19]** 8/4 15/8 24/14 25/12 28/15 34/2 36/21 37/3 38/13 40/24 43/13 49/2 52/11 58/12 58/15 67/6 68/12 73/9 73/25
**evening [1]** 65/3
**event [4]** 19/16 61/7 61/19 62/12
**ever [12]** 7/22 20/4 29/7 31/2 31/12 33/4 40/3 45/2 45/2 57/5 58/14 69/9
**every [24]** 8/6 18/6 18/8 32/1 37/24 48/22 48/24 49/5 56/8 56/16 59/17 60/2 66/22 66/23 67/10 67/20 67/21 69/22 70/2 70/6 75/16 75/18 75/21 76/18
**everybody [4]** 4/21 8/12 27/25 56/11
**everyone [2]** 24/19 73/7
**everything [7]** 16/8 28/23 31/18 34/12 41/23 58/4 66/15
**evidence [15]** 15/23 16/11 19/5 20/6 23/3 23/14 27/6 49/23 54/6 54/7 72/16 72/16 75/9 75/19 78/13
**evidentiary [1]** 60/13
**exact [2]** 6/10 47/15
**exactly [8]** 20/17 21/11 67/1 69/6 71/3 71/12 78/23 79/10
**examine [1]** 25/5
**example [6]** 19/6 24/17 39/8 48/25 51/11 64/12
**examples [2]** 7/12 18/2
**except [1]** 13/22
**exceptions [1]** 36/24
**excess [1]** 34/13
**excessive [1]** 35/21
**exclude [1]** 57/14
**excuse [1]** 21/15
**execute [1]** 33/6
**executed [2]** 46/19 62/10
**exercised [1]** 15/7
**exercising [2]** 27/10 59/19
**exhibit [6]** 46/11 63/13 63/14 63/17 63/20 68/22
**Exhibit 2 [1]** 68/22
**Exhibit 3 [1]** 63/17
**exhibits [3]** 46/6 54/23 63/19
**existence [1]** 64/21
**exists [4]** 6/7 15/6 23/1 23/20
**expense [3]** 14/15 71/8 72/1
**expert [1]** 78/20
**Expiration [1]** 83/17
**explain [3]** 13/11 19/11 33/22
**explained [4]** 19/12 20/25 55/22 65/6
**explaining [1]** 73/9
**explains [1]** 37/17
**explicitly [1]** 54/16
**expose [1]** 30/22
**exposed [1]** 22/21
**exposing [1]** 13/2
**expressly [1]** 48/2
**extensively [1]** 51/9
**extent [4]** 13/4 15/13 52/7 52/15
**extinguish [1]** 23/18
**extortion [2]** 22/2 36/9
**extra [1]** 72/2
**extra-statutory [1]** 72/2
**extract [3]** 7/23 36/9 71/10
**extracted [1]** 32/1


## F


**face [1]** 27/23
**Facebook [2]** 19/22 28/5
**fact [13]** 43/5 43/8 48/14 48/23 49/6 55/24 56/2 56/3 60/3 66/11 66/25 69/16 74/17
**fact-dependent [1]** 60/3
**factors [4]** 34/17 51/10 51/20 51/25
**facts [7]** 50/25 51/6 57/15 67/4 68/6 68/8 77/14
**fair [2]** 23/17 50/8
**fake [1]** 19/11
**fall [1]** 11/1
**false [1]** 67/5
**familiar [3]** 14/4 25/25 50/24
**family [2]** 8/19 79/17
**far [4]** 56/6 73/16 80/12 80/12
**fast [1]** 34/6

## F


**fast-forward [1]** 34/6
**fat [1]** 24/9
**fat-fingered [1]** 24/9
**FBI [1]** 24/6
**FCC [2]** 52/6 52/8
**federal [3]** 8/4 60/9 66/13
**fee [35]** 7/19 7/21 7/24 31/11 31/14 31/24 32/17 34/10 34/18 35/21 35/22 35/25 36/20 36/21 37/3 37/3 37/5 44/17 44/22 46/14 46/18 46/20 46/24 47/2 47/3 54/12 54/24 63/7 63/24 64/3 68/13 68/15 68/19 70/6 70/7
**fee-shifting [4]** 7/24 36/21 37/3 37/5
**fee-splitting [1]** 54/12
**feel [5]** 16/5 30/8 30/10 40/9 51/24
**fees [25]** 7/8 7/23 8/3 13/15 14/7 31/10 31/23 33/18 34/14 34/25 35/1 36/13 37/2 37/10 37/15 47/16 54/13 54/17 54/18 58/19 65/11 65/11 70/7 71/10 72/2
**fiduciaries [2]** 6/8 32/10
**fiduciary [5]** 12/19 27/12 28/20 44/20 76/13
**Fifth [1]** 2/21
**fight [2]** 8/18 25/16
**fighting [2]** 46/4 77/16
**figure [4]** 24/4 24/6 24/22 35/6
**figured [1]** 42/9
**file [12]** 13/12 14/10 14/25 15/1 15/2 15/4 15/9 17/6 22/8 41/22 67/16 74/1
**filed [17]** 5/19 8/11 12/14 13/12 15/16 15/22 16/15 20/18 34/2 60/6 60/6 65/3 68/9 68/15 69/10 75/13 76/9
**filing [10]** 13/20 20/21 20/22 21/2 25/1 29/23 49/17 49/19 65/2 67/25
**filings [2]** 63/6 78/17
**fill [1]** 18/25
**filled [3]** 23/10 24/7 55/25
**filling [1]** 72/19
**final [2]** 63/1 63/6
**finally [1]** 56/24
**financial [6]** 18/20 23/6 26/1 50/14 69/15 72/18
**financially [1]** 49/12
**find [3]** 53/9 53/10 57/10
**findings [1]** 26/2
**finds [1]** 57/10
**fingered [1]** 24/9
**finish [6]** 13/8 14/24 27/20 27/24 39/20 41/7
**finished [1]** 14/17
**fire [1]** 17/6
**firm [50]** 5/18 5/19 6/17 10/10 10/19 11/5 11/7 11/18 12/3 12/12 14/13 15/19 16/22 16/24 17/13 17/18 18/4 19/7 19/13 21/19 24/2 30/23 32/25 33/23 33/24 34/1 34/7 34/19 34/20 38/3 40/15 43/16 44/12 44/23 45/13 45/18 46/15 59/14 69/5 71/5 75/4 75/13 75/18 75/19 75/24 78/12 78/17 78/23 79/8 81/8
**firm's [3]** 6/1 70/12 77/3
**firms [2]** 45/22 68/11
**first [20]** 16/7 26/25 27/1 28/13 35/19 41/22 41/25 43/12 46/13 49/16 52/23 55/17 58/11 59/8 59/11 65/8 70/17 70/21 70/21 74/5
**five [3]** 18/7 38/7 66/14
**fix [1]** 26/19
**flaws [1]** 53/5
**flip [1]** 22/24
**Floor [1]** 2/21
**flow [1]** 23/21
**fold [1]** 28/13
**folks [3]** 3/5 4/24 81/23
**following [4]** 3/3 43/8 45/1 46/24
**foolish [1]** 39/13
**force [1]** 79/5
**forced [2]** 6/23 7/14
**foregoing [1]** 83/8
**forensic [1]** 78/20
**forever [1]** 76/4
**form [4]** 24/7 48/12 55/25 56/23
**formally [1]** 9/18
**format [1]** 63/21
**former [2]** 10/13 24/6
**forms [6]** 23/12 25/6 29/19 56/12 72/19 72/19
**forth [2]** 74/16 76/3
**forward [3]** 9/15 34/6 61/17
**forwarded [2]** 21/25 63/7
**found [5]** 11/3 25/23 39/19 57/24 69/9
**four [4]** 18/7 46/16 46/16 61/15
**fraction [1]** 38/24
**frankly [7]** 30/9 42/21 43/13 44/18 44/24 57/5 64/7
**FRANSEN [2]** 2/20 4/19
**fraud [4]** 13/13 41/19 42/22 75/20
**fraudulently [1]** 23/3
**free [2]** 16/5 48/5
**free-rider [1]** 48/5
**FREEWAY [24]** 1/9 3/10 4/1 4/14 7/6 7/12 19/23 19/24 19/25 20/7 24/7 25/3 25/5 35/2 41/8 41/16 56/9 56/11 56/12 56/16 57/16 57/21 79/2 83/3
**Freeway's [5]** 24/20 24/21 56/3 56/4 61/3
**frequently [2]** 26/13 36/11
**frivolous [1]** 7/1
**front [7]** 9/5 39/10 40/7 66/1 66/9 76/19 78/25
**fulfill [1]** 41/9
**full [7]** 13/3 15/13 41/8 41/23 46/4 47/19 61/13
**fully [3]** 29/23 61/1 79/15
**fun [1]** 11/22
**fund [5]** 7/25 36/19 36/24 57/19 62/11
**fundamental [1]** 5/10
**fundamentally [2]** 15/12 28/19
**funds [2]** 17/1 65/12
**further [2]** 11/5 80/17
**future [1]** 11/7


## G


**GA [3]** 2/10 2/14 2/18
**Gaertner [1]** 39/10
**gave [2]** 21/13 70/6
**gay [2]** 28/4 40/4
**gays [1]** 28/8
**gear [2]** 72/9 72/9
**general [2]** 10/14 60/8
**generally [1]** 17/19
**generated [1]** 18/18
**generates [1]** 56/15
**genius [1]** 35/6
**genuinely [1]** 5/22
**get [34]** 3/6 3/15 5/17 5/24 7/13 7/24 8/4 8/11 12/17 12/23 13/7 14/14 18/9 20/4 21/7 30/21 36/22 37/2 40/25 47/23 58/6 59/8 66/17 66/18 67/13 68/24 71/11 74/9 75/5 76/16 76/20 76/21 79/6 81/1
**gets [3]** 16/20 34/11 66/18
**getting [5]** 7/15 36/5 37/25 40/23 58/19
**give [5]** 9/11 39/15 41/16 56/1 66/17
**given [5]** 11/9 18/10 32/5 37/15 51/25
**gives [3]** 12/21 16/24 34/4
**giving [1]** 38/3
**glad [1]** 28/11
**go [25]** 3/18 10/1 20/5 20/5 24/23 26/19 26/23 26/24 29/13 35/12 38/25 42/2 55/6 61/17 64/4 64/8 65/12 70/21 71/19 73/11 76/3 78/6 79/21 80/2 80/12
**gobbled [1]** 65/12
**God [2]** 44/11 44/12
**goes [7]** 18/21 19/18 38/6 39/20 60/9 65/10 73/1
**going [42]** 4/23 7/2 8/10 9/1 9/14 9/15 9/20 10/1 11/14 14/10 17/23 20/10 21/15 21/17 24/3 25/16 26/23 26/24 28/3 28/18 28/21 29/15 40/14 43/11 43/12 54/8 54/20 55/1 56/25 68/24 70/1 70/4 76/14 77/4 78/4 78/9 78/23 79/1 79/5 79/18 80/18 81/5
**gone [1]** 14/12
**good [8]** 4/7 4/11 4/13 9/9 18/14 30/24 32/4 69/24
**got [6]** 16/6 19/7 20/7 23/15 44/11 44/12
**Government [1]** 53/8
**grain [1]** 75/24
**grant [1]** 76/15
**grants [4]** 33/5 33/12 61/2 61/3
**great [3]** 11/18 42/17 64/20
**greatest [1]** 39/19
**grounds [3]** 13/7 14/7 22/8
**group [9]** 23/9 44/3 49/22 72/3 72/9 72/12 72/17 72/25 76/7
**Guarantee [1]** 48/3
**guard [1]** 25/8
**guess [10]** 3/8 4/23 12/15 30/3 43/17 63/21 64/6 80/9 80/15 81/20
**guidance [2]** 52/7 61/13
**gun [1]** 64/7


## H


**had [17]** 4/23 4/24 5/2 5/2 7/4 12/2 14/15 24/5 38/14 42/13 49/18 53/21 57/25 59/10 59/12 75/8 79/17
**hadn't [2]** 16/17 63/6
**half [4]** 12/23 18/7 18/13 65/11
**hand [2]** 6/23 7/14
**handcuffed [1]** 70/2
**handed [1]** 63/10
**handled [2]** 75/19 81/15
**Hannon [1]** 56/18
**happened [4]** 12/14 19/15 21/19 65/17
**happening [2]** 19/12 73/16

## H

happens [4] 8/6 40/24 61/6 67/17
happy [4] 5/3 7/12 7/13 13/18
hard [2] 16/8 57/1
hardest [1] 56/24
harm [1] 8/16
harmed [1] 5/23
has [84]
hate [3] 12/18 19/22 73/17
hateful [1] 71/17
hating [1] 44/25
have [112]
haven't [11] 11/13 13/11 16/15 22/4 24/8 33/10 34/3 37/7 42/9 63/6 79/17
having [6] 21/23 29/17 32/13 39/15 56/10 57/16
he [72] 10/8 11/2 11/6 11/11 12/17 16/20 16/21 17/5 17/5 17/9 17/10 21/10 22/21 22/22 24/13 24/18 25/6 25/12 27/11 27/14 27/16 27/19 27/20 27/22 27/23 27/23 27/24 28/25 29/4 29/14 35/3 35/4 37/13 38/7 38/11 39/17 39/18 39/18 39/20 39/22 40/19 43/5 43/12 44/21 44/24 45/2 49/12 50/3 50/5 50/8 51/7 52/11 52/13 53/2 53/2 53/6 53/9 57/19 57/25 57/25 58/10 58/12 59/24 59/25 60/20 68/25 69/10 72/6 73/18 74/17 77/20 78/16
he's [27] 11/10 19/21 23/12 23/15 24/12 24/17 24/18 25/6 29/16 30/7 35/14 39/15 42/5 43/4 43/4 43/11 43/11 43/13 44/11 49/18 49/18 49/19 53/1 53/1 53/6 67/6 73/2
head [1] 51/7
healing [1] 51/2
hear [3] 26/13 42/4 63/1
heard [3] 13/21 67/15 68/3
heat [1] 30/22
Heidarpour [36] 10/19 12/12 14/12 15/19 16/22 16/24 17/9 17/13 17/18 18/3 19/7 19/13 21/21 24/2 32/24 34/1 34/7 38/3 38/13 43/15 44/23 45/13 45/18 46/15 59/14 69/4 69/10 75/4 75/13 75/18 75/24 78/12 78/17 78/23 79/8 81/7
held [3] 3/3 52/8 61/5
helpful [1] 5/4
her [2] 25/25 26/2
here [45] 4/14 5/1 5/5 6/7 7/12 7/13 11/22 12/22 16/7 20/12 21/14 23/23 25/11 30/25 31/9 32/12 32/24 36/12 39/5 39/23 42/19 42/25 44/13 44/19 45/14 49/13 50/22 51/14 54/5 54/15 54/20 54/21 56/25 57/1 58/8 61/9 61/14 62/4 65/7 65/15 69/18 71/6 76/23 77/4 81/13
here's [3] 34/18 34/22 40/1
hereby [1] 33/1
hide [1] 68/1
high [1] 36/14
him [26] 11/5 20/25 25/12 29/4 30/8 30/8 35/1 35/9 43/6 44/9 48/16 48/19 49/8 49/10 50/10 55/13 55/25 56/8 58/9 59/23 59/24 71/15 71/16 74/10 74/21 78/19
himself [2] 28/24 49/11
hire [1] 24/5
hired [1] 10/13
his [73] 6/10 8/24 10/4 10/12 11/4 11/7 11/7 21/1 21/8 21/9 22/7 24/13 24/14 24/14 25/6 25/11 25/13 25/13 26/22 27/2 27/2 27/10 27/10 28/5 28/14 29/1 30/11 34/25 35/2 35/4 35/12 39/15 44/21 44/22 47/9 47/10 47/14 47/17 47/19 48/16 48/20 48/23 49/2 49/16 49/24 50/4 50/6 51/4 52/12 52/15 52/17 53/1 53/7 53/21 54/1 54/17 55/14 55/23 56/1 56/20 56/21 57/10 58/18 59/1 67/9 70/18 71/16 72/4 72/18 74/18 77/3 78/17 78/19
historic [1] 16/14
historically [1] 47/23
history [1] 77/3
hit [2] 41/4 43/12
Hitler [4] 27/21 27/24 39/18 39/21
hitting [1] 44/17
HLF [9] 32/24 33/1 33/5 33/12 33/13 33/17 33/18 33/18 68/10
hold [3] 10/16 41/12 60/19
holding [1] 57/9
holes [1] 27/23
homophobic [1] 44/24
homosexuals [1] 28/22
honest [1] 79/17
Honor [54] 3/7 3/14 4/7 4/11 4/13 5/14 7/1 8/24 10/4 14/16 19/9 40/13 41/2 42/7 43/21 44/14 45/4 45/16 46/5 46/13 48/1 49/14 51/24 52/21 53/12 55/4 55/11 57/12 59/5 59/16 60/13 60/23 61/12 61/16 62/5 62/9 62/9 62/18 62/21 62/23 63/3 63/9 63/10 65/14 65/23 66/10 67/23 73/24 74/21 75/1 75/25 79/13 80/1 82/1
HONORABLE [1] 1/17
hood [1] 10/7
hope [3] 5/4 5/6 15/25
hoping [1] 76/21
hour [2] 10/15 81/18
hourly [1] 7/25
hours [1] 16/12
how [32] 7/1 12/7 14/12 16/6 16/18 17/9 21/4 24/22 27/21 27/22 28/1 34/1 34/4 35/12 36/8 38/5 39/1 39/14 41/11 42/3 42/17 45/6 45/25 47/24 47/25 49/24 52/23 56/2 66/21 73/5 73/9 80/12
hundreds [8] 7/11 7/12 8/7 8/7 31/25 35/15 38/10 38/19

## I

I'd [6] 40/6 53/9 53/13 59/5 64/4 80/9
I'll [19] 6/22 7/10 11/24 12/15 13/7 16/4 18/12 29/13 39/25 41/4 42/8 54/24 55/9 55/10 64/3 64/10 66/9 73/10 79/17
I'm [57] 5/15 5/15 7/15 9/1 9/25 12/16 13/18 14/4 17/24 18/13 22/1 26/23 26/24 28/9 28/11 30/4 39/4 40/13 40/23 42/9 42/11 42/21 43/13 43/17 50/24 53/9 53/13 53/14 54/18 54/20 56/25 58/8 58/11 58/11 63/5 64/6 64/7 64/8 66/2 68/24 73/17 75/8 76/14 76/21 78/2 78/8 78/10 78/11 78/15 79/1 79/5 80/6 80/18 81/12 81/16 81/17 81/17
I've [18] 6/19 16/12 16/16 21/23 27/19 29/6 29/6 29/7 31/2 39/19 55/22 59/9 60/6 60/6 62/7 77/16 79/17 79/23
i.e [1] 57/15
iCloud [1] 18/4
idea [4] 9/10 77/7 79/7 80/12
identical [2] 55/20 56/11
identified [2] 47/4 47/16
identifies [1] 51/11
idiot [1] 44/13
illegal [2] 35/20 54/11
imagine [3] 25/4 40/8 76/21
impact [4] 9/17 9/20 55/14 78/24
implicated [2] 35/17 62/14
implication [1] 49/22
imply [1] 40/16
implying [1] 39/14
important [9] 15/9 20/20 22/16 23/7 29/22 37/8 38/21 38/22 66/20
Importantly [1] 36/21
impose [1] 72/1
imposed [3] 12/25 38/11 70/7
impossibility [1] 78/7
impossible [6] 17/3 24/25 26/6 35/12 53/15 54/15
impropriety [1] 59/14
inadequacy [2] 22/10 29/25
inadequate [8] 20/15 26/22 64/12 64/13 70/15 71/2 71/16 74/21
inapposite [1] 56/18
incentives [2] 47/21 69/25
incentivized [1] 50/10
incitement [1] 19/22
include [1] 35/22
includes [1] 8/19
including [3] 10/12 32/16 53/22
income [1] 12/19
incorrect [1] 28/14
increase [2] 20/13 70/25
incurred [3] 14/15 17/5 33/18
independent [3] 32/4 36/6 39/3
independently [1] 22/11
indicating [1] 50/5
indifference [1] 34/24
indisputable [1] 64/16
individual [15] 7/18 8/5 10/9 13/24 19/17 22/1 24/3 26/4 31/9 44/3 44/25 68/6 71/1 77/7 78/1
individualized [4] 48/9 50/15 60/21 73/6
individually [2] 1/5 70/19
individuals [1] 44/3
industry [1] 44/10
ineligible [1] 52/16
informally [1] 9/19
information [5] 17/13 49/21 52/25 54/8 72/18
informed [1] 53/24
inherently [1] 29/8
initial [2] 29/23 32/24
initially [1] 68/15
injury [1] 55/21
inner [1] 17/17
inordinate [1] 38/9
input [1] 31/5
inquiry [3] 26/4 50/15 55/20

I

ins [2] 23/5 24/22
insight [1] 17/11
instance [2] 50/13 59/3
instead [4] 8/18 13/7 35/7 72/7
institutional [1] 16/18
insurance [8] 1/9 3/10 4/1 4/14 18/22 18/25 51/15 83/3
integrity [1] 21/8
intend [3] 6/11 14/6 63/16
intended [1] 43/19
intending [5] 58/15 60/2 63/15 67/17 67/25
intent [1] 80/12
intentionally [2] 73/23 74/11
interest [12] 18/20 23/6 31/19 47/12 58/10 58/18 58/18 58/18 59/2 64/14 72/18 77/24
interested [2] 18/13 29/2
interests [7] 31/15 47/8 47/9 57/8 62/13 70/14 77/2
internalize [1] 16/8
Internet [1] 17/21
interplay [1] 52/6
interrupt [2] 9/1 55/10
interrupted [1] 55/8
introduce [1] 4/5
invented [1] 37/1
invest [1] 14/11
invested [2] 6/1 12/22
investigate [1] 41/18
investigation [4] 45/13 45/16 65/15 66/4
investigator [1] 24/6
invite [1] 39/1
involve [1] 32/21
involved [2] 32/19 42/21
involves [2] 65/21 66/12
involving [2] 25/19 50/25
IP [4] 23/11 49/21 49/23 49/25
is [256]
isn't [5] 17/24 23/2 25/17 73/9 77/18
issue [21] 11/3 12/20 13/10 27/11 39/6 50/23 51/22 59/25 65/15 71/13 71/24 73/2 76/12 76/20 76/25 77/1 77/10 77/23 79/11 80/21 81/14
issues [24] 9/16 11/11 11/13 18/6 30/19 31/1 32/6 42/20 44/17 48/6 48/9 50/13 50/18 60/11 60/13 60/14 60/15 60/21 76/24 76/24 77/17 79/17 81/5 81/14
it [157]
It'd [1] 13/13
It'll [1] 46/11
it's [102]
its [10] 14/19 25/3 25/6 41/9 41/9 49/21 57/22 61/8 61/8 78/13
itself [3] 28/18 75/10 77/5

J

JAMES [3] 2/16 4/13 17/11
JAMS [1] 45/11
Jew [1] 44/25
Jew-hating [1] 44/25
Jewish [3] 27/23 28/4 40/4
Jews [4] 27/25 28/7 28/22 53/6
job [1] 26/20
join [1] 79/3
joined [4] 6/19 62/7 62/9 76/17
joke [2] 39/11 39/16
judge [5] 1/18 13/25 14/1 25/18 50/13
Judge You [2] 25/18 50/13
judges [2] 29/10 42/13
judgment [2] 23/19 39/14
jump [1] 16/6
jumped [1] 64/7
jumps [1] 13/18
jurisdiction [2] 41/18 41/18
jury [1] 73/3
just [74] 3/19 5/17 6/7 8/8 8/16 9/1 9/23 10/5 10/24 11/3 11/9 13/21 14/7 14/22 14/24 15/5 15/7 17/16 18/17 18/18 19/24 22/16 23/21 24/11 24/22 26/24 27/4 27/16 27/25 28/13 30/4 30/19 31/3 31/7 32/9 32/22 35/11 39/5 40/8 41/12 41/20 41/21 42/11 43/15 45/16 47/8 48/24 49/12 50/12 50/12 51/25 55/12 56/24 58/7 59/16 60/24 63/7 63/12 63/23 64/15 67/16 67/17 67/24 70/2 70/11 76/9 76/9 76/16 76/24 77/1 79/12 80/1 80/7 80/18

K

keep [3] 3/21 74/10 74/10
keeping [1] 43/14
Kester [2] 2/20 4/20
key [1] 44/19
kidney [1] 5/23
kill [1] 53/6
kind [15] 13/13 13/17 23/21 43/18 45/13 50/17 50/17 50/18 52/17 53/7 55/8 65/18 77/20 79/21 80/16
kinds [2] 42/16 77/17
knew [1] 70/4
know [110]
knowing [1] 75/16
knowledge [3] 16/14 16/18 61/13
knows [3] 31/11 41/17 58/6

L

lack [1] 68/4
language [4] 31/18 34/13 37/6 37/7
large [2] 7/17 51/8
largely [1] 15/18
larger [1] 7/24
largest [1] 45/22
last [10] 32/19 36/4 37/7 37/8 40/24 44/8 46/16 46/16 74/25 79/18
late [1] 4/22
later [8] 10/2 11/1 11/15 20/24 21/18 27/16 29/14 35/4
law [46] 2/4 8/4 10/19 11/7 12/12 14/12 15/19 16/22 16/24 17/13 17/18 18/3 19/7 19/13 24/2 32/25 33/23 33/25 34/1 34/7 34/19 35/21 38/3 39/4 43/15 44/2 44/12 44/23 45/13 45/18 46/15 48/4 53/23 59/14 60/12 69/4 75/4 75/13 75/18 75/24 77/3 77/13 78/12 78/17 78/23 81/7
lawsuit [1] 76/9
lawyer [9] 21/4 21/4 30/13 33/15 33/24 34/19 35/19 36/5 71/5
lawyer's [1] 36/2
lawyers [21] 6/10 6/13 7/21 10/14 12/1 15/13 16/15 19/18 28/19 30/12 31/19 31/21 31/22 34/5 34/12 35/9 35/25 36/16 44/9 70/11 75/20
layer [3] 32/6 32/6 32/6
lead [7] 13/15 23/11 24/7 56/12 56/23 72/18 72/19
leads [1] 24/1
learned [1] 37/19
least [8] 5/5 5/6 9/7 30/18 38/10 42/25 56/6 72/13
leave [2] 11/24 15/1
left [3] 64/5 74/14 74/16
legal [4] 24/11 32/8 57/8 78/7
legitimate [2] 17/20 17/20
lend [1] 50/19
less [3] 13/22 41/19 78/2
let [10] 13/8 33/22 41/7 45/16 54/24 55/9 63/1 66/9 73/10 75/9
let's [11] 3/15 26/21 29/12 34/6 36/8 40/3 42/24 50/12 63/12 63/12 75/9
letter [1] 19/7
letters [3] 18/8 38/10 74/2
level [1] 22/16
leverage [4] 7/17 7/19 20/14 70/25
levied [1] 61/14
lie [3] 27/17 39/22 40/14
lies [1] 48/2
life [1] 50/6
like [31] 5/11 5/23 7/6 8/6 8/14 8/18 17/4 21/3 26/12 26/19 28/3 30/7 33/4 33/23 40/8 40/15 46/7 48/22 48/24 51/15 53/13 56/10 59/1 59/5 64/4 65/9 66/11 66/17 73/21 80/9 80/18
limited [4] 13/9 14/24 61/22 66/15
Lindsey [2] 2/23 83/15
line [3] 48/14 49/7 73/13
lines [1] 46/17
link [2] 23/24 49/24
list [8] 24/19 35/16 43/9 43/20 50/5 52/5 53/1 77/8
literally [1] 31/23
litigant [1] 29/9
litigate [1] 16/25
litigating [1] 9/15
litigation [12] 10/12 11/6 18/7 28/16 49/17 49/19 60/8 78/24 78/25 79/1 79/6 81/22
litigators [1] 42/17
little [10] 3/22 6/22 30/5 30/8 32/7 40/6 53/5 77/21 78/2 81/16
live [1] 30/16
LLC [3] 1/10 2/4 4/2
LLP [4] 2/8 2/12 2/16 2/20
local [4] 4/19 14/9 20/9 30/18
locate [1] 24/8
location [1] 40/22
log [1] 18/25
longer [2] 49/18 49/18
look [23] 9/17 10/7 14/19 16/22 24/21 25/15 28/4 31/2 36/1 39/1 39/9 40/18 42/24 46/5 46/8 46/15 47/11 51/11 55/12 64/25 68/13 77/14 79/19
looked [6] 11/13 25/18 37/7 39/4 63/6 70/22
looking [4] 30/4 30/5 43/17 58/11
looks [3] 46/13 49/12 80/17
lost [1] 30/18

**L**

**lot [15]** 7/2 7/5 7/6 16/7 16/15 18/9 26/17 26/19 42/6 42/23 49/12 50/22 76/23 77/6 77/14
**lovers [1]** 39/11
**low [1]** 67/1
**loyally [1]** 32/16

**M**

**machine [1]** 29/2
**made [8]** 6/23 15/14 35/9 46/11 57/21 73/2 74/12 79/5
**Magistrate [1]** 13/25
**MAH [10]** 23/9 49/22 72/3 72/4 72/5 72/8 72/12 72/17 72/25 76/7
**major [2]** 52/22 53/22
**majority [1]** 48/14
**make [27]** 3/15 3/20 11/20 11/22 18/5 18/17 20/14 26/2 29/5 35/8 35/12 46/10 48/16 48/19 49/8 53/5 54/6 57/3 59/17 70/4 70/4 70/16 71/1 72/8 74/10 74/12 74/25
**makes [11]** 9/21 17/2 26/6 28/9 36/2 41/20 49/10 54/15 56/8 60/12 74/21
**making [9]** 35/14 44/9 44/22 44/25 52/8 60/11 73/5 77/24 79/8
**male [1]** 27/25
**maneuvering [1]** 20/14
**manner [2]** 15/4 42/11
**manufactured [1]** 54/1
**many [13]** 5/20 5/24 9/5 12/7 14/6 29/7 29/10 34/1 38/7 38/8 67/23 73/10 77/17
**material [1]** 16/8
**matter [8]** 7/1 23/14 24/1 26/11 35/25 55/1 59/21 72/20
**matters [3]** 26/10 34/25 68/23
**Mattson [4]** 25/21 25/25 26/1 50/13
**max [1]** 7/7
**maximize [1]** 58/2
**maximum [1]** 36/17
**may [10]** 11/14 23/13 28/4 34/16 46/19 53/7 60/19 63/5 64/19 81/19
**maybe [12]** 3/21 5/2 18/18 38/21 63/4 64/18 64/19 70/16 70/21 73/2 73/3 81/4
**MC [2]** 1/8 83/4
**McSHANE [1]** 1/17
**me [31]** 7/7 9/21 10/25 11/10 11/12 13/11 16/5 21/14 33/22 39/15 42/3 44/10 44/13 44/18 45/6 45/16 55/9 62/19 63/1 63/5 66/1 74/4 76/1 76/19 76/22 77/14 78/7 78/25 79/12 79/20 81/1
**mean [32]** 6/16 6/17 8/2 8/21 9/16 9/21 9/21 13/12 13/21 14/21 17/16 22/5 23/23 24/5 24/19 26/7 28/3 28/8 29/9 29/16 31/1 39/16 41/21 42/1 50/17 58/5 58/6 58/8 59/2 62/6 64/11 81/9
**means [4]** 29/17 35/8 37/12 83/10
**meant [1]** 76/7
**mechanically [1]** 28/9
**mechanics [1]** 28/2
**mechanism [14]** 6/3 6/11 7/21 7/22 8/9 8/17 14/13 15/5 22/7 27/5 37/2 38/6 38/22 73/21
**mechanisms [1]** 32/22
**media [2]** 57/2 58/7
**mediation [1]** 45/10
**mediator [1]** 45/11
**meet [1]** 59/12
**member [12]** 6/13 30/15 40/2 40/4 48/21 48/22 48/24 49/5 49/13 56/9 56/17 65/9
**members [15]** 6/8 22/20 22/22 22/23 27/7 28/2 32/11 32/13 55/19 55/20 57/19 58/1 61/25 62/13 72/23
**membership [1]** 57/15
**mention [1]** 29/13
**mentioned [4]** 19/17 68/9 70/18 72/3
**mentions [2]** 52/1 52/1
**message [2]** 50/2 50/3
**messages [5]** 19/8 50/2 72/8 72/12 76/8
**method [2]** 80/22 80/24
**MICHAEL [4]** 1/5 1/17 2/16 83/3
**microphones [1]** 3/21
**might [4]** 23/4 23/5 48/7 51/19
**Milbank [5]** 10/15 11/1 11/3 11/19 11/21
**military [2]** 51/2 72/10
**million [5]** 12/23 18/13 64/20 64/20 68/5
**millions [7]** 6/1 8/17 15/14 15/14 15/14 19/17 38/18
**minute [2]** 58/16 59/3
**minutes [1]** 55/1
**mischaracterization [1]** 45/24
**misconduct [2]** 14/20 32/15
**misses [1]** 72/15
**misspeak [1]** 76/7
**misunderstanding [1]** 27/8
**mixed [2]** 26/5 50/16
**moment [4]** 5/6 9/2 10/6 19/24
**Monday [1]** 65/3
**money [9]** 6/2 7/3 7/9 7/13 44/25 70/2 70/5 74/11 77/24
**months [3]** 10/9 16/9 69/3
**more [26]** 5/3 5/4 5/8 6/13 7/9 7/23 9/23 10/11 12/22 21/18 29/1 29/3 29/14 29/19 29/22 30/8 31/2 31/9 31/21 35/2 37/2 47/14 47/20 54/16 69/10 71/19
**moreover [1]** 47/13
**morning [2]** 20/20 20/22
**Mortgage [4]** 26/1 50/14 50/24 51/4
**most [9]** 6/13 15/21 16/14 17/16 18/12 27/1 33/16 38/21 65/1
**motion [49]** 4/2 4/3 5/10 5/10 5/19 6/20 9/7 11/11 12/14 13/20 14/10 14/25 15/9 15/20 16/15 19/6 20/15 20/18 21/2 21/12 22/3 22/6 22/8 27/18 29/23 30/14 34/2 38/15 41/12 41/21 41/22 46/25 55/16 59/4 60/21 61/3 62/2 62/8 62/22 63/13 65/5 68/9 68/15 71/2 75/13 76/15 76/18 79/3 80/24
**motions [1]** 12/4
**move [9]** 14/7 15/1 29/12 39/25 41/8 58/16 61/17 74/17 74/18
**moved [5]** 10/7 12/1 14/8 15/11 38/13
**Mr [4]** 10/21 40/7 46/14 58/17
**Mr. [145]**
**Mr. Carpenter [1]** 10/25
**Mr. Paronich [1]** 34/7
**Mr. Perrong [30]** 4/9 5/9 10/12 20/25 21/10 21/20 30/4 30/11 34/7 42/4 42/8 53/15 54/24 55/8 63/10 63/24 64/5 67/16 68/14 68/21 68/24 70/18 71/14 72/3 72/25 73/1 73/18 75/11 75/22 76/3
**Mr. Perrong's [2]** 75/1 75/9
**Mr. Watstein [1]** 59/13
**Mr. West [1]** 54/1
**Mr. West's [1]** 54/14
**Mr. Williams [1]** 26/22
**Mr. Wilson [79]** 6/10 10/18 16/20 17/8 19/20 23/2 24/1 25/5 27/1 27/9 28/6 28/21 28/23 29/2 34/7 34/9 35/12 38/19 40/5 40/10 40/18 40/25 43/4 43/10 43/18 44/6 44/7 44/9 44/10 44/20 45/3 45/14 45/25 47/7 47/13 48/13 48/20 48/22 49/1 49/1 49/4 49/16 49/23 50/2 50/4 50/12 51/1 52/11 52/13 52/25 54/8 54/16 56/2 56/4 57/12 57/14 57/18 58/8 59/1 59/15 59/22 60/17 61/9 62/1 65/7 67/6 69/4 69/9 72/7 72/9 73/20 74/10 74/16 76/12 77/2 78/8 78/15 78/18 79/9
**Mr. Wilson's [28]** 22/13 23/10 34/25 36/3 37/13 39/17 46/1 47/20 48/8 48/10 48/11 48/18 49/7 55/13 55/14 55/17 55/23 56/7 56/20 57/2 58/7 58/17 59/20 71/15 73/4 75/3 77/19 77/23
**Ms. [2]** 3/23 81/5
**Ms. Pew [2]** 3/23 81/5
**much [17]** 8/15 13/22 15/15 21/9 22/14 29/19 29/19 34/4 37/15 38/5 39/1 51/1 52/23 57/21 71/24 72/16 77/16
**multifactorial [1]** 25/15
**multiple [3]** 71/11 73/14 74/17
**multiplier [8]** 8/1 8/2 8/4 34/17 36/18 36/23 37/4 37/15
**Murray [1]** 47/22
**must [2]** 22/24 47/12
**my [25]** 5/15 5/15 5/18 7/7 11/19 30/23 33/4 36/10 40/1 40/23 42/10 42/23 43/23 44/11 44/12 51/7 52/1 54/25 57/4 59/10 64/21 66/7 66/19 69/17 80/24
**MyPillow [14]** 32/18 47/15 52/19 52/22 53/18 53/19 53/20 53/20 53/22 54/2 73/8 73/10 73/13 73/16
**myself [1]** 60/5

**N**

**N.E [3]** 2/9 2/13 2/17
**name [6]** 6/12 8/8 40/24 67/9 70/12 70/13
**named [5]** 22/25 27/14 69/25 70/1 73/5
**namely [1]** 69/20
**nature [1]** 51/11
**necessarily [1]** 50/8
**necessary [1]** 78/21
**need [17]** 3/6 15/4 38/25 42/2 46/19 54/22 60/25 70/15 72/20 73/11 78/6 79/14 79/25 80/16 80/17 80/18 81/11
**needs [3]** 13/19 78/11 78/22

**N**

**nefarious [2]** 17/23 33/16
**negotiate [1]** 31/23
**negotiation [1]** 33/20
**Neither [1]** 33/3
**nervous [1]** 40/6
**never [13]** 6/14 13/3 16/14 21/23 25/6 26/14 27/19 29/6 29/6 47/14 48/23 66/8 67/21
**nevertheless [1]** 56/19
**new [10]** 20/23 22/4 26/1 45/23 46/18 46/20 46/21 50/14 66/18 79/20
**news [2]** 30/24 30/25
**next [7]** 8/10 34/18 35/24 36/1 39/9 55/1 75/14
**nifty [1]** 38/24
**night [4]** 44/8 44/8 44/11 65/2
**nines [1]** 48/11
**Ninth [6]** 20/11 20/12 25/14 26/2 50/20 70/23
**Ninth Circuit [5]** 20/11 20/12 25/14 26/2 70/23
**Ninth Circuit's [1]** 50/20
**no [32]** 1/8 7/1 19/10 23/20 31/12 40/23 42/4 43/9 43/20 44/21 47/19 49/1 53/3 54/6 54/7 56/10 62/4 62/17 62/18 63/16 63/20 63/20 65/4 66/5 68/8 72/14 76/2 77/7 80/9 80/12 83/4 83/17
**no-call [2]** 43/9 43/20
**nobody [2]** 35/7 35/7
**non [4]** 31/24 37/3 62/11 70/7
**non-fee-shifting [3]** 31/24 37/3 70/7
**non-reversionary [1]** 62/11
**none [1]** 12/16
**normal [2]** 9/13 64/23
**norms [1]** 30/16
**not [194]**
**note [2]** 5/15 20/20
**nothing [10]** 10/8 19/4 19/18 34/25 35/7 37/17 38/19 61/10 64/19 68/23
**notice [3]** 15/22 28/7 33/21
**notification [1]** 28/2
**now [28]** 3/25 5/21 6/10 8/21 12/16 14/25 15/1 15/8 15/9 17/24 21/18 26/21 29/13 29/23 34/2 34/6 34/10 36/8 41/16 41/24 42/3 43/18 63/8 67/16 74/3 74/19 76/16 81/9
**now's [1]** 76/4
**nowhere [1]** 12/3
**number [73]** 6/19 12/18 16/20 18/24 19/11 21/16 23/3 24/9 24/14 24/16 24/17 24/23 25/11 25/13 29/1 38/9 48/8 48/10 48/11 48/16 48/18 48/19 48/23 48/25 49/2 49/3 49/5 49/7 49/11 49/16 49/19 50/4 51/5 51/9 51/16 51/22 52/3 52/12 52/14 52/15 52/16 52/17 53/1 53/7 55/13 55/23 55/23 56/1 56/7 56/8 56/14 56/15 56/20 56/21 56/22 60/14 63/14 66/14 66/16 66/17 66/18 66/19 66/19 66/21 67/6 67/9 67/10 67/22 69/2 71/15 73/2 73/4 73/23
**number's [1]** 25/16
**numbers [15]** 49/6 49/6 49/9 49/9 51/17 51/17 52/4 52/9 56/12 66/15 66/22 66/23 66/24 67/11 67/21
**nuther [1]** 15/6

**O**

**object [1]** 40/2
**objecting [1]** 40/6
**objective [2]** 57/15 75/9
**obligation [2]** 14/18 41/9
**obtain [1]** 44/4
**obtained [5]** 15/23 17/13 34/13 49/16 68/17
**obvious [1]** 68/2
**obviously [7]** 42/9 42/13 49/22 50/21 59/8 60/18 78/24
**occur [2]** 13/20 40/21
**occurred [3]** 12/12 22/14 45/14
**off [9]** 3/17 24/14 35/15 43/6 51/7 53/8 64/5 73/25 77/24
**offended [1]** 43/7
**offensive [1]** 39/9
**offer [5]** 6/24 10/9 37/12 37/18 59/23
**offered [2]** 35/1 35/2
**offers [1]** 31/20
**Official [1]** 83/16
**oh [6]** 14/12 21/17 29/12 44/11 44/12 63/16
**okay [24]** 3/19 9/25 12/10 14/4 17/15 21/14 37/13 39/25 45/12 47/23 54/9 55/6 59/7 62/24 63/1 63/22 63/23 64/2 64/2 64/10 65/24 71/19 80/5 80/8
**old [1]** 66/19
**omnibus [1]** 10/20
**once [6]** 14/12 35/1 43/11 58/21 61/6 67/1
**one [42]** 6/12 7/16 8/7 10/17 12/15 13/12 13/20 13/21 21/20 23/3 24/14 29/12 29/13 30/18 34/8 40/10 41/4 43/12 43/12 43/13 43/14 45/22 46/4 46/4 51/1 53/15 62/3 62/4 64/21 65/17 67/10 67/18 67/18 67/20 67/21 69/3 70/21 73/6 73/25 75/8 75/21 80/1
**one-off [2]** 24/14 73/25
**ones [3]** 57/2 57/3 75/17
**ongoing [1]** 81/21
**online [4]** 18/21 25/13 51/1 52/25
**only [18]** 5/19 6/17 14/11 16/10 19/25 20/3 20/7 25/10 32/20 36/23 40/12 41/3 43/10 52/3 52/4 57/19 67/18 76/6
**open [3]** 3/4 51/20 61/6
**operate [1]** 60/12
**operating [2]** 51/8 51/8
**operation [1]** 68/10
**operative [4]** 47/2 59/20 68/23 69/1
**opinion [3]** 9/22 76/20 79/22
**opportunity [1]** 54/23
**oppose [1]** 41/14
**opposed [1]** 43/19
**opposing [2]** 15/20 46/8
**opposite [2]** 6/5 6/11
**opt [4]** 20/3 23/5 23/9 24/22
**opt-in [1]** 23/9
**opt-ins [2]** 23/5 24/22
**option [1]** 13/12
**options [1]** 41/11
**oral [4]** 1/15 4/2 79/16 83/5
**order [9]** 20/16 56/21 61/22 68/4 71/3 78/18 78/19 80/8 80/13
**ordering [2]** 78/12 78/15
**ordinary [1]** 36/20
**OREGON [6]** 1/2 4/25 5/7 31/8 35/17 83/17
**original [1]** 83/11
**originate [1]** 18/21
**originated [1]** 10/10
**other [51]** 5/24 8/22 9/8 9/14 9/17 12/15 12/21 14/16 15/18 16/13 16/15 18/1 21/15 22/13 23/8 23/16 25/10 27/1 27/12 29/12 32/21 33/11 38/14 40/4 41/4 43/24 48/21 48/24 49/5 49/13 51/16 51/17 55/19 55/20 58/1 61/11 61/15 63/19 65/2 66/6 72/19 72/19 72/23 75/16 75/25 77/7 78/25 81/8 81/17 81/21 81/21
**others [3]** 1/6 29/3 74/7
**our [63]** 3/15 3/19 6/1 6/23 6/23 9/22 9/24 12/3 12/14 12/22 13/5 14/5 14/7 14/23 15/20 17/19 18/19 19/5 19/23 20/1 20/20 20/22 21/12 21/19 22/3 22/6 22/8 25/17 27/8 27/11 28/20 29/3 29/11 29/23 33/23 34/2 38/12 41/20 41/22 60/5 60/19 65/2 65/2 65/4 65/4 65/4 65/5 67/22 68/9 68/11 68/15 69/8 71/17 71/24 72/7 72/11 72/15 72/15 73/8 74/14 74/23 75/18 75/22
**ours [1]** 73/21
**ourself [1]** 37/15
**ourselves [1]** 70/6
**out [50]** 11/3 12/3 14/14 14/18 15/3 17/19 18/25 23/7 23/10 24/4 24/6 24/7 24/22 32/1 35/6 37/19 39/5 42/10 43/24 44/10 46/3 46/4 49/15 49/20 51/5 51/9 53/10 53/10 54/8 55/24 55/25 57/12 57/20 59/2 60/13 60/24 60/25 68/20 69/9 72/6 72/19 74/14 74/14 74/16 76/16 76/20 76/21 77/6 80/21 81/10
**outcome [1]** 38/17
**outing [1]** 12/23
**outset [2]** 12/15 65/12
**outside [1]** 19/12
**outstanding [1]** 33/17
**over [16]** 14/6 18/4 19/15 19/15 19/16 30/5 34/5 53/11 59/11 59/13 77/16 78/19 79/18 79/23 80/11 80/13
**overall [1]** 42/23
**overriding [1]** 77/23
**overseas [2]** 20/2 60/13
**own [13]** 6/1 10/7 23/8 24/14 28/16 47/9 53/7 54/1 56/5 61/8 61/8 69/21 73/25
**ownership [1]** 31/15
**owns [3]** 31/17 69/11 69/22

**P**

**p.m [5]** 3/1 3/17 55/5 55/5 82/3
**PA [1]** 2/6
**PacifiCorp [15]** 45/5 48/25 49/4 61/24 62/10 64/5 64/11 65/2 65/6 65/13 65/17 66/3 66/7 67/18 78/3
**page [3]** 32/19 36/4 46/14
**pages [1]** 46/24
**paid [3]** 32/1 37/23 37/25
**papers [4]** 65/6 67/15 68/22 74/15
**paragraph [6]** 36/1 46/16 46/17 47/7 47/11 47/18

P

**Parole [1]** 48/4
**Paronich [1]** 34/7
**part [7]** 19/23 37/10 43/1 46/11 56/25 63/6 68/4
**particular [3]** 16/18 43/1 51/3
**parties [4]** 9/14 62/10 78/6 81/19
**party [1]** 78/20
**passed [1]** 36/13
**path [1]** 41/22
**patiently [1]** 42/5
**patients [1]** 5/23
**pattern [1]** 55/24
**pay [9]** 7/7 7/11 8/18 17/5 37/16 58/22 65/15 77/9 80/16
**paying [2]** 6/25 7/13
**payment [1]** 65/8
**payouts [1]** 7/25
**pen's [1]** 6/21
**penalties [2]** 35/11 69/13
**penalty [1]** 17/2
**pending [5]** 22/3 38/16 61/16 62/22 76/19
**Penn [2]** 26/1 50/14
**people [18]** 5/22 7/11 19/25 20/3 20/7 21/14 23/16 24/24 27/13 27/22 27/24 28/20 30/23 36/15 42/16 42/16 53/5 58/5
**people's [1]** 66/23
**per [5]** 36/14 37/4 44/5 44/5 65/9
**percent [16]** 6/13 19/18 30/12 30/12 30/13 31/10 31/10 31/12 31/13 34/18 34/19 34/20 35/23 37/23 60/10 65/10
**percentage [1]** 36/17
**perfect [2]** 43/25 44/1
**perfectly [1]** 42/15
**perhaps [2]** 4/24 28/25
**permanent [1]** 16/25
**permissible [3]** 71/7 71/7 71/12
**permission [1]** 46/7
**permit [1]** 36/12
**permits [2]** 48/3 69/6
**permitted [2]** 7/24 37/4
**perpetrate [1]** 73/15
**perpetuity [1]** 17/1
**PERRONG [33]** 2/4 2/4 4/8 4/9 5/9 10/12 20/25 21/10 21/20 30/4 30/11 34/7 42/4 42/8 53/15 54/24 55/8 63/10 63/24 64/5 67/16 68/14 68/21 68/24 70/18 71/14 72/3 72/25 73/1 73/18 75/11 75/22 76/3
**Perrong's [2]** 75/1 75/9
**person [9]** 5/4 24/9 24/23 28/19 30/24 53/7 73/6 81/12 81/13
**personal [4]** 50/17 51/17 74/12 77/19
**personally [4]** 16/12 26/7 33/7 60/5
**perspective [1]** 9/10
**persuasive [1]** 29/20
**pertains [1]** 62/3
**pertinent [1]** 5/18
**Pew [2]** 3/23 81/5
**phone [10]** 5/15 5/16 20/24 51/4 66/13 66/17 66/18 66/23 75/8 81/1
**phrases [1]** 39/5
**piece [5]** 5/10 31/7 37/7 38/25 38/25
**pitch [1]** 69/24
**place [4]** 16/7 42/22 70/17 74/5
**placeholder [1]** 48/11
**plaintiff [28]** 1/7 2/3 4/8 13/24 20/13 20/14 22/19 22/25 25/2 26/18 27/15 36/23 37/21 39/7 39/10 45/11 47/16 47/19 50/25 51/4 53/20 57/21 60/7 69/25 70/25 71/1 73/5 77/11
**plaintiff's [4]** 4/5 20/5 20/18 65/11
**plaintiffs [2]** 70/1 71/6
**plan [1]** 62/19
**play [2]** 28/1 77/19
**plays [2]** 66/21 77/21
**plea [1]** 54/22
**please [3]** 3/5 4/4 44/13
**plenty [1]** 35/21
**plus [1]** 37/15
**point [36]** 7/15 11/19 11/20 12/19 14/16 16/21 22/3 23/7 23/15 24/3 24/21 25/9 25/17 27/8 29/3 29/13 30/10 39/5 40/12 41/4 44/19 49/15 49/20 54/10 60/24 64/21 68/20 70/9 71/13 72/15 72/16 73/4 73/11 73/12 73/17 74/25
**pointed [5]** 14/18 57/12 60/13 74/14 74/15
**points [8]** 26/24 39/7 43/24 49/16 49/20 52/22 59/6 73/1
**Polaroid [2]** 57/20 57/20
**police [2]** 41/9 47/22
**policing [1]** 35/12
**Porch.com [3]** 50/21 52/1 52/10
**portfolio [6]** 12/1 17/4 34/23 35/14 69/12 69/12
**portfolio-wide [3]** 35/14 69/12 69/12
**Portland [3]** 2/22 2/24 3/20
**pose [2]** 72/22 72/23
**position [5]** 28/21 43/7 56/5 57/5 69/8
**positions [1]** 81/1
**possession [1]** 78/13
**possibility [1]** 58/25
**post [1]** 41/17
**post-dismissal [1]** 41/17
**posts [3]** 28/5 40/10 51/1
**potential [3]** 61/19 62/13 65/9
**potentially [1]** 72/22
**pound [2]** 14/10 20/11
**power [11]** 10/19 17/2 31/4 33/3 33/5 33/14 34/4 38/2 38/3 47/5 69/5
**PowerPoint [8]** 5/12 5/17 16/5 46/10 57/22 63/15 69/17 73/9
**PowerPoint's [1]** 63/24
**practical [1]** 33/13
**practice [1]** 79/4
**precedent [1]** 79/23
**precipice [1]** 21/2
**predominance [8]** 22/10 23/22 23/25 24/3 25/9 50/18 72/23 76/25
**preempted [1]** 43/15
**prefer [1]** 64/4
**preferred [4]** 4/25 80/20 80/22 80/24
**prejudice [7]** 10/8 12/9 12/11 22/23 35/4 72/23 75/14
**premise [1]** 44/6
**premium [1]** 36/9
**prepare [1]** 11/10
**prepared [2]** 61/17 64/8
**presentation [6]** 5/12 16/5 16/11 46/11 63/15 72/11
**presented [6]** 47/24 59/23 68/14 69/16 75/19 77/14
**preserve [2]** 78/12 78/15
**presiding [1]** 53/11
**presuit [3]** 33/23 34/1 69/10
**presumptively [1]** 52/9
**pretend [2]** 57/1 80/15
**pretty [5]** 22/1 22/6 41/6 43/2 43/2
**previously [1]** 62/22
**primary [2]** 8/16 26/24
**prior [4]** 49/17 52/8 56/10 60/6
**private [2]** 24/5 53/25
**privilege [1]** 68/2
**privileged [2]** 59/9 75/6
**pro [2]** 26/18 26/18
**pro-defendant [1]** 26/18
**pro-plaintiff [1]** 26/18
**probably [10]** 4/22 5/8 12/22 15/2 33/16 40/10 41/24 77/15 77/21 79/14
**problem [13]** 22/17 22/18 25/7 26/16 38/21 47/15 48/2 70/18 70/19 70/24 72/22 72/24 73/20
**problematic [2]** 47/4 69/20
**problems [5]** 20/8 26/17 43/24 48/5 69/2
**procedurally [1]** 41/5
**proceed [2]** 61/4 80/2
**proceeding [1]** 15/7
**proceedings [5]** 1/16 3/3 54/7 61/14 83/10
**process [2]** 25/7 34/2
**processes [1]** 41/10
**procured [1]** 17/21
**produced [2]** 15/18 38/14
**producing [1]** 15/21
**product [1]** 19/10
**products [2]** 51/13 51/13
**Professional [1]** 31/8
**prohibit [1]** 27/9
**prohibits [1]** 36/5
**proliferated [1]** 8/7
**properly [1]** 29/10
**prosecute [4]** 5/20 16/25 32/14 70/12
**prosecuting [3]** 6/2 67/3 75/12
**protect [5]** 35/10 42/25 42/25 43/19 43/23
**protector [1]** 39/19
**prove [2]** 64/22 72/21
**proves [2]** 67/5 68/1
**provide [2]** 59/21 69/14
**provided [1]** 27/5
**provides [1]** 41/22
**provision [5]** 33/16 34/4 69/22 70/3 70/15
**provisions [7]** 8/13 8/14 31/3 32/17 33/11 47/4 69/20
**public [8]** 8/8 8/17 14/23 18/14 19/21 22/4 38/8 38/8
**publicly [2]** 27/20 28/25
**punishes [1]** 13/2
**punishing [1]** 73/21
**purchased [1]** 49/11
**purport [1]** 17/17
**purpose [2]** 7/17 43/17
**purposes [8]** 9/7 23/15 45/7 51/16 62/7 63/13 76/18 81/20
**pursue [9]** 36/16 36/18 45/12 60/2

P

**pursue... [5]** 60/12 65/14 67/17 67/22 67/25
**pursued [2]** 66/4 66/25
**pursuing [5]** 7/25 29/3 58/14 59/15 67/9
**pushback [3]** 58/16 59/3 77/4
**put [14]** 16/10 16/11 18/24 19/1 24/10 24/16 49/2 50/4 53/1 53/7 60/4 62/12 63/14 81/24
**putative [5]** 7/2 21/5 27/15 64/16 65/21
**puts [2]** 43/6 47/20
**putting [6]** 21/12 44/19 51/1 51/5 51/9 73/23

Q

**quarter [1]** 68/5
**quarter-million-dollar [1]** 68/5
**quash [2]** 15/21 38/13
**question [13]** 7/16 10/17 28/11 32/9 42/9 42/23 51/20 53/14 57/8 69/7 72/21 73/6 80/1
**questions [9]** 5/8 11/14 13/8 15/9 16/2 42/23 55/15 71/14 76/1
**quick [4]** 6/16 10/22 23/2 55/2
**quickly [3]** 59/2 65/18 81/2
**quietly [1]** 42/5
**quite [8]** 6/15 36/11 42/21 43/13 44/18 44/24 57/5 64/6
**quote [7]** 18/22 18/25 20/12 32/19 36/4 70/22 70/24
**quoted [1]** 35/17
**quotes [3]** 32/15 32/24 39/23

R

**race [1]** 5/24
**race-based [1]** 5/24
**racist [3]** 19/21 27/11 44/24
**raise [2]** 42/14 75/17
**raised [3]** 18/6 50/13 51/22
**rants [1]** 19/21
**rare [1]** 36/24
**rate [2]** 48/13 60/8
**reach [1]** 81/9
**reached [3]** 6/20 37/19 72/5
**reaction [1]** 30/2
**read [2]** 27/22 73/11
**reading [1]** 5/15
**real [2]** 51/5 56/1
**realistically [1]** 28/1
**reality [4]** 6/25 9/16 67/12 74/9
**realize [3]** 53/4 60/18 65/16
**really [33]** 5/9 5/10 6/18 7/22 8/5 8/7 9/4 9/6 9/10 9/22 11/3 11/9 11/13 12/20 15/3 15/4 17/24 28/9 28/19 29/14 29/20 29/25 31/14 32/9 42/2 44/17 51/8 55/14 58/23 64/18 66/20 76/3 80/25
**realtime [2]** 19/9 19/10
**reason [8]** 14/16 16/10 21/13 32/5 39/3 53/3 70/11 75/7
**reasonable [3]** 31/11 31/13 33/14
**reasonably [1]** 55/18
**reasons [5]** 13/19 23/2 26/22 41/2 48/8
**reassigned [15]** 24/17 62/23 66/14 66/15 66/16 66/19 66/21 66/22 66/24 67/6 67/8 67/9 67/11 67/21 67/22
**REBECCA [2]** 2/12 4/16
**receive [3]** 44/3 53/2 54/16
**received [6]** 19/6 33/23 40/16 49/4 49/5 50/2
**receiving [2]** 24/18 54/13
**Recess [1]** 55/5
**recipient [5]** 24/17 56/2 56/8 56/10 67/6
**recipients [1]** 68/5
**record [19]** 3/17 4/5 6/5 22/15 23/8 38/24 41/8 41/23 46/12 55/6 55/16 56/22 56/25 61/9 61/23 62/1 74/22 76/10 83/9
**recorded [1]** 54/3
**recording [2]** 53/24 54/3
**records [1]** 24/20
**recover [5]** 6/2 37/10 47/14 47/19 72/2
**recovering [1]** 35/5
**recovery [3]** 36/20 58/2 69/22
**recycled [1]** 71/9
**referral [2]** 21/21 68/10
**refused [1]** 38/12
**regard [4]** 11/5 26/5 78/16 79/23
**regarding [9]** 33/2 49/21 50/15 53/5 59/10 78/13 78/17 80/13 81/5
**regardless [5]** 9/18 50/1 69/7 69/14 72/24
**registration [1]** 52/16
**reimbursed [1]** 33/19
**reject [1]** 31/21
**rejected [3]** 10/8 35/3 59/24
**rejecting [1]** 31/22
**related [5]** 11/6 11/12 26/25 49/3 66/13
**relationship [3]** 39/15 56/10 57/16
**relatively [1]** 78/11
**release [10]** 32/2 36/5 37/24 38/2 62/10 65/8 66/12 66/14 66/15 67/1
**releases [3]** 31/25 33/6 38/4
**relevant [3]** 17/24 17/25 33/11
**relies [1]** 39/10
**relinquish [1]** 33/20
**rely [1]** 29/20
**relying [1]** 6/14
**remain [2]** 3/5 69/8
**remaining [1]** 65/12
**remanded [1]** 26/2
**remarkable [2]** 8/5 21/19
**remarkably [1]** 43/6
**remember [1]** 18/20
**reminder [1]** 3/19
**remote [1]** 3/20
**removed [1]** 19/21
**removes [3]** 47/21 69/25 70/3
**render [2]** 52/15 55/13
**renders [3]** 56/20 71/15 71/16
**renegotiating [1]** 81/19
**repeat [1]** 39/5
**repeatedly [1]** 72/7
**reply [2]** 63/2 65/4
**report [2]** 18/15 80/25
**reporter [3]** 2/23 3/19 83/16
**represent [11]** 9/14 20/2 21/4 23/16 32/16 33/1 44/9 44/21 45/21 47/8 70/14
**representation [1]** 78/14
**representative [11]** 20/15 23/18 32/10 57/24 60/18 60/20 67/7 70/10 71/2 76/14 78/9
**representative's [3]** 39/14 55/18 57/8
**representing [1]** 5/22
**represents [3]** 45/23 62/4 71/6
**repugnant [3]** 57/10 57/10 57/23
**request [6]** 7/7 19/25 34/16 50/3 72/4 72/7
**requested [2]** 20/22 40/20
**requests [1]** 72/14
**require [3]** 15/6 32/3 81/19
**requirement [2]** 22/18 23/1
**requirements [1]** 24/12
**requires [2]** 9/23 25/11
**requiring [2]** 78/18 78/19
**residential [13]** 25/12 25/16 26/5 26/10 43/1 51/13 51/14 51/21 52/2 52/4 52/9 60/14 73/4
**residential/business [1]** 26/10
**resolution [2]** 47/12 61/18
**resolve [2]** 55/1 81/2
**resources [2]** 14/11 20/18
**respect [2]** 37/21 63/4
**respond [3]** 30/14 42/6 54/23
**response [3]** 19/3 20/19 21/7
**rest [1]** 42/2
**result [1]** 29/24
**results [1]** 19/16
**retains [1]** 33/1
**return [1]** 61/8
**reversionary [1]** 62/11
**review [2]** 48/5 77/13
**reviewing [1]** 79/20
**rhetoric [7]** 10/6 14/22 21/13 27/11 28/13 28/15 28/18
**rhetorical [1]** 53/14
**RHYM [2]** 2/12 4/16
**rid [1]** 74/9
**rider [1]** 48/5
**right [29]** 3/11 3/12 4/4 4/15 4/21 4/22 5/21 6/22 14/3 16/25 17/24 18/23 21/1 24/19 24/20 26/13 27/10 27/14 30/21 37/10 39/10 39/18 53/25 64/18 66/17 67/14 73/3 76/12 81/23
**rights [3]** 27/10 29/3 42/17
**rigorously [2]** 77/13 77/15
**rip [1]** 53/8
**risk [1]** 34/17
**RMR [2]** 2/23 83/15
**road [3]** 2/5 9/25 13/16
**roadmap [1]** 13/1
**Robertson [3]** 15/22 37/18 38/7
**robocall [2]** 44/11 44/12
**robocallers [1]** 24/19
**robocalls [1]** 20/2
**robust [2]** 78/11 78/22
**rocket [5]** 25/25 36/20 50/14 50/24 51/4
**role [2]** 46/19 47/10
**ROMAN [1]** 2/4
**room [4]** 2/24 30/7 40/23 40/25
**rule [15]** 6/7 36/4 41/13 41/14 41/16 47/1 47/20 48/2 52/8 55/16 55/17 57/7 57/14 60/15 62/3
**Rule 23 [1]** 62/3

**R**

**rule-making [1]** 52/8
**rules [11]** 14/9 20/9 30/16 31/8 32/3 35/16 35/18 35/18 36/20 61/6 73/15
**RULEY [2]** 2/16 4/13
**ruling [5]** 12/24 41/20 62/1 62/6 71/13
**rulings [1]** 25/25
**RYAN [3]** 2/8 4/11 66/18

**S**

**S.W [2]** 2/21 2/24
**said [22]** 8/19 12/17 14/22 16/4 20/11 21/3 21/14 26/4 27/20 27/23 29/4 31/7 31/12 36/22 40/19 40/19 66/11 71/11 71/14 72/3 74/5 79/23
**salient [1]** 49/15
**salt [1]** 75/25
**same [17]** 9/20 11/25 15/20 15/21 19/20 20/24 22/21 26/15 38/14 48/21 52/11 55/21 55/21 55/24 56/16 73/1 73/9
**sanction [1]** 41/18
**sanctions [4]** 13/15 13/21 14/25 41/8
**sand [2]** 14/10 20/11
**saw [2]** 14/12 30/2
**say [32]** 4/23 5/17 6/24 12/15 18/16 25/10 28/16 30/10 35/9 35/13 37/13 37/14 40/3 40/7 44/21 47/7 50/8 50/22 51/24 53/6 58/10 59/11 63/21 64/15 67/2 67/15 67/16 72/5 74/3 74/20 75/22 76/8
**saying [8]** 10/4 21/5 44/12 53/9 54/2 58/5 69/15 81/1
**says [25]** 3/9 6/15 7/23 12/16 18/12 18/21 25/14 27/19 31/17 32/25 34/11 34/12 34/16 35/21 37/9 39/11 39/17 39/20 53/23 68/25 69/22 70/24 70/25 72/25 73/18
**scale [1]** 73/15
**scary [1]** 40/20
**scenario [1]** 73/22
**schedule [1]** 80/25
**scheme [5]** 8/6 12/23 13/2 19/16 73/15
**science [1]** 36/20
**screens [1]** 3/16
**screenshot [2]** 72/12 72/13
**scrutiny [2]** 13/1 22/5
**seated [1]** 3/5
**second [4]** 25/9 43/12 49/20 54/10
**secondary [1]** 31/16
**secure [1]** 40/22
**security [2]** 40/14 41/1
**see [14]** 3/8 3/8 3/9 3/13 26/19 30/2 36/12 38/1 39/1 39/8 40/9 72/13 77/8 81/11
**seeing [1]** 42/14
**seek [1]** 32/4
**seeking [3]** 13/14 36/6 58/1
**seem [1]** 59/1
**seemingly [1]** 58/15
**seems [4]** 39/18 58/17 59/1 78/7
**seen [12]** 7/22 17/19 18/1 18/2 19/5 21/1 21/23 31/2 33/4 37/20 37/22 77/16
**sell [1]** 51/2
**sells [2]** 72/9 72/10
**send [2]** 28/7 74/1
**sending [1]** 68/11
**sense [9]** 9/13 9/21 18/5 18/17 35/8 41/20 48/19 64/23 72/8
**sent [6]** 21/24 30/13 50/2 50/3 72/4 72/6
**sentence [1]** 37/9
**sentences [1]** 46/16
**sentiment [1]** 49/15
**separate [2]** 23/22 23/22
**serial [2]** 29/9 42/16
**serious [4]** 13/23 20/7 32/15 79/7
**serve [5]** 7/16 22/20 28/20 70/10 76/13
**served [5]** 12/24 13/9 15/10 15/11 71/10
**service [1]** 19/9
**SERVICES [4]** 1/9 4/1 4/14 83/3
**set [7]** 3/6 3/7 3/25 22/16 70/11 79/14 81/12
**setting [1]** 39/22
**settle [10]** 6/16 31/5 32/20 33/19 35/25 37/16 58/12 58/13 64/24 70/19
**settled [5]** 47/25 47/25 61/15 67/24 78/3
**settlement [32]** 6/20 6/24 7/18 7/25 10/9 32/1 32/2 33/12 33/13 33/14 36/19 36/24 37/11 37/18 40/2 40/7 40/8 45/7 46/2 47/6 59/18 62/14 64/17 64/21 65/10 66/8 67/1 68/6 68/11 71/1 78/5 78/7
**settlements [3]** 19/17 33/6 81/18
**settling [3]** 58/14 64/7 81/20
**seven [4]** 12/8 21/18 38/8 47/11
**several [2]** 15/9 26/21
**shall [1]** 35/19
**share [6]** 30/11 30/13 46/7 57/3 57/4 61/3
**sharing [2]** 47/16 54/12
**she [3]** 25/18 25/23 26/4
**shift [2]** 7/8 8/3
**shifting [7]** 7/24 31/24 36/21 37/3 37/3 37/5 70/7
**shoes [1]** 6/8
**shortly [1]** 31/3
**should [13]** 13/5 22/9 27/20 39/20 41/3 41/5 41/7 42/3 46/20 60/22 61/4 61/4 75/24
**shouldn't [1]** 70/17
**show [3]** 49/21 51/18 64/22
**shown [2]** 15/12 56/6
**shows [9]** 6/5 20/6 22/6 23/8 28/23 34/4 39/14 49/23 65/6
**shut [1]** 29/10
**sic [1]** 60/22
**side [3]** 12/21 22/24 43/24
**sides [1]** 65/20
**sidestep [1]** 28/15
**sign [4]** 16/25 18/3 31/6 38/4
**signature [5]** 38/1 83/11 83/12 83/12 83/16
**signed [9]** 10/18 29/18 33/9 34/8 37/24 38/2 46/15 69/3 83/12
**significance [1]** 33/22
**significant [4]** 23/25 31/1 40/14 77/22
**signing [2]** 46/2 83/8
**signs [2]** 16/21 19/10
**silence [1]** 11/4
**similar [5]** 13/22 32/19 35/18 68/7 68/7
**similarly [1]** 1/6
**simple [2]** 43/2 46/2
**simplifying [1]** 44/16
**since [2]** 29/22 69/9
**single [7]** 18/8 36/23 37/24 75/18 75/20 75/21 76/18
**single-plaintiff [1]** 36/23
**sir [1]** 45/21
**sit [4]** 23/15 38/12 57/1 75/22
**sitting [2]** 25/4 42/5
**situated [1]** 1/6
**situation [2]** 24/13 39/2
**six [1]** 38/8
**skeletons [1]** 23/19
**skip [1]** 16/6
**skunk [1]** 30/7
**Slevin [8]** 13/22 14/6 14/8 14/17 14/22 15/7 47/4 47/22
**slide [5]** 34/18 36/2 39/9 49/21 72/11
**slides [2]** 42/2 70/21
**slower [1]** 3/22
**small [4]** 7/5 7/6 8/19 36/15
**smart [1]** 21/14
**so [115]**
**social [2]** 57/2 58/7
**solicitor [1]** 10/14
**solve [1]** 22/18
**some [46]** 3/6 6/17 11/14 12/9 13/13 13/15 16/21 18/16 20/25 20/25 22/12 24/2 24/18 26/11 28/12 30/19 31/1 32/12 35/16 37/6 40/10 41/1 42/13 42/16 42/21 48/8 50/15 51/2 51/19 51/19 52/18 53/4 54/12 62/24 68/10 72/8 78/2 78/5 78/11 78/22 79/3 79/16 80/11 81/14 81/16 81/19
**somebody [18]** 16/17 17/4 18/19 18/21 21/5 23/6 24/15 24/15 24/18 44/20 48/10 49/9 49/10 57/16 66/18 67/13 72/17 73/23
**somehow [1]** 13/15
**someone [5]** 27/12 55/24 56/5 56/6 64/12
**something [17]** 3/9 5/18 6/2 13/16 17/25 21/3 21/22 22/4 29/1 29/5 29/8 35/7 37/18 63/18 64/15 65/9 66/20
**sometimes [2]** 42/17 74/13
**somewhat [1]** 48/17
**sooner [1]** 35/8
**sorry [4]** 10/24 53/14 54/18 63/5
**sort [8]** 12/20 29/20 41/1 47/6 59/13 67/19 71/21 79/16
**sought [1]** 48/13
**sounds [1]** 5/11
**source [1]** 12/19
**Southern [1]** 12/13
**speak [4]** 9/6 66/7 66/9 75/10
**speaking [1]** 3/22
**speaks [1]** 77/5
**specific [5]** 18/2 24/19 46/21 50/25 57/7
**specifically [3]** 78/3 78/14 79/3
**speech [9]** 12/18 19/22 21/1 39/3 39/6 39/9 39/17 55/14 73/17
**spend [1]** 7/9
**spending [1]** 18/13
**spent [5]** 8/18 16/9 16/12 20/17 28/12

## S

**spew [1]** 27/11
**spewing [1]** 27/10
**split [1]** 34/18
**splitting [1]** 54/12
**spoke [2]** 20/24 68/12
**stage [2]** 22/14 54/7
**stand [4]** 22/20 24/13 39/18 56/25
**stand-in [1]** 22/20
**standard [2]** 24/11 32/8
**start [7]** 5/11 5/12 16/6 17/19 18/4 42/8 64/4
**started [4]** 27/21 27/24 42/14 68/11
**starting [3]** 4/5 11/1 42/20
**state [2]** 56/21 66/13
**stated [4]** 28/25 52/11 53/2 77/24
**statement [5]** 27/22 32/2 60/24 64/16 75/1
**statements [5]** 28/14 57/2 57/21 57/23 71/17
**states [10]** 1/1 1/18 2/23 20/3 46/17 47/11 47/18 54/16 77/12 77/12
**statistics [1]** 60/4
**status [3]** 33/20 80/25 81/16
**statute [17]** 7/8 7/23 7/24 8/3 26/17 31/24 36/13 36/21 37/3 37/3 43/1 43/18 43/22 43/25 44/1 44/2 70/8
**statutory [18]** 7/8 31/18 31/20 31/21 34/11 34/14 34/25 35/1 35/3 36/14 36/17 37/13 44/4 47/19 53/25 54/14 54/17 72/2
**stay [4]** 12/25 38/12 79/1 81/20
**stayed [3]** 58/1 79/6 81/22
**staying [2]** 80/6 81/17
**steamroll [1]** 7/9
**stenographic [1]** 83/10
**step [1]** 6/8
**steroids [1]** 14/6
**still [8]** 24/7 33/10 34/8 51/20 57/24 58/6 65/21 74/1
**stipulated [4]** 45/7 45/9 62/20 62/21
**stock [1]** 19/9
**stop [7]** 43/11 43/12 50/2 50/4 72/4 72/6 72/14
**story [3]** 9/24 25/6 73/25
**straight [2]** 27/23 64/4
**straightforward [2]** 41/6 43/3
**strain [1]** 38/20
**Street [3]** 2/9 2/13 2/17
**strength [1]** 56/12
**strenuously [1]** 52/24
**stress [1]** 52/23
**strike [1]** 66/12
**stripped [2]** 27/2 70/16
**structure [1]** 72/1
**structured [3]** 31/16 47/12 71/25
**stuff [1]** 26/19
**subgrounds [1]** 22/9
**subject [5]** 5/23 6/9 13/3 15/19 36/24
**submit [1]** 19/4
**submitted [6]** 23/3 23/5 24/1 24/2 24/23 56/7
**submitting [3]** 23/11 52/25 54/8
**subpoena [7]** 10/15 10/16 15/19 15/20 79/11 81/6 81/15
**subpoenaed [3]** 10/10 12/12 75/13
**substantial [2]** 27/6 72/16
**substantially [2]** 35/18 38/6
**such [7]** 16/15 20/14 41/21 43/6 43/23 48/9 52/15
**sue [2]** 32/20 58/6
**sued [1]** 23/10
**sues [1]** 19/23
**suffered [1]** 55/20
**suing [2]** 23/12 54/3
**Suite [4]** 2/5 2/9 2/13 2/17
**summarize [1]** 31/4
**summary [1]** 26/23
**summer [1]** 5/5
**super [1]** 67/1
**supersede [1]** 46/20
**supervision [1]** 6/9
**supplemental [1]** 15/23
**supplying [2]** 7/17 10/11
**support [2]** 65/4 65/5
**supported [1]** 45/3
**suppose [4]** 9/12 13/12 28/6 63/17
**supposedly [3]** 10/8 24/9 29/17
**Supreme [3]** 36/22 37/5 77/12
**sure [18]** 3/15 3/21 5/14 9/3 10/3 10/23 11/16 13/17 14/25 22/1 28/9 30/6 39/4 42/7 43/13 55/4 63/3 65/19
**surreply [3]** 29/24 60/5 65/4
**surround [1]** 11/5
**suspicious [1]** 53/6
**switch [1]** 11/9
**sworn [1]** 59/22
**syndrome [1]** 42/19
**system [2]** 53/8 70/11

## T

**tactical [2]** 72/9 72/9
**take [22]** 17/1 18/12 24/3 27/21 35/6 36/17 37/14 40/22 44/13 46/8 53/22 54/20 54/22 54/25 55/1 61/10 68/13 70/2 71/5 75/24 79/19 79/22
**taken [2]** 55/5 83/9
**takes [1]** 35/7
**taking [2]** 8/14 42/22
**talk [6]** 6/22 26/21 27/15 36/8 46/3 50/12
**talked [9]** 4/24 6/7 23/4 24/11 32/7 32/22 35/11 66/5 69/20
**talking [6]** 12/16 17/24 25/20 32/13 62/25 63/9
**targeted [1]** 15/10
**taxpayers [1]** 8/20
**TCPA [29]** 7/4 12/2 12/5 12/6 16/16 17/1 17/7 19/2 21/24 25/19 25/24 26/11 26/13 29/6 33/2 33/25 36/12 36/21 42/24 48/15 49/18 52/2 60/7 60/8 60/15 75/12 77/25 78/13 78/17
**teaches [1]** 8/8
**team [1]** 10/14
**telephone [8]** 48/16 48/18 48/23 49/2 49/8 51/15 53/24 56/1
**tell [11]** 10/17 11/6 16/5 20/6 24/5 30/23 44/10 45/6 55/9 72/6 75/7
**telling [3]** 9/23 11/16 78/8
**ten [1]** 49/17
**tens [1]** 8/17
**Terepka [5]** 2/8 2/12 2/16 4/12 4/16
**term [3]** 36/10 36/10 68/5
**terminate [1]** 17/3
**terminates [1]** 33/17
**termination [4]** 17/2 34/4 35/11 69/12
**terms [8]** 7/20 47/12 47/24 54/24 61/18 64/25 69/15 81/21
**terrible [1]** 29/8
**terrorem [1]** 71/8
**terrorist [1]** 6/25
**tertiary [1]** 12/20
**test [2]** 25/15 57/11
**testified [2]** 29/16 59/22
**tethered [1]** 68/8
**text [5]** 19/8 19/11 50/3 72/12 76/8
**textbook [1]** 22/2
**texted [2]** 43/8 43/11
**texts [1]** 43/2
**than [26]** 3/22 7/9 7/24 7/25 9/23 12/22 21/9 29/3 29/9 31/2 31/21 35/2 37/3 38/7 40/4 43/7 47/14 49/8 49/12 49/18 49/19 51/1 54/16 57/21 69/10 77/7
**thank [17]** 4/9 4/18 4/21 4/22 5/14 9/22 11/16 16/3 42/7 55/4 55/11 62/5 63/3 76/11 81/3 81/23 82/1
**Thanks [1]** 81/25
**that [537]**
**that's [71]** 3/11 5/2 6/17 6/22 7/11 9/9 10/5 11/12 12/19 14/3 14/13 14/21 14/21 14/22 15/22 17/12 20/1 20/3 20/17 21/10 22/25 23/20 25/7 25/11 25/16 26/14 26/15 26/20 29/3 29/23 30/22 32/1 32/17 33/9 33/14 36/10 36/10 39/8 40/10 40/20 42/17 42/17 43/4 45/4 46/23 49/9 49/24 52/7 56/2 56/17 56/17 57/1 57/20 60/4 60/16 62/11 62/24 64/18 64/20 65/13 66/19 68/17 69/16 71/3 71/9 74/4 75/4 76/1 76/9 79/4 80/7
**their [32]** 7/14 8/3 9/15 10/7 10/20 12/1 18/4 18/24 22/25 23/17 23/18 23/19 24/9 28/15 31/23 34/5 34/11 35/1 37/19 44/4 45/24 49/6 60/24 67/15 69/21 69/21 70/3 70/12 70/16 71/25 73/25 77/9
**them [42]** 5/11 5/20 10/16 12/4 12/7 12/21 17/5 17/6 20/6 20/9 21/11 21/24 21/25 24/2 24/24 25/7 26/23 26/24 27/1 31/4 33/1 43/11 45/23 46/7 46/8 50/24 51/7 57/17 63/13 66/5 66/9 67/11 67/25 68/17 69/6 69/11 70/2 70/17 74/4 75/18 81/2 81/10
**themselves [8]** 4/5 12/25 35/10 37/2 50/19 66/9 73/20 74/2
**then [33]** 3/11 8/20 11/25 12/1 13/9 13/14 13/15 13/25 14/11 14/11 17/6 19/3 21/25 27/6 31/25 32/18 33/16 34/12 35/3 36/4 39/3 41/14 45/20 47/10 47/18 54/3 61/17 62/22 63/1 67/14 70/16 71/25 81/4
**there [63]** 3/18 6/16 6/17 8/22 11/4 12/7 12/8 13/19 14/20 19/10 25/24 26/10 26/17 26/21 27/6 30/5 31/1 31/25 32/2 32/12 32/20 32/23 37/22 37/23 38/2 38/15 39/3 39/10 40/1 40/14 40/25 45/2 45/15 48/5 49/1 50/15 51/5 51/16 51/17 52/2 54/6 54/7 58/25 62/15 62/17 63/20 64/9 66/11 68/17 68/19 71/14 72/13 72/13 72/16

T


**there... [9]** 75/22 76/16 76/17 76/24 77/6 78/11 78/22 79/21 80/11
**there's [42]** 8/20 8/20 15/5 16/7 17/22 22/12 23/22 24/22 25/14 25/15 27/7 29/8 29/12 31/4 32/18 33/3 35/21 36/23 38/1 38/9 40/23 42/5 42/23 43/14 52/6 53/4 53/19 54/21 58/16 59/3 59/3 63/20 66/20 69/2 70/10 76/4 76/23 76/24 76/25 77/4 77/6 78/8
**these [75]** 6/18 6/19 7/4 10/11 10/13 12/3 12/5 14/11 15/13 16/13 17/16 18/3 18/16 18/20 19/8 19/20 21/5 23/11 23/19 24/1 25/2 28/19 29/15 29/18 30/19 31/14 32/7 33/11 35/16 36/10 37/20 40/10 42/11 42/14 42/17 43/5 43/6 43/14 43/24 44/3 44/6 45/25 46/2 46/2 46/6 47/24 49/2 49/2 49/4 49/6 50/9 50/17 51/3 53/2 53/11 59/15 60/20 63/4 63/5 67/3 67/11 67/16 67/21 67/25 68/10 68/15 68/19 69/14 70/19 74/12 75/2 78/3 79/7 81/14 81/17
**they [138]**
**they'll [1]** 81/8
**they're [22]** 7/13 8/10 8/25 10/5 17/20 17/21 18/18 25/1 26/25 31/15 39/21 46/3 46/4 47/25 55/19 58/14 67/12 67/25 70/1 70/20 79/7 79/15
**they've [6]** 8/2 17/5 36/8 56/5 64/7 73/24
**thing [5]** 12/15 21/19 25/10 69/24 76/6
**things [10]** 10/1 12/17 21/5 44/16 46/2 50/22 51/15 64/23 66/3 68/20
**think [54]** 3/7 5/3 5/9 9/16 9/22 13/17 13/19 13/24 22/6 22/16 23/13 25/23 27/7 29/22 30/15 30/16 30/17 37/7 38/25 39/24 41/6 41/6 41/19 42/19 43/25 50/7 50/9 50/20 50/23 51/10 51/20 52/15 53/12 55/12 59/18 60/23 61/1 64/3 65/1 65/20 74/21 76/14 77/3 77/4 77/6 77/16 77/22 77/23 78/5 78/10 78/22 80/18 81/7 81/14
**thinking [3]** 28/12 44/11 48/10
**third [4]** 2/24 30/13 43/13 78/20
**third-party [1]** 78/20
**third-year [1]** 30/13
**this [170]**
**those [27]** 6/2 7/21 9/20 11/13 18/6 22/11 22/13 41/2 50/7 51/18 51/19 51/20 57/21 57/23 59/6 60/7 60/15 61/25 64/23 65/6 67/23 70/4 71/17 74/8 79/1 79/11 81/19
**though [6]** 3/13 15/8 33/7 38/13 67/6 81/18
**thought [6]** 5/8 19/12 21/10 54/25 67/5 80/7
**thoughts [2]** 9/9 54/25
**thousand [2]** 38/19 49/9
**thousands [6]** 10/11 16/12 17/4 35/15 38/10 74/1
**threat [2]** 45/1 71/8
**threaten [1]** 27/22
**threatened [1]** 27/19
**threatening [1]** 77/24
**threats [4]** 27/6 27/16 33/24 40/16
**three [5]** 22/8 24/12 25/13 46/16 46/17
**thriving [1]** 43/6
**throttle [1]** 46/4
**through [9]** 17/13 22/25 25/3 26/23 26/24 38/25 42/2 45/1 73/11
**Tim [1]** 4/19
**time [23]** 3/6 3/25 8/6 10/2 11/22 15/20 18/6 18/12 19/20 28/12 31/20 33/21 34/2 40/9 41/20 49/18 52/14 52/14 70/2 76/5 78/10 79/2 81/24
**timeout [1]** 10/22
**times [5]** 14/6 18/10 19/22 38/7 38/8
**timing [2]** 11/9 13/10
**TIMOTHY [1]** 2/20
**today [8]** 3/20 6/7 11/2 57/3 60/17 68/19 70/22 79/23
**today's [1]** 66/21
**together [2]** 16/11 16/11
**token [1]** 26/15
**told [8]** 10/16 14/10 20/9 20/10 21/11 29/7 34/3 74/4
**too [9]** 5/4 5/20 9/5 15/15 18/3 25/8 30/10 30/25 38/10
**took [2]** 40/9 55/8
**top [2]** 51/7 69/23
**totality [4]** 71/21 71/23 76/22 76/23
**track [1]** 43/14
**tracks [1]** 60/8
**trades [1]** 16/21
**transcript [3]** 1/16 83/9 83/11
**transfer [1]** 79/19
**transferred [3]** 11/12 79/12 81/6
**transplant [2]** 5/23 5/24
**travel [1]** 5/5
**treatment [1]** 67/19
**trial [1]** 61/19
**tricking [1]** 54/2
**tried [5]** 14/14 21/10 27/16 67/22 69/24
**troll [1]** 42/16
**true [7]** 26/14 67/20 67/24 72/6 72/20 72/25 83/9
**trust [2]** 8/17 65/7
**trusted [3]** 28/20 32/10 64/13
**try [6]** 6/2 18/14 24/4 24/6 55/10 80/21
**trying [9]** 19/1 19/2 22/18 24/15 25/8 42/24 42/25 51/2 66/2
**turn [4]** 16/5 18/4 51/10 78/19
**turning [2]** 57/7 80/13
**turns [1]** 57/15
**two [20]** 13/19 23/2 25/19 25/25 28/13 33/11 37/20 41/11 46/6 47/7 49/15 51/1 52/22 53/19 55/15 59/6 60/7 63/10 71/14 79/18
**two-fold [1]** 28/13
**type [8]** 7/17 32/20 39/6 56/18 65/14 66/4 74/12 74/22
**typed [2]** 56/1 56/14
**types [4]** 6/6 7/4 23/19 52/2
**typical [6]** 23/2 24/12 29/21 60/17 60/20 67/8
**typicality [14]** 22/10 22/13 22/17 22/17 23/1 23/14 23/20 23/24 25/8 51/23 55/17 64/22 72/22 76/24


U


**U.S [2]** 10/13 48/4
**ultimately [2]** 61/5 61/21
**umbrage [1]** 71/5
**unclear [1]** 81/16
**under [31]** 7/8 8/3 8/4 10/7 10/19 12/25 14/7 14/9 14/14 17/6 20/9 24/11 24/12 31/23 32/1 36/21 44/21 44/22 49/17 55/16 56/18 57/14 69/5 69/11 70/7 73/25 76/22 77/12 77/17 77/25 78/4
**underground [2]** 21/22 68/10
**underlying [1]** 18/17
**understand [5]** 21/4 42/15 53/16 71/18 74/24
**understanding [2]** 11/7 66/8
**understands [3]** 46/18 46/19 47/10
**understatement [2]** 50/11 77/15
**undisputed [1]** 50/1
**unethical [2]** 54/11 71/7
**uniform [1]** 24/19
**unilateral [1]** 38/12
**unilaterally [1]** 59/19
**unique [7]** 22/22 23/11 25/2 48/17 48/19 48/19 56/18
**UNITED [6]** 1/1 1/18 2/23 20/3 77/12 77/12
**United States [2]** 77/12 77/12
**universe [1]** 73/10
**unless [6]** 24/20 42/3 58/20 64/3 75/25 79/2
**unlike [1]** 7/22
**unrelated [1]** 55/25
**unsolicited [1]** 19/8
**until [4]** 37/16 41/13 63/7 79/6
**unusual [2]** 28/6 55/23
**unwanted [1]** 43/2
**unwitting [1]** 43/19
**up [30]** 3/6 3/7 3/15 3/21 8/14 14/24 16/21 19/10 25/4 28/5 30/16 34/11 35/24 44/11 44/13 44/20 45/19 53/21 54/25 55/9 57/22 58/8 64/11 65/12 65/17 66/17 70/11 74/19 77/9 79/19
**upon [2]** 32/6 32/6
**us [22]** 9/23 10/17 10/17 11/16 11/17 13/8 14/10 20/10 20/23 21/25 34/3 34/15 37/19 41/7 56/25 63/11 72/6 72/6 74/9 75/16 80/8 80/22
**use [7]** 8/13 26/5 26/5 50/16 51/21 52/2 71/7
**used [9]** 3/22 36/8 36/10 38/18 51/2 51/16 52/14 72/1 73/15
**uses [5]** 8/13 25/12 31/17 34/13 52/11
**using [6]** 12/18 31/23 49/11 51/4 73/20 74/10
**utility [1]** 49/3


V


**various [1]** 53/21
**verbatim [1]** 71/9
**Vergeer [2]** 2/20 4/20
**verify [1]** 56/13
**versus [6]** 4/1 26/5 26/5 50/14 50/14 50/16
**very [17]** 13/8 18/25 23/25 29/5 29/11 36/13 36/24 50/25 57/3 57/7 60/3 60/3 64/15 73/19 74/11 79/7 81/24
**via [1]** 81/15
**victims [2]** 13/2 73/22
**video [2]** 4/24 81/15

## V


**view [11]** 12/20 13/5 14/5 14/23 17/19 41/20 60/19 60/19 61/4 65/2 71/24
**views [3]** 57/9 57/25 77/19
**vigorously [1]** 32/14
**vindicate [1]** 27/10
**violates [2]** 31/8 73/14
**violation [1]** 44/5
**violations [1]** 33/2
**violence [1]** 19/22
**violent [6]** 12/18 19/21 27/6 27/16 28/13 28/15
**vitriol [1]** 40/19
**voice [1]** 9/11
**voices [1]** 3/21
**volume [1]** 66/24
**voluntary [2]** 4/3 18/11
**VPN [1]** 18/25


## W


**wait [2]** 41/21 80/8
**waiting [1]** 54/21
**waive [1]** 37/9
**want [49]** 5/17 11/22 12/22 15/3 15/9 16/6 18/21 21/14 28/4 29/5 30/8 30/8 30/9 30/23 35/13 37/14 39/8 40/16 40/21 41/24 42/3 42/4 43/5 44/14 49/15 53/2 53/6 53/9 53/10 54/22 55/9 55/12 55/25 56/24 57/2 59/16 64/15 68/13 68/20 68/24 70/21 74/11 74/25 76/3 76/4 76/16 80/15 80/16 81/13
**wanted [5]** 36/16 74/9 74/10 76/9 80/8
**wanting [1]** 80/13
**wants [11]** 17/6 25/5 27/11 27/24 41/11 43/10 43/12 44/6 50/9 58/7 73/18
**was [82]** 4/23 6/23 7/14 10/4 10/18 10/19 11/19 11/20 13/12 13/21 13/24 13/25 13/25 14/2 14/2 14/3 15/7 15/23 19/9 19/10 19/12 21/7 21/13 21/20 21/20 23/10 24/14 24/15 26/1 26/18 31/9 32/23 34/8 36/13 36/19 37/24 38/23 39/6 39/13 39/17 39/18 40/4 40/21 40/25 41/4 42/24 44/8 45/6 45/8 45/9 45/10 45/15 46/21 47/16 48/23 48/25 49/1 51/4 51/7 54/3 56/14 57/24 59/11 59/13 59/25 62/19 62/22 62/22 65/17 67/18 68/7 68/17 69/4 69/4 73/16 75/1 75/2 75/3 75/11 76/9 77/8 81/6
**wasn't [7]** 5/4 11/6 32/5 38/15 40/24 68/6 70/11
**WATSTEIN [10]** 2/8 2/8 2/12 2/16 4/12 4/12 4/16 40/24 59/13 66/19
**way [24]** 7/24 9/20 15/17 16/10 20/3 23/13 28/25 31/15 35/15 38/18 40/23 41/19 41/23 43/23 49/1 56/23 58/20 59/15 67/23 68/8 70/9 71/24 71/25 77/9
**ways [3]** 44/16 52/18 73/10
**we [217]**
**we'd [1]** 21/1
**we'll [14]** 10/1 12/17 16/22 27/15 31/2 36/1 55/6 63/14 63/22 64/8 74/5 76/20 79/20 80/20
**we're [23]** 3/7 3/22 5/19 6/4 6/7 9/14 11/14 15/17 18/10 18/10 21/1 21/14 21/17 26/8 33/24 38/14 54/5 61/5 61/17 69/15 74/20 81/5 81/13
**we've [27]** 6/1 7/20 7/22 9/17 12/24 13/9 14/12 15/10 15/12 16/9 18/2 18/6 19/13 27/5 29/5 34/3 37/15 37/22 57/5 59/22 59/23 59/24 60/4 61/13 61/15 66/5 68/7
**weather's [1]** 5/6
**web [1]** 48/12
**website [1]** 51/6
**Wednesday [1]** 3/1
**weeks [2]** 76/21 79/18
**welcome [1]** 30/8
**well [39]** 3/9 9/12 18/9 18/16 19/3 20/19 21/17 22/5 25/6 26/13 27/19 30/4 32/3 32/5 35/6 35/21 37/14 38/11 39/13 45/19 45/21 46/5 46/12 48/4 49/10 50/18 53/13 58/24 62/24 66/3 67/5 68/22 69/2 74/5 74/7 74/8 74/20 75/1 81/24
**went [4]** 21/22 37/23 43/8 68/10
**were [39]** 3/3 5/22 5/23 8/14 9/18 12/3 12/4 12/7 12/8 12/8 13/3 14/10 15/20 15/21 16/10 20/10 20/20 28/3 32/20 33/7 37/22 40/3 40/11 40/14 42/25 47/17 49/3 50/25 50/25 51/14 53/10 54/12 54/13 60/7 63/7 63/15 70/4 75/11 75/17
**Weresch [2]** 2/23 83/15
**West [9]** 32/18 38/23 47/15 47/21 54/1 54/10 73/8 73/10 73/13
**West's [1]** 54/14
**what [96]**
**what's [3]** 29/14 29/22 77/4
**whatever [5]** 27/11 60/11 61/21 61/22 71/10
**whatnot [1]** 17/22
**when [26]** 10/10 14/13 18/16 19/11 20/24 21/10 25/1 27/23 32/15 36/13 38/15 42/13 42/20 43/17 44/21 48/6 48/6 48/9 51/10 58/10 59/11 64/23 68/15 74/4 77/3 81/5
**where [15]** 7/23 9/25 12/3 19/6 31/19 40/25 47/16 52/2 54/12 58/12 64/5 64/18 75/19 79/10 80/23
**Whereupon [1]** 3/3
**whether [31]** 3/8 9/9 9/18 14/19 19/1 19/1 25/15 32/9 35/25 42/22 51/12 51/16 51/17 51/21 55/18 55/19 55/20 56/21 57/15 58/17 58/18 60/14 60/17 61/2 67/2 71/15 71/16 72/25 76/12 77/20 77/20
**which [33]** 22/1 26/8 27/5 29/20 33/10 33/18 36/21 40/19 41/5 42/11 44/18 46/14 46/21 46/24 46/25 47/1 47/1 47/14 48/13 48/25 50/25 51/9 51/15 51/21 55/14 59/19 59/23 60/8 62/10 64/5 64/25 65/3 69/14
**while [1]** 61/6
**Whispered [1]** 3/17
**white [2]** 10/14 27/25
**white-collar [1]** 10/14
**who [41]** 5/22 5/23 6/16 8/18 9/6 10/17 12/16 16/17 18/21 19/10 19/25 21/5 21/9 22/19 23/18 24/6 24/9 24/15 24/15 24/18 24/23 25/2 27/12 33/9 38/2 39/16 43/5 43/20 44/9 44/20 44/25 49/10 58/6 58/13 64/12 64/13 69/3 75/19 76/17 77/6 77/8
**who's [4]** 27/25 43/14 46/1 53/7
**whole [4]** 15/6 37/9 47/13 70/9
**wholesale [1]** 51/23
**whom [1]** 6/14
**whose [3]** 56/13 62/13 71/5
**why [34]** 5/12 6/7 6/23 7/11 13/8 13/19 15/22 16/15 18/9 22/5 22/9 22/25 23/2 23/20 33/9 38/11 39/8 40/20 41/2 44/1 45/19 55/12 55/13 55/22 57/20 60/4 64/12 65/7 66/23 68/17 70/11 75/4 75/5 75/8
**wide [3]** 35/14 69/12 69/12
**will [37]** 7/7 7/9 7/9 10/16 10/17 10/24 11/1 11/2 11/4 11/5 22/23 27/3 32/16 33/18 37/14 39/5 46/10 47/13 47/19 51/24 54/16 64/2 64/17 65/20 72/4 72/5 74/20 76/18 76/19 76/20 78/18 78/24 79/19 79/20 79/22 79/24 81/20
**Williams [1]** 26/22
**willing [4]** 53/6 53/7 66/12 81/12
**WILSON [108]**
**Wilson's [36]** 6/12 8/8 21/13 21/15 22/13 23/8 23/10 24/7 33/23 34/25 36/3 37/13 38/5 39/17 46/1 47/20 48/8 48/10 48/11 48/18 49/7 55/13 55/14 55/17 55/23 56/7 56/20 57/2 58/7 58/17 59/20 71/15 73/4 75/3 77/19 77/23
**win [1]** 25/17
**window [1]** 18/11
**within [2]** 17/8 62/2
**without [10]** 22/15 25/12 31/5 35/4 36/5 46/1 57/16 58/14 58/15 83/11
**witness [3]** 22/19 23/15 25/4
**witnessed [1]** 68/7
**wittingly [1]** 45/3
**won't [7]** 11/11 29/13 39/5 41/24 66/7 71/19 74/8
**work [3]** 11/10 46/3 80/21
**worked [1]** 16/19
**working [5]** 10/25 11/2 11/11 16/12 46/3
**workings [1]** 17/17
**world [1]** 50/5
**worse [3]** 38/6 39/1 57/21
**worst [1]** 73/22
**worst-case [1]** 73/22
**would [45]** 3/23 11/8 13/1 13/3 13/6 13/15 13/22 14/23 16/17 20/14 20/16 21/11 24/10 25/10 26/8 26/19 28/6 36/15 40/9 40/11 40/12 40/13 40/21 43/7 46/7 49/15 50/11 53/2 56/9 56/20 60/24 61/8 61/21 62/2 62/12 62/13 67/2 67/9 71/1 71/3 73/3 73/6 76/6 77/15 79/4
**would've [2]** 5/3 66/8
**wouldn't [4]** 8/13 28/5 28/8 40/25
**wrap [2]** 54/25 55/9
**wrapped [1]** 65/17
**write [1]** 57/13
**writing [2]** 36/6 47/21
**written [2]** 8/2 79/22
**wrong [15]** 8/25 10/5 24/16 24/23 29/8 39/18 44/7 48/25 49/3 49/5 49/6 51/6 56/8 64/19 73/23

**W**

**wrongdoing [3]** 59/14 75/4 75/23
**wrote [1]** 44/2

**Y**

**Yardley [1]** 2/6
**Yeah [5]** 17/16 25/21 30/9 64/6 81/11
**year [1]** 30/13
**years [2]** 49/17 66/14
**yelled [1]** 21/7
**yes [15]** 45/4 46/9 52/21 53/17 62/9 62/21 63/9 63/12 64/2 65/23 66/2 72/24 74/19 79/13 80/4
**yesterday [3]** 9/5 17/25 41/5
**York [1]** 45/23
**you [178]**
**you'd [1]** 64/4
**You'll [2]** 38/1 63/18
**you're [14]** 6/17 13/14 19/1 25/25 26/13 28/4 28/4 44/16 44/17 58/4 63/9 64/23 74/19 80/10
**you've [3]** 20/7 30/19 81/24
**your [73]** 3/7 3/14 3/21 3/21 4/7 4/11 4/13 5/14 7/1 7/16 8/24 9/9 9/10 10/4 14/16 15/25 18/18 19/9 32/4 34/14 35/13 39/4 40/13 41/2 42/7 43/21 44/14 45/4 45/16 46/5 46/13 48/1 49/14 51/24 52/21 53/5 53/12 55/4 55/11 57/12 59/5 59/16 60/13 60/23 61/12 61/16 62/5 62/9 62/9 62/18 62/21 62/23 63/3 63/9 63/10 65/14 65/23 66/10 67/23 68/4 70/15 73/24 74/21 75/1 75/25 78/7 79/13 80/1 80/6 80/12 81/1 81/9 82/1
**Your Honor [53]** 3/7 3/14 4/7 4/11 4/13 5/14 7/1 8/24 10/4 14/16 19/9 41/2 42/7 43/21 44/14 45/4 45/16 46/5 46/13 48/1 49/14 51/24 52/21 53/12 55/4 55/11 57/12 59/5 59/16 60/13 60/23 61/12 61/16 62/5 62/9 62/9 62/18 62/21 62/23 63/3 63/9 63/10 65/14 65/23 66/10 67/23 73/24 74/21 75/1 75/25 79/13 80/1 82/1
**yourself [1]** 30/22